# E-filing

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name   SULLIVAN, JERRY L.

      (Last)                    (First)              (Initial)

Prisoner Number   C-66878

Institutional Address   SAN QUENTIN STATE PRISON, SAN QUENTIN, CA. 94974

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

CV   08   087   VRW   (PR)

JERRY L. SULLIVAN

Full Name of Petitioner

       vs.

ROBERT L. AYERS JR., Warden.

      Name of Respondent
      (Warden or jailor)

Case No (To be provided by the
clerk of court)

PETITION FOR A WRIT OF HABEAS CORPUS

---

### Read Comments Carefully Before Filling In

#### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

About Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county, or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example: Alameda County Superior Court, Oakland):

| SUPERIOR COURT OF CONTRA COSTA COUNTY | MARTINEZ, CALIFORNIA |
|---|---|
| Court | Location |

(b)    Case number, if known  NO. 26837

(c)    Date and terms of sentence  APRIL 20, 1983 – SEVEN(7) TO LIFE

(d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes **X**   No

Where?  SAN QUENTIN STATE PRISON, SAN QUENTIN, CA. 94974

(Name of Institution)                    (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

PETITIONER'S ABOVE ENTITLED ACTOINS DOES NOT ATTACK THE LEGALITY

OF HIS CONVICTION. HE'S ADMITED THAT HE WAS LEGALLY CONVICTED OF

KIDNAPPING TO COMMIT ROBBERY (COUNTS ONE AND TWO) PC 209(B) PC 187-664
PC 245(A).

3.    Did you have any of the following?

Arraignment: Yes **X**  No __  Preliminary Hearing: Yes **X** No ___ Motion to Suppress: Yes __  No **X**

4.    How did you plead?

Guilty **YES** ___    Not Guilty _____    Nolo Contendere _____

Any other plea (specify): ___ **N/A** _____

5.    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone **X** ___    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes **X** ___  No ___

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes **X** ___    No ___
(b)    Preliminary hearing    Yes **X** ___    No ___
(c)    Time of plea   Yes **X** ___    No ___
(d)    Trial   Yes **X** ___    No ___
(e)    Sentencing    Yes **X** ___    No ___
(f)    Appeal    Yes ___    No **X**
(g)    Other post-conviction proceeding    Yes ___    No **X**

8.    Did you appeal your conviction?   Yes ___  No **X**

(a)    If you did, to what court(s) did you appeal?

| | | | (Year) | (Result) |
|---|---|---|---|---|
| Court of Appeal | Yes ___ | No ___ | | |
| Supreme Court of California | Yes ___ | No ___ | | |
| Any other court | Yes ___ | No ___ | | |

(b)    If you appealed, were the grounds the same as those that you are raising in this petition?    Yes ___  No ___

(c)    Was there an opinion?    Yes ___  No ___

(d)    Did you seek permission to file a late appeal under Rule 31(a)?    Yes ___  No ___

4

If you did, give the name of the court and the result.

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal? Yes ___ No X

**However, I am appealing the denial of parole. See Exhibit "A", Exhibit "E"**

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)   If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.   Name of Court   (SEE ATTACHED PAGES) _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

II.   Name of Court   (SEE ATTACHED PAGES) _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

III.   Name of Court   (SEE ATTACHED PAGES) _____

Type of Proceeding: _____**(SEE ATTACHED PAGES)**_____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

(b)     Is any petition, appeal or other post-conviction proceeding now pending in any

court?     Yes ___ No **X**

**(SEE ATTACHED PAGES)**

(Name and location of court)

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened? Who

made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need

more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent

petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499

U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: _____**(SEE ATTACHED PAGES)**_____

(SEE ATTACHED PAGES)

Supporting Facts: _____

_____

_____

_____

Claim Two: _____

Supporting Facts: _____

_____

_____

_____

Claim Three: _____

Supporting Facts: _____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why: (SEE ATTACHED PAGES)

_____

_____

_____

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

**(SEE ATTACHED PAGES)**

Do you have an attorney for this petition?    Yes __ No X_ **PETITIONER REQUEST'S APPOINTMENT OF COUNSEL.**

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on __3/31/2008__    _Jerry Lee Sullivan_
              Date                    Signature of Petitioner

(rev 5/96)

## CONTENTION

## I.

## THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN IT MADE A DETERMINATION OF UNSUITABILITY WITHOUT "SOME EVIDENCE"

Petitioner Jerry L. Sullivan, (Petitioner) appeared before the Board of Parole Hearings on July 30, 2007, for his 11th (12th hearing over all) and was denied parole for one year. The Board stated the following reasons for their denial:

1. First of all, this offense was carried out in an especially cruel and callous manner.

2. Multiple victims were attacked.

3. This offense was carried out dispassionately and in a (inaudible) manner in that the message included threats of rape and murder to Mrs. Reily and then to Mr. Reily.

4. This offense was carried out in a manner demonstrating callous disregard for human suffering.

5. Public safety was at risk (inaudible) and you had a clear opportunity to cease.

6. The motive for this crime moreover was very trivial in relation to the offense.

(Exhibit "A" pp. 63-64)

The Board further mad several favorable finding:

1. No criminal history.

2. Institutional behavior is commendable.

3. You have continued your AA participation.

4. You have an outstanding record. You have zero 115s.

5. Psychological assessment is supportive of parole.

6. Viable parole plans.

(Exhibit "A" pp. 65-67)

1

The Board's decisions are governed by the California
Penal Code § 3041 (a) states that the Board "shall normally set
a parole release date" when a prisoner approaches her minimum
parole eligibility released date. However, the California
Supreme Court has held that the Board must first consider,
under section 3041 (b), whether a prisoner's commitment offense
and or past offenses require further delay in setting a release
date because of public safety concerns. The over-arching factor
regarding parole sis whether a prisoner still poses a threat to
public safety. (In re Barker, 59 Cal. Rptr.3d 746, 760).

The California Supreme Court has also established a
standard of review in parole denial cases, a "some evidence"
test, based on the due process requirements of the California
Constitution. The Ninth Circuit has constructed a standard of
review in such cases based on the due process clause of the
U.S. Constitution. The Federal standard applied by district
courts in the Ninth Circuit also use the "some evidence"
language -requiring affrimance of the decision denying parole.
The Ninth Circuit further adds that the Board's decision must
have "some indicia of reliability." McQuillion v. Duncan, 306
F.3d 895, 904 (9th Cir. 2002).

In the instant action the Board relied solely on
commitment offense to deny Petitioner parole. The commitment
offense can be relied on to deny parole if there is "some
evidence" in the record that Petitioner poses a threat to
public safety. The Supreme Court in In re Rosenkrantz, 29
Cal.App.4th explained that denial of parole could be based upon
the nature of the commitment offense. The Rosenkrantz Court

cautioned that "a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation--for example where no circumstances of the offense could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the .." [Citation.] 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings could destroy the proportionality contemplated by Penal Code Section 3041, subdivision (a), and also by the murder statute, which provide distinct terms of life without possibility of parole, 25 years-to-life, and 15 years-to- life for various degrees and kinds of murder.) Pen.Code, § 190 et. seq.) [] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.'" In re Rosenkrantz, (2002) 29 Cal.App.4th 616, 683; 128 Cal.Rptr.2d 104. 59 P.3d 174 (italics added).

The California Supreme Court in In re Dannenberg, (2005) 34 Cal.App.4th 1061, 1095, has provided additional explanation as to 2when a commitment offense alone is sufficient to deny parole. Specifically, the Dannenberg court explained when a

commitment offense is "particularly egregious." The Dannenberg
court stated: "Our discussion [in Rosenkrantz], including our
use of the phrase 'particularly egregious' conveyed only that
the violence vicious or viciousness of the inmate;'s crime must
be more than the minimally necessary to convict him of the
offense for which he is confined." In the instant action was
convicted of kidnapping and attempted murder, for which
Petitioner was sentenced to seven year plus life with the
possibility of parole.

　　　As stated above, the overarching consideration is public
safety. The test is not whether there is some evidence that
supports the Board's reasons's for denying parole, but whether
there is some evidence that Petitioner's release poses a threat
to public safety. Petitioner has consistently been found not to
pose a threat to public safety. The Board pointed out that the
professional psychologist determined that Petitioner did not
pose a threat to public safety. The Board than found that
Petitioner has sufficiently programmed and had viable parole
plans.

　　　By the Board's own statements, Petitioner has been a
model prisoner for many years. He has maintained family ties,
with his mother and siblings throughout his incarceration. He
has been repeatedly evaluated as posing a low risk of violence
by correctional counselors and prison  psychologists. His
offenses while numerous involved no actual injury to anyone.
Yet the Board continues to arbitrarily and capriciously find
that Petitioner's release would pose an unreasonable risk to
society. This finding is unsupported by any evidence in the

4

record, thus violates Petitioner's due process rights. (In re Rosenkrantz, supra, at p. 658; Inmates of Nebraska Penal (1979) 442 U.S. 1; Board of Pardons v. Allen (1987) 482 U.S. 369.)

Despite the Boards' attempts to characterize Petitioner's crime as especially heinous atrocious or cruel, it is quite obvious that they were not. Not a single person was ever physically injured in Petitioner's offense. Petitioner has repeatedly attempted to explain to the Board that the gun did work prior to committing this crime. So there never was an intent to hurt anyone. There is no evidence in the record to support these findings.

The Board further stated that the crime was trivial in relation to the offense. The Board used this nonsensical basis on which to find a prisoner poses an unreasonable risk if released. The motive for personal gain is the motive for virtually all theft offenses, such as robbery, burglary and kidnap for robbery. Once again, the Board attempted to force the unremarkable facts of the this case into the mold of a factor recognized as a proper basis for finding of parole unsuitability. The Cal.Regs., § 2402 subdivision (c)(1)(E), states the fact that "The motive for a crime was inexplicable or very trivial in relation to the offense" should be considered in determining if an offense is especially heinous. The Board's approach would label every theft offense heinous and indicative of unreasonable risk, because the motive of personal gain is "very trivial."

This type of construction of the factor has been condemned in the case law. "The reference in Board regulations

5

to motives that are 'very trivial in relationship to the
offense" therefore requires comparisons; to fit the regulatory
description, the motive must be materially less significant (or
more 'trivial') than those which conventionally drive people to
commit the offense in question, and therefore more indicative
of a risk of danger to society if prisoner is released than is
ordinarily presented." (In re Scott (2004) 119 Cal.App.4th 871,
893.)

       The motive of personal gain is not a very trivial motive
for crimes of theft, but rather the single motive which
conventionally drives people to commit such offense. The Board's
finding to the contrary appears to be nothing more than a
"makeweight rationalization" for what seems to be a
"predetermined conclusion in search of justification." (In re
Caswell (2001) 92 Cal.App.4th 10 7, 1030.)

       The Board also tried to justify its finding of
especially heinous offenses by saying that multiple victims
were attacked. (Cal. Regs., § 2402 (c)(1).) But the regulations
says that an offense may be heinous if multiple victims were
"attacked, injured or killed." The two victims in the kidnap
for robbery were not attacked, injured or killed. An attack
implies some attempt to use force on the victims whether or not
the attempt was successful. While threats to use force were
employed, an element of the offenses, there is no evidence of
an attempt to use force or of any physical injury whatsoever.
No injury was inflicted, nor was there any "attack which
attempted to inflict injury.

       The Board's boilerplate reference to the allegedly

6

dispassionate and calculated manner of the crime is an attempt
to justify its finding by reference to the regulations which
says "the offense was carried out in a dispassionate and
calculated manner, such as an execution-style murder." (Cal.
Regs., § 2402, subd. (c)(1).) This factor refers to the calm
and coldblooded infliction of serious injury or death upon
another human being. With reference to Petitioner's offense,
the Board's finding that the offense was calculated and with
purposeful intent to get money is nothing more than a recitation
of the elements of the offense. Kidnap for robbery requires a
finding that the kidnap was done with the intent to rob, that
is to acquire property from the person or presence of the
victim by means of force and fear (People v. Tribble (1971) 4
Cal.3d 826, 831-832.) The kidnap must be calculated to advance
the robbery, or no life term offense would have been committed.
No rational basis for treating these offenses as especially
heinous can be derived from the presence of mental states
required for conviction. (In re Dannenberg, supra, at 1095;
Rosenkrantz, supra, at p. 683.)

        Fairly considered Petitioner's offense cannot be viewed
as particularly heinous. Petitioner's behavior during the crime
seemed calculated to avoid the use of violence. Specifically,
Petitioner's attempt to rob the victims with an inoperable
weapon shows that no harm was ever intended. (See Exhibit "B"
p. 14).

        Having established that the Board relied solely on the
(immutable factor) commitment offense to deny Petitioner
parole. The commitment offense fails in gravity compared to

7

other kidnap cases in which these prisoners were found suitable
for parole.

Petitioner ask this Court to take judicial notice of In
re Procopio Martinez Reyes, Case No. 90372. The Santa Clara
County Superior Court ordered that petitioner back to the Board
after finding that the was not "some evidence" to support the
Board's finding. Reyes was convicted of two kidnappings,
robbery, burglary and a gun enhancement.

Petitioner would ask this Court to also take judicial
notice of another kidnap case, in Mike Yellen v. Diane Butler,
et. al., Case No. CIV S-01-2398 MCE GGH P, ORDER AND FINDINGS
AND RECOMMENDATIONS (Aug. 20 2003). (See Exhibit "C") Yellen
was convicted of two concurrent life sentences and numerous
other charges. The Yellen court found that there was
insufficient evidence to deny that petitioner parole The Yellen
court further found that "More important to the undersigned in
assessing any due process violation is the fact that continuous
reliance on unchanging circumstances transforms an offense for
which California law provides eligibility for parole into a de
facto life imprisonment without the possibility of parole."
(Yellen, surpa, at p.12)

Petitioner would ask this Court to further compare with
other (murder) case.

In In re Elkins, 50 Cal.Rptr.3d 503 (Cal.App. 1 Dist.
2006) that court held that the beating of the victim with a
baseball bat in order to rob him did not constitute a
particularly egregious murder. The appellate court held:

The robbery drew a concurrent determinate term.

8

> Needlessly striking a robbery victim may, of course,
> show an especially heinous, atrocious or cruel robbery,
> but does not necessarily show an especially brutal
> first-degree murder.

(In re Elkins 50, Cal.Rptr.2d at p. 518).

In In re Barker, (2007) 59 Cal.Rptr.3d 746 (Cal.App. 1 Dist. 2007) Barker was convicted of two counts of second-degree murder and one count of first-degree murder for his role in the killing of his friends' parents and grandfather. His friend shot his parents and Barker shot the grandfather, after first hitting him several times on the head with a chisel. Barker had been incarcerated for 29 years.

In In re Lawrence, 59 Cal.Rptr.3d 537 (Cal.App.2d Dist. 2007), Lawrence was convicted of first-degree murder after shooting her lover's wife five times, than stabbing her multiple times with a potato peeler. The appellate court found that the evidence did not support the parole denial finding Lawrence's offense was 'particularly egregious.' (Although Lawrence is under review, the Supreme Court rejected the appeal to stay the release) Lawrence had been incarcerated for 24 years. Petitioner's commitment offense does not automatically render him unsuitable for parole, especially parole should not have been denied parole for the twelfth time.

The Board's reliance on the commitment offence to deny parole violates Petitioner's due process rights. The Board may rely on the commitment offense alone to deny parole, but the proposition must be understood. The commitment offense is a factor indicative of unsuitability Petitioner cannot change. In a recent decision the Board recognized that the "[e]vents and

circumstances surrounding petitioner's crime are unchanging...
(I want to explain to you that no matter what happens in your
lifetime, the crime is never going to change. **You understand
that... That's always going to be there, period... [T]he crime
is never going to change...**)" Sanchez v. Kane,444 F.,Supp.2d
1049, 1062.

Reliance on such an immutable factor "without regard to
or consideration of subsequent circumstances" may be unfair.
(In re Smith (2003) 114 Cal.App.4th 343, 372, 7 Cal.Rptr.3d
655), and "runs contrary to the rehabilitative goals espoused
by the prison system and could result i a due process
violation." In re Scott, 133 Cal.App.4th 573, 595, (quoting
Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910  917). The Scott,
court further stated; "The commitment offense can negate
suitability only if circumstances of the crime reliably
established by the evidence in the record rationally indicate
that the offender will present an unreasonable public safety
risk if released from prison. Yet the predictive value of the
commitment offense may be very questionable after a long period
of time." (Scott, supra, at 595) (quoting Irons v. Warden of
California State Prison--Solano (E.D. Cal. 2005) 358 F.Supp.2d
936, 947, fn.2 )

The Board's reliance solely on the commitment offense at
this point, after 24 years, is no longer "some evidence" that
will rationally support a finding that the public safety
requires that he be found unsuitable for parole. Recently, the
California Court of Appeals Sixth District, in its decision, in
In re Weider, 52 Cal.Rptr.3d 147 (Cal.App. 6th Dist 2006)

10

quoted <u>Weider</u>, stating:

> The court noted that Weider "has served so much
> time that, with custody credits, he is with in the
> matrix for first degree murder.. ⌈I⌉t should be
> self evident that after an inmate has served the
> equivalent of 25 years, whether his actions were
> more than the minimally necessary for a second
> degree conviction. . is no longer the appropriate
> question [The Board's] position, that inmates who
> were only convicted of second degree may forever
> be denied parole based on some modicum of evidence
> that their acts rose to the level of a first, without
> acknowledging that fact that they have already served
> the time for a first, should be seen as so ridiculous
> that simply to state it is to refute it.

In <u>Irons v. Carey</u>, (9th Cir. 2007) 479 F.3d 658 the

Ninth Circuit held that "indefinite detention based solely on

an inmate's commitment offense, regardless of the extent of his

rehabilitation, will at some point violate due process given

the liberty interest that flows from the relevant California

statutes." In <u>Biggs v. Terhune</u>, 334 F.32d 910, 916 (9th

Cir.2003) the Ninth Circuit held that a continued reliance in

the future, on an unchanging factor, the circumstances of

commitment offense and conduct prior to imprisonment, runs

contrary to the rehabilitative goals espoused by the prison

system and could result in a due process violation." The Court

in <u>Rosenkrnatz v. Marshall</u>, 444 F.Supp.2d 1063 (C.D. Cal.2006),

held:

> While relying upon petitioner's crime as a indicator
> of his dangerousness may be reasonable for some
> period of time, in this case, continued reliance on
> such unchanging circumstances--violates due process
> because petitioner's dozen parole suitability
> earings--violates due process because petitioner's
> commitment offense has become such a n unreliable
> predictor of his present and future dangerousness
> that it does not satisfy the 'some evidence'
> standard. After nearly 20 years of rehabilitation,
> the ability to predict a prisoner's future

dangerousness based simply on the circumstances of
his or her crime is nil."

(Rosenkrantz v. Marshall supra, at p. 1084.).

Our Supreme Court has noted that studies by psychiatrist
have erred in predicting certain individuals as potentially
violent, "thus branding as 'dangerous' many persons who are in
reality totally harmless. [Citation]" (People v. Burnick (1975)
14 Cal.3d 306, 327 121 Cal.Rptr. 488, 535 P.2d 352.) A review
of the statistics or recidivism rate of term to life prisoners
who have been granted release is less than one percent.
Petitioner is such a prisoner and therefore should be released.

### CONTENTION

### II.

### THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN IT ARBITRARILY USED REGULATIONS WHICH CONTAIN INTOLERABLE VAGUE CRITERIA FOR DETERMINING UNSUITABILITY FOR PAROLE

Petitioner's parole suitability hearing was an arbitrary
decision because it used intolerable vague criteria to
determine Petitioner's unsuitability. Our courts have
recognized that the state and federal due process requirements
dictate that the Board must apply detailed standards when
determining whether a prisoner is unsuitable for parole on
public safety grounds. (In re Dannenberg, (2005) 34 Cal.4th
1061 at p. 1096, fn. 16). The standards are found in
Cal. Regs., 2402 (c):

> (1). Commitment offense. The prisoner committed the
> offense in an especially heinous, atrocious or
> cruel manner. The factors to consider include:

> (A). Multiple victims were attacked, injured or killed
> in the separate incidents.

12

(B). The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C). The victim was abused, defiled or mutilated during or after the offense.

(D). The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E). The motive for the crime is inexplicable or very trivial in relation to the offense.

The threshold question in a vagueness challenge is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in particular case." Schwartzmiller v. Gardner,752 F.3d 1341, 1345 (9th Cir. 1984). The Board used the following sections of Cal. Regs., § 2402 "Determination of Unsuitability." (1), (A), (B), (D), (E). The Boar d has consistently used all the language cortained in these statutes to deny Petitioner parole at the past eleven parole suitability hearings. The terms "especially heinous, atrocious or cruel" do not render the factor unconstitutionally vague if the crime fits within the criteria and serves as a basis for the finding of unsuitability. The circumstances of the crime must be more aggravated or violent than the minimum necessary to sustain a conviction for that offense. (In re Rosenkrantz, (2002) 29 Cal.4th 616, 682-683.) In such case the commitment offense alone can justify the denial of parole. (In re Dannenberg, supra, at p. 1095.) However, the Board has applied such language i an arbitrary and capricious manner throughout Petitioner's parole hearings, in light of the fact that Petitioner exemplary behavior. Furthermore, Petitioner did not kill or hurt anyone.

13

Petitioner's offense was kidnap, not murder, or manslaughter.

## CONTENTION

## III.

### THE SUPERIOR COURT DECISION WAS AN UNREASONABLE DETERMINATION OF THE FACTS; AND AN UNREASONABLE DETERMINATION OF STATE AND FEDERAL LAW, THEREBY VIOLATING PETITIONER'S DUE PROCESS

On January 9, 2008 Petitioner received a denial of his habeas petition claims by the superior court. Exhibit "D" The superior court decision was an unreasonable determination of state and federal law, thereby violating Petitioner's due process. The superior court stated that the Board used the immutable factor, which is the commitment offense to justify their denial of parole. The superior court then stated:

> However, the nature of the commitment offense is an immutable factor. Reliance on the commitment offense alone to deny parole can be sustained only where all other factors are considered and only if the circumstances of the crime reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released form prison.

(Exhibit "D" p. 4)

The superior court contradicted itself when it stated all the reasons the Board used to deny Petitioner parole, and then state that the Board made the unsuitability conclusion despite the fact that Petitioner fulfilled a number of factors spelled out in the regulations. (Exhibit "D" p. 4) In fact when the record is reviewed, Petitioner has consistently fulfilled all of the Board's recommendations over the past 11 Board hearings.

All of the factors that the superior court stated that the Board used to justify their decision, were factors of the

14

commitment which the superior court just stated Board could not justify denial of parole if no other factors were found, especially if all the other factors spelled out regulations that would favor parole.

Recently, the United States Court of Appeals for the Ninth Circuit held that the very same factors the Board and the superior court upheld in this instant action, were over several years (50) ago and did not support the decision that he still posed a threat to society. (RONALD HAYWARD V. JOHN MARSHALL, Case No. 06-55392 (2008) p. 53). In another recent decision in In re Dannenber, Case No. HO3003 (11/16/07), the Dannenberg Court pointed to In re Jacobson, (2007) 154 Cal.App.4th 849, stating: "Jacobson held  that a parole unsuitability decision must be upheld so long  as some evidence supports a finding that the offense was "especially heinous" wihtout regard to whether there is a nexus between this finding and a conclusion that the prisoner currently poses an unreasonable risk of danger to society if released. We reject this criticism of Scott, Lee, and Elkins. (See In re Dannenberg, supra, at p. 12-13).

Furthermore, if the circumstances of Petitoner's offense and past criminal and social behavior can be used after over 26 years to deny him parole, even though those factors do not provide evidence that Petitioner still poses a threat to public safety, then Petitioner's offense has been turned into, by defacto a life sentence with the possibility, to a life sentence without the possibility of parole.

For the above mentioned reasons this Court should grant

relief prayed for.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner respectfully prays that this Court would:

1. Issue writ of habeas corpus;'

2. Issue an Order to Show Cause;

3. Order an Evidentiary Hearing;

4. Order the Board to immediately set Petitioner a parole date.

5. Order the Board to calculate Petitioner's time and any time over the set release date by the Board pursuant the matice, the good conduct credit should be taken of the parole period;

6. Appoint Counsel;

7. Grant any and all other relief deemed appropriate.


Dated: this $\underline{31}$, day of **March 2008.**

Jerry A. Sullivan
In Pro Se

EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:              )     CDC Number C-66878
                         )
JERRY LEE SULLIVAN        )
_____ )


SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 30, 2007

2:33 P.M


PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Pat Shields, Deputy Commissioner


OTHERS PRESENT:

Jerry Lee Sullivan, Inmate
Pat Fox, Attorney for Inmate
Jack Waddell, Deputy District Attorney
Mr. Gate, Observer
Correctional Officer(s), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum


**ROBERT WEISZ**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**



ii

INDEX

                                                                    Page

Proceedings ............................................... 1

Case Factors ............................................. 13

Pre-Commitment Factors ................................... 13

Post-Commitment Factors .................................. 26

Parole Plans ............................................. 44

Closing Statements ....................................... 52

Recess ................................................... 62

Decision ................................................. 63

Adjournment .............................................. 75

Addendum ................................................. 76

Transcriber Certification ................................ 77

--oOo--

1

1              P R O C E E D I N G S

2          **DEPUTY COMMISSIONER SHIELDS:**  We are on record,

3     Commissioner.

4          **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

5     this is the eleventh Subsequent Parole Consideration

6     Hearing for Jerry Lee Sullivan, CDC No. C-66878.  Today's

7     date is July 30th, 2007, the time 14:33.  We're located at

8     San Quentin State Prison.  This inmate was received May

9     31st of 1983 from Contra Costa County.  The life term

10    began June 1st, 1986, with a minimum eligible parole date

11    of June 1st of 1993.  Charging in Case No. Contra Costa

12    26837.  Counts 1, 2, and --

13         **DEPUTY COMMISSIONER SHIELDS:**  You know, rustling

14    the papers is a problem.  What we'll do is we'll take a

15    pause, and then people can move things around.

16         **ATTORNEY FOX:**  Okay.

17         **DEPUTY COMMISSIONER SHIELDS:**  But go back.  I'm

18    sorry.

19         **PRESIDING COMMISSIONER BRYSON:**  All right.  Do you

20    want to finish getting the papers out there, sir?

21         **INMATE SULLIVAN:**  Sorry.

22         **PRESIDING COMMISSIONER BRYSON:**  Go ahead if you

23    want to.  We understand you didn't plan to do that.  Go

24    ahead if you want to get them out.

25         **DEPUTY COMMISSIONER SHIELDS:**  Yeah.

2

1          **ATTORNEY FOX:**  Okay.  Now, I didn't realize that
2     the --
3          **DEPUTY COMMISSIONER SHIELDS:**  Neither did we.  I
4     think it's just the table's small.
5          **ATTORNEY FOX:**  Okay.
6          **PRESIDING COMMISSIONER BRYSON:**  All right.
7          **DEPUTY COMMISSIONER SHIELDS:**  Okay.
8          **PRESIDING COMMISSIONER BRYSON:**  I'll reiterate the
9     Case number is CC26737, charging in Counts 1, 2, and 5,
10    the controlling offense, Penal Code 209(b), Penal Code
11    664/187, that is Kidnap for Robbery and Attempted Murder.
12    Counts 3 and 4, Penal Code 211, Robbery, with Penal Code
13    12022.5, Using a Weapon concurrent to Count 5.  And Count
14    6, Penal Code 245(a), aggravated assault, concurrent with
15    Count 5, for which the inmate received a term of life
16    plus 7 years.  This hearing is being recorded.  For the
17    purpose of voice identification, each of us will state
18    our first and last name, spelling our last name.  When it
19    is your turn, sir, after you spell your last name, please
20    state your CDC number.  I will start and go to my right.
21    Sandra Bryson, B-R-Y-S-O-N, Commissioner, Board of Parole
22    Hearings.
23         **DEPUTY COMMISSIONER SHIELDS:**  Pat Shields, S-H-E-
24    I-L-D-S, Deputy Commissioner.
25         **DEPUTY DISTRICT ATTORNEY WADDELL:**  My name is Jack

3

 1   Waddell, W-A-D-D-E-L-L, Deputy District Attorney, Contra

 2   Costa County.

 3           PRESIDING COMMISSIONER BRYSON:  Thank you.  Go

 4   ahead, sir.

 5           INMATE SULLIVAN:  My name is Jerry  Sullivan, S-U-

 6   L-L-I-V-A-N, C-66878.

 7           PRESIDING COMMISSIONER BRYSON:  All right.  And

 8   sir, would you pull that mic a little bit closer to you

 9   now.  That's important.  Thank you.

10           DEPUTY COMMISSIONER SHIELDS:  Who's that printing?

11           MR. GATE:  It'll pick up.

12           ATTORNEY FOX:  Pat Fox, F-O-X, attorney for Mr.

13   Sullivan.

14           DEPUTY COMMISSIONER SHIELDS:  All right.  And just

15   so we can hear Mr. Waddell, if you would just increase

16   that volume just a bit.  Thank you.

17           PRESIDING COMMISSIONER BRYSON:  I note for the

18   record that we have two -- three correctional peace

19   officers in the room who are here for security purposes,

20   and so I need to swear you in.  Would you raise your

21   right hand, please.  Do you solemnly swear or affirm that

22   the testimony you give at this hearing will be the truth,

23   the whole truth, and nothing but the truth?

24           INMATE SULLIVAN:  I do.

25           PRESIDING COMMISSIONER BRYSON:  And Commissioner

4

1    Shields, is there any confidential material in the file

2    and if so will it be used today.

3            **DEPUTY COMMISSIONER SHIELDS:**  There is not, and

4    the -- we will not be using it.

5            **PRESIDING COMMISSIONER BRYSON:**  Thank you.

6            **DEPUTY COMMISSIONER SHIELDS:**  Commissioner, let me

7    just pause.  I have a sense that your microphone is not

8    on.  There's a lot background noise, and -- Mr. Gate, can

9    we just check the plugs and make sure.

10            **PRESIDING COMMISSIONER BRYSON:**  Testing, testing.

11            **DEPUTY COMMISSIONER SHIELDS:**  It almost sounds

12    like your --

13            **ATTORNEY FOX:**  Can we use the same one?

14            **DEPUTY COMMISSIONER SHIELDS:**  Here's a delay.  She

15    has one minute.  No, see you're very faint.

16            **ATTORNEY FOX:**  Would mine pick her up.

17            **PRESIDING COMMISSIONER BRYSON:**  Let's go off

18    record for a moment, and we'll test these mics.

19                        **(Off the Record)**

20            **PRESIDING COMMISSIONER BRYSON:**  All right.  We're

21    back on record.  The time is 13:39, and all parties are

22    still in the room and here in the Jerry Sullivan hearing.

23    And I'm -- I had passed the hearing checklist marked

24    Exhibit 1 to your attorney, sir, to check that we are all

25    proceeding with the same set of documents, and let me

5

1    first ask, Counsel, do you have those documents?

2        **ATTORNEY FOX:**  Yes, I do.

3        **PRESIDING COMMISSIONER BRYSON:**  And does the

4    District Attorney have all the documents marked on the

5    hearing checklist that's dated March 13th?

6        **DEPUTY DISTRICT ATTORNEY WADDELL:**  We appear to

7    have all those documents, yes.

8        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Are

9    there any additional documents to be presented, Counsel?

10       **ATTORNEY FOX:**  Yes, I do have -- let's see -- some

11   photographs that I'd like to submit, and there's some

12   other documents, but I'll wait and see if they're in the

13   file as we continue through the hearing.

14       **PRESIDING COMMISSIONER BRYSON:**  And you're welcome

15   to do so.

16       **ATTORNEY FOX:**  Thank you, very much.

17       **PRESIDING COMMISSIONER BRYSON:**  Sir, would you

18   please read the ADA statement in front of you aloud?

19       **INMATE SULLIVAN:** ADA statement,

20       "Americans with Disabilities Act, ADA, is a

21       law to people with disabilities.

22       Disabilities are problems that make it hard

23       for some people to see, hear, read, talk,

24       walk, learn, think, work, or take care of

25       themselves than it is for others.  Nobody can

6

1          be kept out of a public place or activities

2          because of a disability.  If you have a

3          disability, you have the right to ask for

4          help to get ready for your disability

5          hearing, get to the hearing, talk, move form

6          or papers, and understand the hearing

7          process.  (inaudible) look at what you ask

8          for to make sure that you have a disability

9          that is covered by this ADA and that you have

10         asked for the right kind of help.  If you do

11         not get help, or if you don't think that's

12         the kind of help you need, ask for a BPT 1074

13         Grievance Form.  You can also get help

14         filling it out."

15         **PRESIDING COMMISSIONER BRYSON:**  Thank you, sir.

16    Do you understand what you read?

17         **INMATE SULLIVAN:**  Yes.

18         **PRESIDING COMMISSIONER BRYSON:**  All right.  Sir,

19    the record reflects that on March 15th of 2007 you signed

20    BPT Form 1073, the Reasonable Accommodation Notice and

21    Request in accordance with the provisions of the

22    Americans with Disabilities Act.  A disability is defined

23    under the ADA, and it shows that you have no disability

24    identified in the file review, that in fact you have a

25    reading level of 12.9, which is the highest attainable,

7

1    and I notice, sir, that you didn't appear to have any

2    issues with motility getting to the hearing.  Is that

3    correct?

4            **INMATE SULLIVAN:**  No.

5            **PRESIDING COMMISSIONER BRYSON:**  Okay.  And you

6    don't appear to have any hearing difficulties.  Is that

7    correct?

8            **INMATE SULLIVAN:**  No.

9            **ATTORNEY FOX:**  You say yes to that.

10            **PRESIDING COMMISSIONER BRYSON:**  And would that be

11    correct?

12            **INMATE SULLIVAN:**  Oh, I'm sorry.

13            **PRESIDING COMMISSIONER BRYSON:**  I need to have the

14    proper answer, sir.

15            **INMATE SULLIVAN:**  Correct.

16            **PRESIDING COMMISSIONER BRYSON:**  All right.  And

17    you do wear glasses.  Do they accommodate you for seeing

18    as well as reading?

19            **INMATE SULLIVAN:**  Yes.

20            **PRESIDING COMMISSIONER BRYSON:**  All right.  Have

21    you ever been involved in the Triple CMS or EOQ Club

22    hearings?

23            **INMATE SULLIVAN:**  No.

24            **PRESIDING COMMISSIONER BRYSON:**  Have you ever

25    taken a psychotropic medication either in prison or on

8

1    the streets?

2            INMATE SULLIVAN:  No.

3            PRESIDING COMMISSIONER BRYSON:  Do you suffer from

4    any disability that would prevent you from participating

5    in today's hearing.

6            INMATE SULLIVAN:  No.

7            ATTORNEY FOX:  I have one question.  Mr. Sullivan

8    does have a stuttering issue from time to time, and I

9    just ask that in the event he communicates that way, that

10   we perhaps delay asking the next question until he

11   finished answering.

12           PRESIDING COMMISSIONER BRYSON:  Absolutely.  No

13   problem, sir.  And we'll take the time you need.  So just

14   relax --

15           INMATE SULLIVAN:  Thank you.

16           PRESIDING COMMISSIONER BRYSON:  -- this is your

17   hearing, and we don't want to make it overly formal, so

18   just take the time you need to answer the questions.  All

19   right.  This hearing is being conducted pursuant to Penal

20   Code Sections 3041 and 3042 and the rules and regulations

21   of the Board of Parole Hearings governing parole

22   consideration hearings for life inmates.  The purpose of

23   today's hearing is to consider your suitability for

24   parole.  The hearing's panel will consider the number and

25   nature of the crimes for which you were committed, your

9

1    prior criminal and social history, and your behavior and

2    programming since your commitment.  The panel has had the

3    opportunity to review your Central File.  You will be

4    given the opportunity to correct or clarify the record.

5    The panel will consider your progress since your

6    commitment, your counselor's psychological report, and

7    any other relevant information.  Any change in parole

8    plans should be brought to the panel's attention.  The

9    panel will reach a decision today and inform you whether

10   or not it finds you suitable for parole and the reasons

11   for its decision.  If you're found suitable for parole,

12   the length of your confinement will be explained to you.

13   Nothing that happens here today will change the findings

14   of the court.  The panel is not here to retry your case.

15   The panel is here for the sole purpose of determining

16   your suitability for parole.  Do you understand?

17            **INMATE SULLIVAN:**  Yes.

18            **PRESIDING COMMISSIONER BRYSON:**  This hearing will

19   be conducted in three phases.  I will discuss with you

20   the crime for which you were committed, your prior

21   criminal and social history.  Commissioner Shields will

22   discuss with you your progress since your commitment,

23   your counselor's report, and your psychological

24   evaluation.  I will then discuss with you parole plans

25   and letters of support or opposition that may be in the

10

1    file.   Once that is concluded, the panel and then the

2    District Attorney, who is on videotape -- or, excuse me,

3    video live -- and your attorney will be given the

4    opportunities to ask you questions.   Questions from the

5    District Attorney shall be asked through the chair, and

6    you will direct your answers to the panel.   Next, the

7    District Attorney, then your attorney, then you will be

8    given an opportunity to make a final statement regarding

9    your parole suitability.   Your statement should address

10   why you feel you're suitable for parole.   The panel will

11   then recess, clear the room, and deliberate.   Once the

12   deliberations are completed, the panel will resume the

13   hearing and announce its decision.   The California Code

14   of Regulations states that regardless of time served, a

15   life inmate shall be found unsuitable for and denied

16   parole in the judgment of the panel the inmate would pose

17   an unreasonable risk of danger to society if released

18   from prison.   You have certain rights.   Those rights

19   include the right to a timely notice of this hearing.

20   First, let me ask this in two parts.   Number one, let me

21   ask were you, sir, given timely notice of this hearing?

22          **INMATE SULLIVAN:**   Yes.

23          **PRESIDING COMMISSIONER BRYSON:**   And then, Counsel,

24   I understand there were some issues with the general

25   notices of this hearing.

11

1          **ATTORNEY FOX:**  Yes.  Pursuant to 3042 Notices, the

2    trial counsel who had represented Mr. Sullivan did not

3    receive notice, nor was one served, but apparently it was

4    served on that person.  I've also been advised that

5    perhaps the victims had not received notice from the

6    institution, but I don't know.

7          **PRESIDING COMMISSIONER BRYSON:**  All right.  Thank

8    you.  And, in fact, just prior to this hearing we did

9    talk to Paula Painter, the case records manager, and she

10   did represent that in fact for some unknown reason that

11   practice was discontinued at some period of in the past

12   and that in fact that notice did not go out.  You are

13   absolutely correct, and so the question would be then is

14   this inmate willing to waive that notice process?

15         **ATTORNEY FOX:** Yes.  Mr. Sullivan does waive his

16   rights under 3042 as to this hearing.

17         **PRESIDING COMMISSIONER BRYSON:**  Thank you.

18         **ATTORNEY FOX:**  You're welcome.

19         **PRESIDING COMMISSIONER BRYSON:** Sir, you also have

20   the right to review your Central File.  Were you given an

21   opportunity to review your Central File?

22         **INMATE SULLIVAN:**  Yes.

23         **PRESIDING COMMISSIONER BRYSON:**  And did you do so?

24         **INMATE SULLIVAN:**  Yes.

25         **PRESIDING COMMISSIONER BRYSON:**  All right.  Thank

12

1    you.  And you also have the right to present relevant

2    documents, which we're doing as we -- I go through this

3    hearing.  You also have the right to be heard by an

4    impartial panel.  Do you have any evidence that the panel

5    before you cannot be impartial?

6            **INMATE SULLIVAN:**  No.

7            **PRESIDING COMMISSIONER BRYSON:**  All right.  You

8    will receive a copy of the panel's written tentative

9    decision today.  That decision will become effective

10   within 120 days.  It is also subject to review by the

11   Governor.  A copy of the tentative decision and a copy of

12   the transcript will be sent to you.  The Board has

13   eliminated its appeal process.  If you disagree with

14   anything in today's hearing, you have a right to go

15   directly to the court with your complaint.  You are not

16   required to admit your offense or discuss your offense if

17   you do not wish to do so; however, this panel does accept

18   as true the findings of the court and you are invited to

19   discuss the facts and circumstances of the facts if you

20   desire.  The Board will review and consider any prior

21   statements you have made regarding the offense in

22   determining your suitability for parole.  So basically

23   it's quite simple.  Just tell the truth.  And Counsel,

24   are there any preliminary objections.

25           **ATTORNEY FOX:**  No, we have none, thank you.

13

1          PRESIDING COMMISSIONER BRYSON:  All right.  And

2    will the inmate be speaking with the panel today?

3          ATTORNEY FOX:  Yes.  Mr. Sullivan will be

4    responding to questions by the panel; however, he will

5    not be discussing the facts at this time.

6          PRESIDING COMMISSIONER BRYSON:  All right.

7    (inaudible) will be incorporated by reference the facts

8    of this crime as set forth in the notice of intent for

9    the full Board -- well, the most recent full Board report

10   of the trial, which was actually prepared for the July

11   2006 hearing, and that would be the summary of the crime,

12   as source the inmate probations officer's report dated

13   the 20th of 1983.  And my question to counsel is, there a

14   particular version that the inmate prefers to use to

15   represent his current version of his responsibility in

16   the crime?

17         ATTORNEY FOX:  I think it would be reasonable to

18   take the prisoner's version from that same document.

19         PRESIDING COMMISSIONER BRYSON:  And that's what it

20   shall be.  We'll consider that.

21         INMATE SULLIVAN:  Thank you.

22         PRESIDING COMMISSIONER BRYSON:  And appropriate

23   (inaudible) our references to prisoner's version from the

24   afore-mentioned report.  And I'll note for the record as

25   to pre-conviction factors that this inmate has no

14

1    juvenile record and that the instant offense is his only

2    criminal activity (inaudible) convictions.  And as to

3    personal factors, Mr. Sullivan, you're the second child

4    of seven children born to George Collins and Dorothea

5    Sullivan-Sims, and you say you didn't know if you're

6    parents ever actually married, but they -- they do have a

7    common law relationship; is that correct?

8         **INMATE SULLIVAN:**  Yes.

9         **PRESIDING COMMISSIONER BRYSON:**  Okay.  And you

10   were reared principally by your grandmother, Virginia

11   Cardenas.

12        **INMATE SULLIVAN:**  Denas.

13        **PRESIDING COMMISSIONER BRYSON:**  Denas, okay.  You

14   traveled between the two homes as you were growing up.

15   And you graduated from Norwalk High School 1971.  How

16   would you characterize your early upbringing, sir, given

17   that you had a big family?  Would you say you had a good

18   upbringing?

19        **INMATE SULLIVAN:**  Yes.

20        **PRESIDING COMMISSIONER BRYSON:**  And were you to

21   taught right from wrong and the basics that way?

22        **INMATE SULLIVAN:**  Yes.

23        **PRESIDING COMMISSIONER BRYSON:**  All right.  How

24   about other aspects of your upbringing.  Would you say,

25   did you feel that it was -- it was good, or were there

15

1  problems?  Was there -- was it -- were you provided a

2  good home?

3          INMATE SULLIVAN:  I feel that it was, that, you

4  know, I was (inaudible)

5          PRESIDING COMMISSIONER BRYSON:  All right.  It

6  says that you graduated from high school in 1971, and you

7  did have a football injury, but that you are in good

8  health.  Then you married (inaudible) Sullivan in 1983,

9  and you were divorced in 1991.  Now, I understand that

10  you had a child by Ms. Vivian Ferguson; is that correct?

11          INMATE SULLIVAN:  Yes.

12          PRESIDING COMMISSIONER BRYSON:  And is that a son

13  or a daughter or --

14          INMATE SULLIVAN:  A daughter.

15          PRESIDING COMMISSIONER BRYSON:  A daughter?

16          INMATE SULLIVAN:  Yeah.

17          PRESIDING COMMISSIONER BRYSON:  Do you keep in

18  communication with that daughter?

19          INMATE SULLIVAN:  Yes.

20          PRESIDING COMMISSIONER BRYSON:  How's she doing?

21          INMATE SULLIVAN:  She's doing pretty good.

22          PRESIDING COMMISSIONER BRYSON:  Okay.  How about

23  your siblings, are you in contact with them?

24          INMATE SULLIVAN:  Yes.

25          PRESIDING COMMISSIONER BRYSON:  And how are they

16

1    doing?

2           INMATE SULLIVAN:  My siblings?  That's my

3    daughter, right?

4           PRESIDING COMMISSIONER BRYSON:  No.  The siblings

5    are brothers and sisters.

6           INMATE SULLIVAN:  Oh.  Okay.

7           PRESIDING COMMISSIONER BRYSON:  Okay.

8           INMATE SULLIVAN:  All right.

9           PRESIDING COMMISSIONER BRYSON:  Do you keep in

10   contact?

11          INMATE SULLIVAN:  I keep in contact with my

12   sister.  I have a sister in Las Vegas and one in LA, and

13   I have one in -- my daughter, she's in Hayward.

14          PRESIDING COMMISSIONER BRYSON:  I see.  Let me ask

15   you about your -- your sister.  Don't you have a sister

16   in the military?

17          INMATE SULLIVAN:  Yeah, that's the one in LA.

18          PRESIDING COMMISSIONER BRYSON:  Oh, I see.

19          INMATE SULLIVAN:  The other one's in San Diego.

20          PRESIDING COMMISSIONER BRYSON:  Oh, I see.  Okay.

21   All right.  So is -- is your daughter your only child?

22          INMATE SULLIVAN:  Yes.

23          PRESIDING COMMISSIONER BRYSON:  Okay.  What does

24   she do?

25          INMATE SULLIVAN:  She's -- when we talked last,

17

1    she said she -- she was -- she was a model for some store
2    the last time I talked to her.
3            PRESIDING COMMISSIONER BRYSON:  All right.
4            INMATE SULLIVAN:  And I (inaudible) about a week
5    ago (inaudible)
6            PRESIDING COMMISSIONER BRYSON:  What -- is she out
7    of high school now?
8            INMATE SULLIVAN:  Yeah.  She's out of school.  She
9    got -- she has a -- (inaudible)
10           PRESIDING COMMISSIONER BRYSON:  I see.  Okay.
11   Does she work, or does she --
12           INMATE SULLIVAN:  She works part times.
13           PRESIDING COMMISSIONER BRYSON:  I see.
14           INMATE SULLIVAN:  Somewhere.
15           PRESIDING COMMISSIONER BRYSON:  She's raising a --
16   a family then; is that right?
17           INMATE SULLIVAN:  Yes.
18           PRESIDING COMMISSIONER BRYSON:  I see.  Okay.  And
19   how about your grandkids?  You've got three of them?
20           INMATE SULLIVAN:  Yes.
21           PRESIDING COMMISSIONER BRYSON:  How are they?
22           INMATE SULLIVAN:  They -- they're great.  She's
23   taking really good care of them.
24           PRESIDING COMMISSIONER BRYSON:  Okay.
25           INMATE SULLIVAN:  I'm really proud of her.  She's

18

1    really doing great.

2          PRESIDING COMMISSIONER BRYSON:   That's excellent.

3    (inaudible) this says that you worked in -- you worked as

4    a foreman in a tree trimming business and as a car

5    parking attendant, and you committed this crime when you

6    were 29 years old, so you weren't a child at the time you

7    commit this crime.  As far as the tree trimming business

8    and the car-parking attendant, were there any other jobs

9    that you worked prior to this commitment offense that

10   you'd like to tell us about?

11         INMATE SULLIVAN:   That's pretty much it.

12         PRESIDING COMMISSIONER BRYSON:   Okay.  And it says

13   that you do not have any substance abuse, though you

14   claimed to have had a heavy drinking problem in the 80s,

15   but after a drunk driving stop you discontinued drinking

16   alcohol; is that accurate?

17         INMATE SULLIVAN:   Yes.

18         PRESIDING COMMISSIONER BRYSON:   All right.  And we

19   don't see any evidence that you have been drinking in

20   prison, so that seems to be supported by those facts at

21   any rate.  Is there anything else about your personal

22   history prior to the commitment offense that you'd like

23   us to know that you think would help us understand who

24   you are and what you're about?

25         INMATE SULLIVAN:   Well, I can only share when I

19

1    was on the street, I think I was a pretty decent guy.  I

2    worked hard.  I worked real hard.  I really enjoyed what

3    I was doing.  At the time I think I was (inaudible) I was

4    drinking a lot, but that's no excuse, but -- but pretty

5    much I got -- my car messed up this situation thing, but

6    other than that, I -- I was a pretty (inaudible) guy.  I

7    used to abide by the law.  I never did break the law.

8    (inaudible) you know, I was -- like I say, I was

9    speeding, and I got a drunk driving speeding, but I

10   always got a ticket.  Whenever I got a ticket, I paid it.

11   It's no -- it's really no excuse for what I -- what I

12   did.

13            **PRESIDING COMMISSIONER BRYSON:**  Uh-huh.

14            **INMATE SULLIVAN:**  It's no --

15            **PRESIDING COMMISSIONER BRYSON:**  It's just a

16   surprise because you had no priors.  You received no

17   prior good operating -- panel is left with trying to

18   understand where -- where did the motivation come from to

19   do this thing, and it's so hard -- it's hard to try to

20   figure that out.  What do you think?

21            **INMATE SULLIVAN:**  You know, I -- I could try to

22   blame, but there's nobody to blame but myself really.  I

23   was drinking, and I wouldn't manage my money, and I was

24   moving around a lot, and I wasn't really paying attention

25   to what I was doing, and I just got involved in -- I just

20

1    got involved in something that I had no idea what I was
2    getting into until it was too late.

3         PRESIDING COMMISSIONER BRYSON:  I'm going to ask
4    you a question which you can elect to answer or not
5    answer since you're not discussing your crime, and you
6    must know that we have a lot of questions --

7         INMATE SULLIVAN:  Yeah.

8         PRESIDING COMMISSIONER BRYSON:  -- about your
9    crime, but -- but so you can decide whether you want to
10   answer this or not, but were you under the influence at
11   the time?

12        INMATE SULLIVAN:  No.  No, I wasn't under the
13   influence at the time of the crime.  It was just a bad
14   decision I made at the time to get involved in it.

15        PRESIDING COMMISSIONER BRYSON:  Okay.  Given your
16   background so -- though, and the fact that you're 29
17   years old, a law-abiding citizen, were you married at the
18   time?

19        INMATE SULLIVAN:  No.

20        PRESIDING COMMISSIONER BRYSON:  Okay.  A law-
21   abiding citizen, and you have what looks like a good
22   background.  To go forward even with thinking about
23   hatching a plan like this and then going forward with it,
24   most law-abiding citizens would just not -- it would not
25   even occur to them, and they wouldn't -- would not follow

21

1    through, so we're trying to understand why you would have

2    gone through with that.  Do -- we don't see anything that

3    you could control.  It's certainly stressful that you

4    were in an emergency situation where -- you know, I --

5    I'm trying to grasp at -- at what really motivated you in

6    this.

7            INMATE SULLIVAN:  Well, you know, I've been

8    thinking about that myself --

9            PRESIDING COMMISSIONER BRYSON:  I know.

10           INMATE SULLIVAN:  -- for 20 years.

11           PRESIDING COMMISSIONER BRYSON:  Yeah.

12           INMATE SULLIVAN:  What, like I say, motivated --

13   motivated me at the time to do what I did, like I say, it

14   was no excuse.  I was drinking a lot, breaking all my

15   cars, and -- and I just got involved in a situation that

16   was about quick, easy money that I thought I could get

17   away with.

18           PRESIDING COMMISSIONER BRYSON:  I see.

19           INMATE SULLIVAN:  It was just that -- it happened

20   just like that.  You know, not thinking it through, I'd

21   say yeah.  Okay.  (inaudible) or whatever.  I knew that's

22   what -- really what happened, and it's just I don't

23   really know how to explain it myself, to be honest with

24   you.  I really don't.  (inaudible)

25           PRESIDING COMMISSIONER BRYSON:  Let me ask

22

1    Commissioner Shields, do you have any questions about the
2    early life, the pre-incarceration factors?
3          **DEPUTY COMMISSIONER SHIELDS:**  Well, I have -- I
4    have one question.  In looking through the file -- and
5    again your -- I'll let your attorney respond before you
6    respond.  Was the gun actually an operational gun?
7          **INMATE SULLIVAN:**  Do you want me to respond to
8    that?
9          **DEPUTY COMMISSIONER SHIELDS:**  Well, you need to
10   have your attorney say.
11         **ATTORNEY FOX:**  Do you want to answer that?
12         **INMATE SULLIVAN:**  Yeah, I could answer that.
13         **ATTORNEY FOX:**  Okay.  Go ahead.
14         **INMATE SULLIVAN:**  I don't believe they were, but
15   that (inaudible) didn't know, but I -- I don't think the
16   gun was operational.
17         **DEPUTY COMMISSIONER SHIELDS:**  Did -- well, did you
18   have any reason -- did you own -- now see, I'm going to
19   ask you a couple --
20         **INMATE SULLIVAN:**  Yeah.
21         **DEPUTY COMMISSIONER SHIELDS:**  But I don't want to
22   do that, but it's kind of in the -- let me tell you why
23   I'm asking, and I would rather hear it from you directly.
24   What you get to this point, there are these you different
25   variations and different details, and just one question

23

1    in my mind was, was this a -- you know, was it a

2    simulated firearm or non-operational firearm, or was it

3    one that could actually work, and then I guess the sub

4    question is did he own it, and then I would just confine

5    it to that.

6         **INMATE SULLIVAN:** I didn't own it. I think when I

7    pulled the gun out of my pants, I think that -- that was

8    -- I think that the gun was inoperable. I don't think it

9    would have worked after that. So I just assumed it

10   didn't work, but it didn't have a pin in it. But that

11   was my assessment at the time. I didn't think it was

12   going to work. I never knew (inaudible) but I don't

13   think it -- I don't think the gun worked. You can say

14   it's an important point.

15        **DEPUTY COMMISSIONER SHIELDS:** Well, that's why --

16   can I ask one more question on that? I mean, I still

17   don't under -- he says he didn't believe that it wouldn't

18   work, but why do you believe that it wouldn't? I mean,

19   did you try to --

20        **PRESIDING COMMISSIONER BRYSON:** Hang on just one

21   moment.

22        **INMATE SULLIVAN:** It was a -- I think it was a

23   .38. It had a -- I think it was a pin that goes into the

24   cylinder to hold the cylinder inside the gun. Once the

25   pin came out, in my mind the gun was inoperative. It

24

1    didn't work, but that's just my assessment of the facts

2    that it didn't work.  They -- the Reilys didn't know at

3    the time it didn't work, but I -- I didn't think the gun

4    would work anyway after that, after I pulled it out.

5         DEPUTY COMMISSIONER SHIELDS:  After you pulled it

6    out of what?

7         INMATE SULLIVAN:  Of my pants.

8         DEPUTY COMMISSIONER SHIELDS:  Well, you know, I'm

9    -- see we opened this door, and I'm just a little stuck

10   because I'm just -- you know, I did catch that where it

11   wasn't a working gun.  It is okay if I ask you just a

12   couple more questions about the gun?  I just want to know

13   what was in -- what did he think about the gun?  When did

14   you first see the gun?

15        INMATE SULLIVAN:  My friend had it.

16        DEPUTY COMMISSIONER SHIELDS:  But you saw it that

17   day, the day before?

18        INMATE SULLIVAN:  That day we -- we were getting

19   ready to do the crime, I saw the gun that day.

20        DEPUTY COMMISSIONER SHIELDS:  And he handed it to

21   you?

22        INMATE SULLIVAN:  I would assume he did because I

23   really don't realize today how I got the gun.  I really

24   don't.  But I wound up with the gun, so at that time --

25        DEPUTY COMMISSIONER SHIELDS:  So the first time

25

1    you saw it was that day in the --

2           INMATE SULLIVAN:  Well, my friend had it..

3           DEPUTY COMMISSIONER SHIELDS:  -- in the course of

4    the crime?

5           INMATE SULLIVAN:  Right.

6           DEPUTY COMMISSIONER SHIELDS:  And did you pull the

7    -- did you pull the -- did you attempt to see if the gun

8    would work, or you --

9           INMATE SULLIVAN:  No.

10          DEPUTY COMMISSIONER SHIELDS:  -- just looked at

11   and went this thing isn't going to work?

12          INMATE SULLIVAN:  No.  I just looked at it and put

13   it in my pants.  I really didn't try to fire it, try to

14   see if it worked or -- I just grabbed it.

15          DEPUTY COMMISSIONER SHIELDS:  And then I saw

16   somewhere that -- that there was one bullet in it.  Did

17   you --

18          INMATE SULLIVAN:  I thought I -- I thought I had

19   like two bullets left, two or three bullets left.  I

20   dropped like three or four bullets on the ground.

21          DEPUTY COMMISSIONER SHIELDS:  When did they get

22   dropped on the ground?

23          INMATE SULLIVAN:  When I pulled it out of my

24   pants.

25          ATTORNEY FOX:  And it was opened.

26

1          DEPUTY COMMISSIONER SHIELDS:  Okay.  Maybe that's

2     -- I'm not a feminist, but maybe that's enough

3     information.  I think it's --

4          PRESIDING COMMISSIONER BRYSON:  All right.  Well,

5     then if you would turn your attention to Ms. Shields, she

6     will talk about your first conviction factors..

7          DEPUTY COMMISSIONER SHIELDS:  Good afternoon, sir?

8          INMATE SULLIVAN:  Hi, how are you?

9          DEPUTY COMMISSIONER SHIELDS:  I'm good.  Thank

10    you.  How are you?

11         INMATE SULLIVAN:  Pretty good.

12         DEPUTY COMMISSIONER SHIELDS:  Let me start.  You

13    have -- you were received into the institution in 1983,

14    into the -- into the system, right?

15         INMATE SULLIVAN:  Yes.

16         DEPUTY COMMISSIONER SHIELDS:  Okay.  And you

17    currently have 19 points, and that's a mandatory minimum

18    because you're a lifer.  Your classification status is

19    medium A.  your reading level is 12.9?

20         INMATE SULLIVAN:  12.9.  I really couldn't  say.

21         DEPUTY COMMISSIONER SHIELDS:  That -- am I making

22    that up, or do -- do you have a high school diploma?

23         INMATE SULLIVAN:  Yes.

24         DEPUTY COMMISSIONER SHIELDS:  Okay.

25         PRESIDING COMMISSIONER BRYSON:  That's as high as

27

1    it goes.  That's why you're reading 12.9.  I think they

2    put 12.9 --

3         DEPUTY COMMISSIONER SHIELDS:  Okay.

4         PRESIDING COMMISSIONER BRYSON:  -- because it's as

5    high as it goes.

6         DEPUTY COMMISSIONER SHIELDS:  Okay.  But you have

7    some education there.  I have that you have certificates

8    in PIA sewing machine operator and furniture finisher.

9         INMATE SULLIVAN:  Yes.

10        DEPUTY COMMISSIONER SHIELDS:  Have you gotten

11   other certificates since you've been down?  Other trades?

12        INMATE SULLIVAN:  Well, I got a forklift operator

13   certificate, upholstery certificate.

14        DEPUTY COMMISSIONER SHIELDS:  Okay.  I didn't get

15   this -- I didn't get the certificate in Tracy when I was

16   there.  I just got in big trucks while I was there.

17        DEPUTY COMMISSIONER SHIELDS:  Okay.  You have done

18   -- you have a lot of chronos for self-help.  The most

19   recent ones are -- you did a -- a 16-week class on

20   nonviolent communication.  It appears to me that you have

21   continuously gone to Alcoholics Anonymous?

22        INMATE SULLIVAN:  Yes.

23        DEPUTY COMMISSIONER SHIELDS:  You go all the time?

24        INMATE SULLIVAN:  Yes, ma'am.

25        DEPUTY COMMISSIONER SHIELDS:  Okay.  You also have

28

1    -- have you completed the impact program?  You've done

2    five sessions of the impact program which includes

3    violence prevention, time out, body signals, conflict

4    resolution, and self-talk.

5         INMATE SULLIVAN:  Yes.

6         DEPUTY COMMISSIONER SHIELDS:  Have you done any

7    more of those since?

8         INMATE SULLIVAN:  I'm doing a -- I'm doing a --

9    what we're doing now is -- we have a lot to do with

10   checking and balancing and stuff like that right now.

11        DEPUTY COMMISSIONER SHIELDS:  Okay.  So how many

12   classes -- how many sessions in the impact program?

13        INMATE SULLIVAN:  There's eight.

14        DEPUTY COMMISSIONER SHIELDS:  Eight, so you're

15   working towards completing that, right?

16        INMATE SULLIVAN:  Yes.

17        DEPUTY COMMISSIONER SHIELDS:  Okay.  I mention

18   that you have the -- that -- that you have the two

19   certificates.  At this point I could also mention, I

20   think, in conjunction with that is that you have a letter

21   from J. Graham, who is the industrial supervisor --

22        INMATE SULLIVAN:  Yes.

23        DEPUTY COMMISSIONER SHIELDS:  -- of the PIA

24   program, and he's writing, and it's a four-page letter to

25   acknowledge your work performance.  It says that you

29

1    worked for the mattress factory for ten years as a sewing

2    machine operator, cutter, and supervisory lead person.

3    You have a very important job, and you've proven to be

4    timely, efficient, and professional in the performance of

5    your duties.  You also are knowledgeable in all areas of

6    machine repair and your machine maintenance.  He

7    describes you as a very conscientious person who has

8    proven to work well under changing situations and

9    conditions.  You have a unique way of being able to

10   prioritize your time and duties that insure the most

11   effective use of your time.  Your professionalism is

12   continually demonstrated when working with staff and

13   fellow inmates.  He states that you're an excellent

14   example of someone who has applied and prepared himself

15   for a reintegration into our society by his strength of

16   character, job skill, sense of professionalism, and

17   excellent work habits.  I'm wondering, he mentions here

18   that you are good at prioritizing your time and duties.

19   How do you do that?  Do you know?

20          **INMATE SULLIVAN**:  Well, like having a job is

21   number one that no one else want to do.  You know,

22   there's always something if you look around.  There's

23   always something -- there's always something need to be

24   done.

25          **DEPUTY COMMISSIONER SHIELDS**:  Okay.  How do you

30

1    handle it when there's too much to do?

2         **INMATE SULLIVAN:** Well, I've been doing this so

3    long that it's really not too much. It's just --

4         **DEPUTY COMMISSIONER SHIELDS:** Okay.

5         **INMATE SULLIVAN:** -- like an everyday -- everyday

6    thing.

7         **DEPUTY COMMISSIONER SHIELDS:** Okay. Do you enjoy

8    going to work?

9         **INMATE SULLIVAN:** Oh, yeah. Oh, yeah.

10        **DEPUTY COMMISSIONER SHIELDS:** And let me ask you

11   about Alcoholics Anonymous --

12        **PRESIDING COMMISSIONER BRYSON:** (inaudible)

13        **DEPUTY COMMISSIONER SHIELDS:** Did I miss

14   something?

15        **ATTORNEY FOX:** Sure, this is a new one at probably

16   isn't in the file from PIA as well, from a different

17   author however.

18        **DEPUTY COMMISSIONER SHIELDS:** Okay. And do you

19   have other ones, or is this what you're going to --

20        **ATTORNEY FOX:** No, I don't. Let me just -- this

21   is parole plans. More this one --

22        **ATTORNEY FOX:** This is parole plans?

23        **ATTORNEY FOX:** And he does have -- I don't know

24   how far you're going to go into this, but the victim

25   offender education group, which is relatively new --

31

1        DEPUTY COMMISSIONER SHIELDS:  Well, let me have

2    that.  I'm going to give some of these papers to the

3    Commissioner.

4        INMATE SULLIVAN:  All right.

5        ATTORNEY FOX:  -- because I don't know exactly

6    what --

7        DEPUTY COMMISSIONER SHIELDS:  And I know that -- I

8    knew (inaudible)

9        ATTORNEY FOX:  So in the abundance of caution I'm

10   passing these out.

11       DEPUTY COMMISSIONER SHIELDS:  You know, and

12   actually -- and I think the Commissioner agrees -- we

13   want to make sure we have everything that -- all the

14   information, so I would encourage both you and Mr.

15   Sullivan if you still have a -- that we're at sort of the

16   end of a subject, just say oh, there's one more thing.

17       ATTORNEY FOX:  Great.  Thank you.

18       DEPUTY COMMISSIONER SHIELDS:  And we'll do --

19       ATTORNEY FOX:  I appreciate that.

20       DEPUTY COMMISSIONER SHIELDS:  -- that.  This is a

21   letter of recommendation dated July 18th, '07, by I. T.

22   Jenkins, and it's written on PIA stationary, but Mr.

23   Jenkins is actually a correctional officer, and he states

24   I've supervised inmate Sullivan as a correctional officer

25   in the mattress factory and in as acting superintendent

32

1    too.  During all these period -- oh, I'm sorry.  This

2    period he's writing about is since April 1993.  During

3    all these periods I observed him to be a very

4    conscientious worker who is dependable and takes a lot of

5    pride in his work.  He is extremely knowledgeable in all

6    areas related to production and a very motivated

7    individual.  Inmate Sullivan is a definite asset to

8    prison industries, a great role model and mentor to other

9    young and old  -- other inmates young and old.  I

10   observed him as being respectful as well as helpful

11   towards both staff and inmates alike.  He's to be

12   commended for his positive attitude and is encouraged to

13   remain the same, an excellent example for others.  In

14   this writer's opinion inmate Sullivan has all those

15   skills needed to be a productive, beneficial, and

16   responsible citizen.  Upon his release he would prove

17   valuable to any company or business venture he might

18   become associated with.  And then Mr. Jenkins gives his

19   phone number.

20           INMATE SULLIVAN:  (inaudible)

21           DEPUTY COMMISSIONER SHIELDS:  Or late.

22           INMATE SULLIVAN:  What's that?

23           DEPUTY COMMISSIONER SHIELDS:  I-T.  Your letter I.

24   Okay.  Let me pass these over to the Commissioner, and

25   then your term we just pointed out, and  I've already

33

1    through your self-help  activities, so this is important.

2    It's the victim offender education group, and you

3    completed this the 2nd of May, 2007.  You voluntarily

4    completed 46 hours of education.  The group includes

5    meeting with a panel of survivors to hear their stories

6    and understand the impact of crime in their lives.  And

7    this is a letter that's actually addressed to you from

8    the facilitator, a Louis Edwards, who is in NFT, and let

9    me see.  He's basically thanking you for your

10   participation in the group and your willingness to -- to

11   share, to be honest, and to be real.  The survivors with

12   whom you expressed their -- express their appreciation of

13   your willingness to share your story with them and hear

14   their stories with such compassion and (inaudible).  That

15   sounds like that was a very important program.  What did

16   you -- what was it like to meet with the victims?

17        **INMATE SULLIVAN:**  It was heartache for me.  And I

18   -- when I met the victims and we sat around, and they

19   told a story, it was hard for -- with me, I -- I seen the

20   pain and the suffering that they went through.  I

21   remember this one lady, she had two sons, but she lost

22   them.  I really felt for her.  I really felt for her.

23   They were like an innocent children (inaudible) I felt

24   it.  I really did.  It was hard.  It really was.  And

25   when that lady had lost a son just over nothing, and that

34

1    was hard, you know.  They were not as -- it's hard when

2    you -- when you see and feel the pain that other people

3    feel that you really don't even recognize until you see

4    it, and it was pretty hard -- hard to handle that.  I

5    felt -- I felt -- I felt (inaudible) sorry that it

6    happened to her and her boys.  It was senseless.  And

7    that was (inaudible).  It was -- you know, I'm in prison,

8    but I understand youth.  I see what's going on in society

9    today.  And people out there they have lost the whole

10   picture what life is all about.  It's sad that I have

11   come and look out, but I -- and I heard just looking at

12   ' it some of the things that are going on out there.  I

13   remember -- I -- it's just how I'd be able to look at

14   some of the stuff that's here.

15        **DEPUTY COMMISSIONER SHIELDS**:  What about the

16   Reilys?

17        **INMATE SULLIVAN**:  Well, you know, when I think

18   about the Reilys, I think about all that.  I think about

19   the Reilys each and every day of my life, the pain that I

20   caused them.  I didn't realize it at the time, but over

21   the years I -- I realize I caused them unnecessary pain.

22   And I feel for them every day.  I think -- I could say I

23   think of it every day.  I wouldn't -- wouldn't --

24   wouldn't want that to happen to my worst enemy, and --

25   and I look at it like my mom or my dad today.  I didn't

35

1    look at it years ago  at 29.  No, I didn't look at it.

2    Just -- I just didn't really look at what I was really

3    doing.  I look at it today, and I still do every day.  I

4    wish I could do something to show them how much -- you

5    know, I am sorry for it, for the bad decision I made.

6         **DEPUTY COMMISSIONER SHIELDS**:  Yeah.  Now, one

7    thing that's so interesting, because you -- the victims

8    you were describing were people where there was a murder,

9    and that's kind of quick.  Do you think maybe the

10   violence in their case had a different kind of experience

11   or a different feelings?

12        **INMATE SULLIVAN**:  No, it ain't the same feelings.

13   It's the -- it's the same -- it's the same feeling when

14   you're -- it's like when you do -- when you do something

15   to an innocent person for no reason, it's like to me

16   you've taken something from that person that you can't

17   give back.  And at the time I did what I did, I didn't

18   really look at it like that.  It's like they had

19   something I wanted.  I went to -- I went to get it, and I

20   wasn't really thinking about the consequences of what I

21   was doing -- doing at the time.  But over the years, it

22   was like yeah, I invaded their privacy.  I took something

23   from them that I can't ever give back.  The -- the

24   freedom of being able to just go outside your house,

25   being able to just walk around and be free like you're

36

1    supposed to be free in the United States.  You're
2    supposed be able to go wherever you want to go.  I didn't
3    -- I didn't understand that then.  I understand it today,
4    yeah.  I say I took something from you, I did.  The idea
5    that you could just be free the way  we as people are
6    supposed to be free in the United States, and I don't --
7    I don't know how to give that back.  I thought it was
8    nothing that would get it back.  It's something that I'm
9    going to have to deal with the rest of my life, and I do.
10   And I think of Mr. And Mrs. Reily every -- each and every
11   day of my life.

12            DEPUTY COMMISSIONER SHIELDS:  Okay.  That's --
13   that's helpful.  Thank you for that.  Let me switch to --
14   and you'll have another chance to talk before we end
15   here.  I don't know if I covered disciplinarys, but you
16   have been disciplinary free since you've been down.  You
17   did that one 128 in 1989.  What was that for?

18            INMATE SULLIVAN:  You know, when I -- when I knew
19   that it was like if you don't know you have a -- a ducket
20   or something, like in '89, how do you -- how do you know
21   to go to it.  It was like somebody said, I didn't know I
22   had it, so it was like a failure to appear or something
23   like that, but I'm certain that if I never received it,
24   how would I know where to go, and I didn't receive it, so
25   I didn't think I had a -- a 128 until I keep hearing it

37

1    every time I come to court, but --

2         **DEPUTY COMMISSIONER SHIELDS:**  Oh, okay.  That's

3    good.  The most recent psychological was done by Dr.

4    Sterrit, and it was done -- you know let me even find --

5    the evaluation was in March -- March 23rd, 2007.  You've

6    had a number of evaluations, and one of the things that

7    then happens is the evaluators are referring back to

8    prior evaluations.  Also, this is a lengthy document,

9    although I don't believe it's completely -- maybe it is

10   in  the new format, but it's similar to if not exactly

11   the new format.  The psychologist does state that he

12   believes that your current parole plans appear to be

13   adequate and feasible.  He states you openly admit your

14   guilt and participation and -- in the incident.  His

15   diagnosis is alcohol abuse by history in institutional

16   remission and in treatment.  And let me go back in a

17   minute and maybe ask you a little bit about a -- and let

18   me -- but what I want to do is to pull out his

19   assessments of your level of risk.  He basically says his

20   overall risk assessment, your level of psychopathy is

21   low, suggesting a low risk for future acting out, and

22   your propensity for future violence is low compared to

23   similar inmates, and he also states that -- that

24   basically he doesn't feel that you would benefit from

25   psychotherapy, but he also notes -- he doesn't see you as

38

1   a candidate for psychotherapy but then also notes because

2   you're in the general population, it wouldn't be

3   available to you.  He recommends continued participation

4   in AA and ongoing involvement in education, self-help,

5   and religion.  Let me see.  One of the things -- because

6   what I saw was that you had a -- you mentioned that you

7   were involved in drugs and alcohol about the time of the

8   crime.

9           ATTORNEY FOX:   I think just alcohol.

10          DEPUTY COMMISSIONER SHIELDS:   Or alcohol.  I'm

11   sorry --

12          INMATE SULLIVAN:   Just alcohol.

13          DEPUTY COMMISSIONER SHIELDS:   -- alcohol.  It's in

14   the world now, it's just drugs and alcohol is the -- the

15   phrase.

16          ATTORNEY FOX:   That's enough.

17          DEPUTY COMMISSIONER SHIELDS:   But you were

18   involved with alcohol.  Yeah, that's enough.   But I

19   thought I saw that you were involved for a couple years,

20   from '81 to '83.

21          INMATE SULLIVAN:   In what?

22          DEPUTY COMMISSIONER SHIELDS:   You -- that you were

23   drinking.  Drinking too much.

24          INMATE SULLIVAN:   Oh, in 80 -- I drank all the

25   time.  That's pretty much what I did.

39

1          DEPUTY COMMISSIONER SHIELDS:  When did you start
2    drinking?  How old were you?
3          INMATE SULLIVAN:  It was my last year in high
4    school  (inaudible)
5          DEPUTY COMMISSIONER SHIELDS:  Okay.  And did it
6    affect -- did it affect you at all when you first started
7    to drink?  Did it affect your going to school and--
8          INMATE SULLIVAN:  I just drank --
9          DEPUTY COMMISSIONER SHIELDS:  No?
10          INMATE SULLIVAN:  -- you know, like --
11          DEPUTY COMMISSIONER SHIELDS:  Just take a deep
12    breath.
13          INMATE SULLIVAN:  I remember drinking when I was
14    to young.  That was my last year in high school.  I drank
15    and up to --
16          DEPUTY COMMISSIONER SHIELDS:  Uh-huh.
17          INMATE SULLIVAN:  -- up to now I consider the time
18    I started.
19          DEPUTY COMMISSIONER SHIELDS:  Okay.  And when did
20    you stop drinking?
21          INMATE SULLIVAN:  I stopped drinking when I came
22    to prison.
23          DEPUTY COMMISSIONER SHIELDS:  Okay.
24          INMATE SULLIVAN:  Or just before, and I had -- I
25    had my last -- I remember when I -- when I had my drunk

40

1    driving test.  I remember getting a drunk driving coming

2    from a party at my girlfriend's.

3              DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

4              INMATE SULLIVAN:  And I drank after that.  And --

5              DEPUTY COMMISSIONER SHIELDS:  Yeah.  Do you

6    consider yourself an alcoholic?

7              INMATE SULLIVAN:  Yeah.  Yeah.  I -- I wouldn't

8    admit it, but I -- I am an alcoholic.

9              DEPUTY COMMISSIONER SHIELDS:  Because aren't

10   intoxicated at the time of the crime, right?

11             INMATE SULLIVAN:  No.

12             DEPUTY COMMISSIONER SHIELDS:  And you apparently

13   got -- when do you get the DUI?

14             INMATE SULLIVAN:  It was on --

15             DEPUTY COMMISSIONER SHIELDS:  How long before --

16             INMATE SULLIVAN:  It was in eighties.

17             DEPUTY COMMISSIONER SHIELDS:  You know, we really

18   probably know that.  But was that --

19             INMATE SULLIVAN:  It was during the eighties.

20             DEPUTY COMMISSIONER SHIELDS:  How many months

21   before the crime did you get the DUI?

22             INMATE SULLIVAN:  Oh, about maybe two years after

23   I (inaudible) I think I committed the crime about a year

24   later or maybe two, I'm not sure.

25             DEPUTY COMMISSIONER SHIELDS:  But you had -- had

41

1    already stopped drinking when you got the DUI?

2           INMATE SULLIVAN:  Yeah.

3           DEPUTY COMMISSIONER SHIELDS:  Was it hard to stop?

4           INMATE SULLIVAN:  Oh, yeah.  It was hard.

5           DEPUTY COMMISSIONER SHIELDS:  But you didn't go

6    back since then, right?

7           INMATE SULLIVAN:  No Once I came to prison, I -- I

8    really wasn't drinking there.  I stopped smoking and

9    everything.

10           DEPUTY COMMISSIONER SHIELDS:  Did you go to AA

11    before you came to prison?

12           INMATE SULLIVAN:  No.

13           DEPUTY COMMISSIONER SHIELDS:  You stopped on your

14    own?

15           INMATE SULLIVAN:  Stopped what?

16           DEPUTY COMMISSIONER SHIELDS:  Drinking.

17           INMATE SULLIVAN:  I wouldn't say I stopped.  I

18    only -- from what I can remember and understand that last

19    time that I -- I did get a drunk driving.  I only drank

20    on the weekends pretty much.

21           DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

22           INMATE SULLIVAN:  Up to the point of me doing the

23    crime, I only drinked on the weekends.  That's what I

24    remember.  And when I come to prison, I really didn't

25    stop drinking altogether

42

1            DEPUTY COMMISSIONER SHIELDS:  Okay.  And then did
2      -- tell me what I find helpful about AA?  About --
3            INMATE SULLIVAN:  You know, AA helped me.  They
4      helped me really look at my life.  They made me look at
5      things that I was doing with my life.  I was drinking a
6      lot, and I really wasn't thing, and I really didn't see
7      things clear.
8            DEPUTY COMMISSIONER SHIELDS:  Uh-huh.
9            INMATE SULLIVAN:  And AA been helping me over the
10     years to look at my life, looking at things I could have
11     been doing, looking at my life as far as looking at my
12     life as the person I could have been.  Just looking at
13     you, I really am.  It help me -- it gave me an
14     opportunity to look at the things I couldn't see on the
15     street.  You know, I really didn't -- really look into me
16     as an inventory of who I was.  So I really -- I really
17     want focused on anything when I was going to school.  I
18     was drinking and working, working and drinking.  That's
19     what I did, worked and drank.
20           DEPUTY COMMISSIONER SHIELDS:  Do you use the
21     steps?
22           INMATE SULLIVAN:  I do today.  I do today.  I
23     really think -- I like step four.  I take moral inventory
24     of myself and my life.  And I like step AA, continue to
25     take an inventory of me and how I try to look more into

43

1    me and how I'm doing and what I'm doing for myself and

2    other people, how I'm react to other people, how I'm

3    treating other people today from what I used to years

4    ago.  You know, some -- something you can forget.  Some

5    things you want to give, and, you know, you can only do

6    so much.  And it hasn't been easy for me doing a lot of

7    things.  But it had -- it gave me a lot of time to look

8    at step eight.

9            DEPUTY COMMISSIONER SHIELDS:  What about

10   meditation?  Do you --

11           INMATE SULLIVAN:  I've done a little meditation.

12   I like that too.  I did that with a -- it's a program.

13   It's a meditation program we have here.  A guy name Jock

14   is the head of it.  I used to go there and meditate for a

15   while, and then I out of that program and I got into the

16   program I'm in now.  I just kind of move around in

17   different programs and see what they've got, and how it

18   can help me (inaudible) see different things in my life,

19   so.

20           DEPUTY COMMISSIONER SHIELDS:  Commissioner, I'll

21   give it back to you.

22           PRESIDING COMMISSIONER BRYSON:  Thank you.  Sir,

23   what was step eight?  You were talking about it.

24           INMATE SULLIVAN:  Step eight is taking an

25   inventory (inaudible)

44

1          PRESIDING COMMISSIONER BRYSON:  I think that eight
2     is make a list of all persons (inaudible)
3          INMATE SULLIVAN:  (inaudible) making amends, yeah.
4     You know, I made amends.  What they said making amends
5     whenever possible.  When you make amends, you do what you
6     can.  Some people probably you won't be able to make
7     amends to.  Know you're making amends to yourself.
8          PRESIDING COMMISSIONER BRYSON:  Have you ever
9     attempted to make amends to your victims?
10         INMATE SULLIVAN:  Well, I haven't wrote them a
11    letter yet, no.
12         PRESIDING COMMISSIONER BRYSON:  Why not?
13         INMATE SULLIVAN:  I just haven't got to it.  I've
14    thought about it.  I know if I feel -- I've wrote several
15    letters making amends.  I've started, but I haven't
16    completed it.
17         PRESIDING COMMISSIONER BRYSON:  Well, let's talk
18    about your -- about your plans here, and I'll incorporate
19    those with all the letters of support you have.  You have
20    several letters of support.  Now you -- what would be
21    your plan for residence?
22         INMATE SULLIVAN:  Well, I was going to live with
23    my mom.
24         PRESIDING COMMISSIONER BRYSON:  Okay.  But that's
25    Dorthea Sims; is that right?

45

1           **INMATE SULLIVAN:**  Yes.

2           **PRESIDING COMMISSIONER BRYSON:**  You do have a

3     letter from her dated January 31st of 2007, and she writes

4     I love him very much.  He's accomplished a great deal in

5     rehabilitation, and she lists a lot of the programs that

6     you've done.  She said you're a close-knit family with

7     strong Christian values, and she says there's also much

8     concern about Jerry's health at 54 years old.  Upon his

9     parole he does have good and positive financial support.

10    I've put money away for him, so he will not be without

11    funds or anything he may need for work or in order to

12    maintain his needs.  Jerry is part owner in property or a

13    home we have in Shreveport, Louisiana.  It was left to us

14    by my friends.  If my son is allowed to parole to me, he

15    will always have a home awaiting him.  For the past two

16    years I've lived here in our home alone except for my

17    granddaughter who moved in with me in April of 2005.  My

18    husband has since unable to live in our home due to his

19    serious dementia with Alzheimer's and on went on to

20    (inaudible) that's really sad, but even so and he lives

21    away.  She said he lives out of the home.  My family and

22    I are very supportive of Jerry, and we'll do whatever we

23    can to assist him in getting right back on track.

24          **ATTORNEY FOX:**  I think --

25          **INMATE SULLIVAN:**  I lost -- I lost my step-father

47

1    going to talk to a guy to the guy give me a job, and

2    (inaudible)

3            PRESIDING COMMISSIONER BRYSON:  I see, that's what

4    PIA does --

5            INMATE SULLIVAN:  Right.

6            PRESIDING COMMISSIONER BRYSON:  -- correct?

7            INMATE SULLIVAN:  Yeah.  They --

8            PRESIDING COMMISSIONER BRYSON:  Okay.  Wait, let

9    me then go over the letters of support we have.  We have

10   a letter from your niece -- niece-in-law is what she

11   says.  And she says -- talks about that you do have

12   grandchildren.  She says she believes you would be a

13   good, law abiding citizen.  You've come a long way.  She

14   said I've known Jerry for over 16 years.  I can offer him

15   love, positive thinking, encouragement to be a better

16   person, a little bit of money, and help in looking for

17   employment, and most of all forgiveness.  And we have a

18   letter from -- I'm sorry.  I didn't even give her name.

19   Alicia Morton, M-O-R-T-O-N.  And this letter  happens to

20   be dated (inaudible) in the late file with the other

21   current letters.  We have a January 10th, 2007, letter

22   from Tanya Sims, S-I-M-S.  And that's your niece.  And

23   she says she's known you all 31 years of her life.  She

24   says I always believe Jerry's a good person.  Sometimes

25   we get the wrong crowd.  I can offer my uncle love,

48

1    dedication, money, my time, help with looking for a job,

2    or any other resources he may need.  I work for social

3    service.  I have access to all kinds of information that

4    would help you out.  She one hundred percent supports

5    you.    And we have a letter from your younger sister,

6    Mrs. Virginia Smith from Norwalk, California.  She says

7    she's been in the military for 18 years.  She said Jerry

8    has been my inspiration.  When I see him, I see what it

9    is to have made a bad decision in life and realize the

10   devastation it caused your life and the life of others.

11   She says you don't want to blame anyone for your

12   mistakes.  It talks about the criminal justice system in

13   the news.  She says I don't know the parole board works,

14   but I really don't understand it.  Being a in the

15   military, I know that you can get your personal feeling -

16   - let a personal feeling interfere with how you do your

17   job, but things don't always work out that way.  She says

18   my mother's been waiting for him to be released for a

19   long time.  She will not leave the state of California.

20   She has a house for him to stay in and friends willing to

21   give him a job.  So those are And your letters of

22   support.  And did I miss anything that you know of, that

23   your are aware of, Counsel?

24        **ATTORNEY FOX**:  No, I think you've covered it.

25   Thank you.

49

1          **PRESIDING COMMISSIONER BRYSON:** All right.  And

2    then we have sent out 3042 notices.  Those notices go to

3    agencies with a direct interest in your case.  We do

4    have a representative of the Contra Costa County District

5    Attorney's office present who will have the opportunity

6    to make a statement regarding parole suitability prior to

7    the conclusion of this hearing.  We do have two letters

8    of opposition, and one is from the Walnut Creek Police

9    Department.  This is dated July 13th of 2007 and is

10   authored by Dennis Bell, B-E-L-L, Police Captain

11   (inaudible)

12          **ATTORNEY FOX:** I have a closing objection.  At

13   this point we have not received a copy of that letter,

14   and I'd invoke the ten-day rule as far as that goes.

15          **PRESIDING COMMISSIONER BRYSON:** I understand, and

16   this material, in fact, is in the late file.  And

17          **ATTORNEY FOX:** (inaudible)

18          **PRESIDING COMMISSIONER BRYSON:** -- it is in the

19   late file.  This letter, however, having been marked July

20   13th, and today's date is the 30th.  Still, you should have

21   received it.  We're going to -- we're going to go ahead

22   and read this into the record.  This letter is to request

23   parole be denied for Mr. Jerry Sullivan.  Mr. Sullivan

24   was involved in a heinous crime in the City of Walnut

25   Creek on July 2nd, 1982.  At that time Mr. Sullivan and

50

1    his accomplice kidnapped two victims at gun point, drove
2    the victims to their residence and burglarized their
3    home.  The victims were then driven to their bank and
4    told if they did not withdraw $150,000, they would be
5    killed.  Walnut Creek police officers attempted to stop
6    the car driven by Mr. Sullivan; however, Mr. Sullivan
7    fled in a the car at a high rate of speed.  Mr. Sullivan
8    was pursued by officers and ultimately crashed the
9    vehicle.  After the collision, Mr. Sullivan put a handgun
10   to the head of one of the victims and held the victim as
11   a hostage for a short period of time.  All of these are
12   heinous and violent crimes which no doubt traumatized the
13   victim.  Even though this crime this -- victims, pardon
14   me, plural -- even though this crime occurred 25 years
15   ago, it is my opinion that Mr. Sullivan still poses a
16   significant threat to the community and subsequently
17   requests that he be denied parole.  And then we do have a
18   letter, as we have every -- every year we have received a
19   letter, and we have -- and I checked that out.  This is
20   just another letter from the victims that we had
21   received, and that was received --
22            ATTORNEY FOX:  May I see that?
23            PRESIDING COMMISSIONER BRYSON:  Yes.
24            ATTORNEY FOX:  Thank you.    And we have to inform
25   the panel that we're going to object to that.  In the

51

1    event letters are forthcoming in the future, (inaudible)

2    would be redacted, and this substance being given over to

3    the (inaudible)

4         PRESIDING COMMISSIONER BRYSON:  The inmate

5    certainly should be receiving a copy in a timely fashion.

6    like to see it.

7         ATTORNEY FOX:  (inaudible)

8         PRESIDING COMMISSIONER BRYSON:    Would you   like

9    to see it?

10        ATTORNEY FOX:  Yes.

11        PRESIDING COMMISSIONER BRYSON:  I wanted her to

12   see this, and we know that one of the victims has died.

13        ATTORNEY FOX:  Thank you.

14        PRESIDING COMMISSIONER BRYSON:  You're welcome.

15   We'll get a copy of that letter (inaudible)

16        ATTORNEY FOX:  Thank you.

17        PRESIDING COMMISSIONER BRYSON:  All right.

18   Commissioner, is there any issue that needs to be

19   discussed at this time.

20        DEPUTY COMMISSIONER SHIELDS:  Not that I'm aware

21   of.

22        PRESIDING COMMISSIONER BRYSON:  All right.   Then

23   I'd like to ask the District Attorney if you have any

24   questions to this inmate, sir, at this time.

25        DEPUTY DISTRICT ATTORNEY WADDELL:  I have no

52

1    questions.

2           **PRESIDING COMMISSIONER BRYSON:**  All right.  And

3    Counsel, do you have any questions for the inmate at this

4    time?

5           **ATTORNEY FOX:**  No, no questions.  Thank you.

6           **PRESIDING COMMISSIONER BRYSON:**  All right.  Then

7    I'd like to ask the District Attorney to go to closing,

8    please.

9           **DEPUTY DISTRICT ATTORNEY WADDELL:**  All right.

10   Thank you very much.  With regard to Mr. Sullivan, he has

11   been convicted by plea of a violation of 2209 in

12   concurrent sentence.  (inaudible) it is worthy to note

13   that he did plead guilty to the charge of attempted

14   murder.  There was a sentence of seven years on that back

15   on those days.  The reason I mention that is because

16   there's been some issue concerning the gun, what he know

17   about the gun, how the gun was used, what was the

18   condition the gun, and so on and so forth.  With regard

19   to the -- what his true intent was, I've been  -- it's

20   instructive and we can infer that the plea of guilty to

21   attempted murder does in fact reflect the true facts of

22   the case.  I would suggest that if the -- I won't go into

23   it right now, but if the Board wants to get a little bit

24   more information about the gun and how it was used, and

25   whether it was operable or inoperable, whether it was

53

1    loaded or unloaded, a probation report on Pages 8 through
2    10 and 13 and 14 of the probation report goes into that
3    in some detail.  Of course, there was no trial in this
4    case, so we don't have a transcript of the testimony from
5    that, and simply his probation would be put on to
6    (inaudible), you know, the hearing.  Another --
7    concerning the operability of the gun is not really
8    relevant to the charge of enhanced 12020.5.  A big point
9    that I think that concerns us is there's -- there's
10   multiple victims in this case, both Mr. and Mrs. Reily,
11   who were threatened with rape and death over a
12   substantial period of time.  They were held at gun point
13   by the inmate and his accomplice.  They were threatened
14   both personally, and (inaudible) was displayed to them as
15   they were held -- held hostage in their home.  The
16   motive, I think, was relatively trivial given the gravity
17   of the offense even though the amount of money that they
18   inmate and his accomplice tried to get was substantial.
19   He did have a leadership role in the crime, and at age 29
20   this is not an act of (inaudible) youth.  It's
21   interesting that he does not have a substantial criminal
22   history.  He does have a drunk driving and a couple
23   arrests -- arrests for 647(f) drunk in public, and a
24   vandalism.  Those charges were dismissed, but there's
25   some indication, although that's (inaudible) not a

55

1    substantial period of time to (inaudible)  During this
2    period of time the inmate himself had had numerous
3    opportunities to reflect upon the serious nature of the
4    acts he was embarking on and chose to go forward with it,
5    and it's noteworthy that he indicated that his judgment
6    was not impaired by alcohol at this time but that it was
7    motivated by greed.  The victim, of course, has noted as
8    well as the Walnut Creek Police Department and has
9    continued throughout the years to write the Board
10   opposing parole.  And you have the latest letter filed,
11   and you got one last year and the year before that and
12   the year before that.  The victims could have -- were
13   vulnerable in this case.  So these were just business
14   people showing what they felt were perspective clients a
15   house, and they had no reason to suspect that granted
16   they were the -- the victims of impending -- impending
17   kidnapping, and of course the inmate was armed with a --
18   with a handgun , which was loaded by the way, even though
19   there was a possibility malfunction, but I think it's
20   important to note that gun was thrown away by the victim,
21   Mr. Reily, and the reason was because it was because it
22   was damaged to a certain extent when it was thrown away,
23   but also there is some evidence to state there was damage
24   before it had left Mr. Sullivan's possession.
25            PRESIDING COMMISSIONER BRYSON:  Mr. Waddell, I --

56

1    Mr. Waddell, I don't want to interrupt you, but I didn't

2    hear something, and never any going back if I just didn't

3    hear something, so I'm going to ask you to -- if you

4    would repeat.  You made some reference to the gun,

5    whether it was or was not loaded, and -- and I didn't

6    hear that, so would you mind restating that?

7            **DEPUTY DISTRICT ATTORNEY WADDELL:**  Yeah.  The

8    weapon was loaded.

9            **PRESIDING COMMISSIONER BRYSON:**  Okay.  Thank you.

10           **DEPUTY DISTRICT ATTORNEY WADDELL:**  And again you

11   could take a look at the -- at the probation report at

12   the pages I've indicated, Pages 10 and 13 to 14.  You'll

13   see that that's the case.

14           **PRESIDING COMMISSIONER BRYSON:**  Understood.

15           **DEPUTY DISTRICT ATTORNEY WADDELL:**  Okay.

16           **PRESIDING COMMISSIONER BRYSON:**  Thank you.

17           **DEPUTY DISTRICT ATTORNEY WADDELL:**  Prior record

18   apparently is minimal.  That's a positive thing in his

19   behalf.  His social history, I think, needs to be stated

20   as being unremarkable, although he does admit to

21   significant alcohol abuse during the time of the

22   incident, but he does not have a significant criminal

23   history.  He has a done well in the institution.  I will

24   give -- I will give him that.  He's done well

25   vocationally.  He's been involved in and average of about

57

1    three different programs a year.  He's involved in AA.
2    He's -- he's got a number of certificates, and he's used
3    his time well.  The psychiatric factors, he does state he
4    didn't attempt to kill anybody, but again, he pled guilty
5    to the attempted murder, and the gun was loaded, as you
6    will see.  In 2002 he was assessed as a moderate-to-mild
7    risk.  Somewhere between 2002 and 2005 he achieved the
8    level of low risk according to the psychiatric report,
9    and in 2007 the overall assessment of low risk.  In and
10   interest of good faith, my concern is that the -- we
11   don't know exactly when he got to the point of being a
12   low risk, but even if it's a little bit before 2005,
13   that's still apparently recent, and I think a little
14   while longer period of observation would be necessary for
15   us to feel certain that the -- that the risk is in fact
16   no longer there.  The 2007 psych report for support a
17   release.  His parole plans appear to be good, and we have
18   no problem with any of that.  I think our big -- biggest
19   concern about Mr. Sullivan is number one, the fact that
20   this was a very violent, well-planned and thought out
21   crime, that he did plead guilty to an attempted murder,
22   there were multiple victims in this case, and the
23   psychiatric reports while positive, are relatively recent
24   when it comes to assessing him as a low risk.  That
25   together with the fact he's got multiple convictions in

58

1    this case.  So all in all, I feel he's done well.  He

2    should be commended for that.  We feel a one-year denial

3    is appropriate.  And that's from both the police

4    department, our office, and Mr. Reily recommend.  Thank

5    you.

6         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

7    now, Counsel, I'd like to your closing statement.

8         **ATTORNEY FOX:**  Thank you.  I respectfully disagree

9    with my colleague from Contra Costa County.  It would be

10   appropriate to find Mr. Sullivan suitable today because

11   he is.  Going to the crime, we can't go back and change

12   the facts that happened on that day.  Mr. Sullivan has

13   expressed deep remorse and insight in the causative

14   factors that led him into the Reily's that day, and he is

15   sincerely remorseful.  The Board report is supportive.

16   The psychiatric or psychological evaluation is supportive

17   as well, so I won't comment further on those except that

18   say that trained professionals who had an opportunity to

19   view Mr. Sullivan on a daily basis or a prolonged period

20   of time have come to those supportive conclusions.

21   Turning to the Walnut Creek Police Department's letter,

22   which I objected to, I feel I must comment that it does

23   fail to acknowledge any of gains in insight achieved by

24   Mr. Sullivan over the 25 years of his incarceration.

25   They have considered nothing that he has done to better

59

1    himself and to prepare himself to reintegrate in society.

2    So the opinion there is forever locked into the immutable

3    past, and I think should be given whatever value the

4    panel thinks its worth.  Turning to his parole plans, Mr.

5    Sullivan does enjoy the support of his family, and that

6    has endured over the years.  He's in touch with his

7    daughter and her family as well as his mother.  He has a

8    broad spectrum of marketable skills, and he is

9    employable.   The PIA people who have viewed him over the

10   years said he's conscientious and dependable and would be

11   an asset in any business.  I think half of being

12   successful is just showing up on time, and yet he goes

13   the extra distance and looks for work to do.  He has

14   involved himself with AA and number of self-help

15   activities.  Many are new, and he keeps looking for new

16   ones.  Takes something from one and moves to the next one

17   to help him understand what happened in his life.  I

18   think it is appropriate and accurate to state that

19   although very serious, the kidnaps, the attempted murder

20   that he's pled guilty to, are isolated incidents of

21   aberrant behavior, and that's clear in Mr. Sullivan's

22   past.  A drunk in public is what I saw and vandalism.  I

23   don't know the facts of that.  Allegation that was

24   ultimately dismissed, and then one DUI, and serious, but

25   nonetheless nothing that would indicate that Mr. Sullivan

60

1    is a violent man.  So I think it would be appropriate to

2    find Mr. Sullivan suitable and set a date for his release

3    today.  I'll submit on that, unless there's something

4    further that Mr. Sullivan would like to add.  Would you

5    like to make a statement.

6         **PRESIDING COMMISSIONER BRYSON:**  Sir, you're

7    welcome to make a statement at this time.

8         **INMATE SULLIVAN:**  Thank you.  What I did back in

9    1982 is something that I will always regret in my life.

10   I've been working hard to try to get my freedom back.

11   And I -- I got to say I -- I think of Mr. -- Mr. and Mrs.

12   Reily were here today, I think of all the great pain that

13   I caused them, and I'm sorry that Mrs. Reily died.  I'm

14   really sorry to hear that.  It's not easy.  It's not easy

15   being in prison, you know.  I've grown a lot since I left

16   the street in '82.  I really didn't have -- I had no idea

17   what I really wanted to do in my life, but I do today.

18   I know that -- my next kid, I didn't know how to be a

19   father.  I think I can be a good father when I get out.

20   I know my daughter's grown, but she's got -- she's got

21   kids that I love, and I can kind of keep them on the

22   right track.  I was hoping that I could get out like and

23   be with my mom before she dies.  I know what I did is

24   wrong, and I know that no matter what happens to me when

25   I get out, I'd never break the law.  I never would do

61

1    anything that would put me back in this type of

2    environment.  This environment will make you see who you

3    really are.  It will make you become the person that you

4    talk to your brother.  I believe my heart I'm a good,

5    decent person.  I made a bad decision in my life when I

6    was 29, but in a way, it helped me grow to who I am

7    today.  The only thing, I hate that I did some wrong to

8    someone else.  And I don't see myself doing that.  I

9    don't see myself breaking the law for no reason because

10   I'm the mother -- I mean, I'm the -- I'm the son that my

11   mother raised to be a good person.  And I am a good

12   person.  I made that decision in my life.  I hope that

13   I'll be able to get out and go to work before I won't be

14   able to go to work, to do something for myself for I

15   don't want nobody taking care of me.  I know who I am.

16   I'm not a threat to anyone.  And you make mistakes in

17   your life.  My grandmother always told me, she'd say you

18   -- you learn from your mistakes, and it was a bad one.

19   And it's one that I will never forget and one that I'm

20   always -- it's like a reminder of who I am.  And I am a

21   good person.  Without -- and all the years I've been, I'm

22   still -- I'm still a good person.  I'm good in my heart,

23   and I know I could do good when I get -- whenever I get

24   to the street.  It's just who I am.  I'm not a bad

25   person, I'm really not.  It was just a bad decision I

62

1    made in my life, and I am trying every day to change and

2    to make good -- good decisions in my life, and that's

3    what I've been trying for, to make good decisions.  So I

4    don't know -- I guess I could sat I've been in prison, as

5    I continue doing what I'm doing, I could say (inaudible)

6    it's not easy staying disciplinary free.  You can wake up

7    in the morning and get involved in something that you

8    have no idea what you get involved in.  I got to come

9    back and explain that.  And I'm not into anything.  I'm

10   trying to do right.  Because that's just what I do.  I --

11   I -- that's what I do.  I do more right for me and

12   others, and it was -- it was a bad decision (inaudible)

13   and I'm sorry for it.  I don't know why it is, I can't

14   say, but you change.  I believe that.  Thank you for

15   that.

16           **PRESIDING COMMISSIONER BRYSON**:  Thank you for the

17   remarks.  And now recess for a little break.  The time is

18   14:(inaudible)

19                       **R E C E S S**

20                        --o0o--

21

22

23

24

25

63

1              CALIFORNIA BOARD OF PAROLE HEARINGS

2                     D E C I S I O N

3         PRESIDING COMMISSIONER BRYSON:  We're back on the

4    record.

5         PRESIDING COMMISSIONER BRYSON:  Thank you.  The

6    time is now 15:55.. we've reconvened for the decision in

7    the matter of Jerry Lee Sullivan, and all parties have

8    returned to the room.  And sir, this panel reviewed all

9    information received from the public and relied on the

10   following circumstances in concluding that you're not yet

11   suitable for parole and would pose an unreasonable risk

12   of danger to society and a threat to (inaudible) safety

13   if released from prison.  Sir, this is a one-year denial,

14   and I will be discussing specifically why we have come to

15   this -- to this decision.  First of all, this offense was

16   carried out in an especially cruel and callous manner and

17   than on July 2nd of 1982 sometime after 14:00 real estate

18   agents Patricia and William Reily, the victims, were

19   particularly vulnerable as though showed up home to you

20   and your partner.  Under the pretext of looking to

21   purchase a home, you and your companion abused the couple

22   as they were walking out the house after showing it to

23   the inmate, to you.  Multiple victims were attacked or

24   injured in this same incident.  (inaudible) your

25   **JERRY SULLIVAN  C-66878    DECISION    PAGE 1  7/30/07**

64

1    companion forced Mrs. Reily into her car, telling a third
2    party who (inaudible) to the scene to leave.  You told
3    Reilys -- the Reilys that you had a gun and you would use
4    it to insure their compliance. Directing Mr. Reily into
5    the car, they drove to the Reily's home in Walnut Creek.
6    There they demanded a $150,000 ransom be approved
7    (inaudible) message.  This offense was carried out
8    dispassionately and in a (inaudible) manner in that the
9    message included threats to rape and murder to Mrs. Reily
10   and then to Mr. Reily.  After the Reilys -- the Reilys
11   explained they didn't have that kind of money, the plan
12   evolved into a bank withdrawal, and they drove to the
13   bank, holding Mr. Reily hostage while his wife made the
14   withdrawal.  Inside the bank Mrs. Reily alerted the
15   teller with a note to call the police.   Arriving
16   officers intercepted the inmate and his accomplice --
17   that is you, sir -- trying to get away.  A police pursuit
18   ended when he lost control you lost control of the
19   vehicle, crashing into a fence.  You and Mr. Reily
20   struggled for the gun, you sticking the gun into Reily's
21   ribs and pulling the trigger, but it did not fire.  This
22   offense was carried out in a manner demonstrating callous
23   disregard for human suffering.  The Reilys thought they
24   were going to die at every instant.  Public safety was at
25   JERRY SULLIVAN  C-66878  DECISION   PAGE 2   7/30/07

65

1    risk   (inaudible) and you had a clear opportunity to
2    cease.   You could have ceased this involvement at the
3    bank.   You could have ceased this involvement during the
4    during the -- there did not need to be a car chase.  You
5    could have stopped for the officers, but you choose to
6    continue, and pulling Reily out of the car at gun point,
7    you tried to escape.  You went through the bushes.  Both
8    you and Mr. Reily fell.  You were immediately surrounded
9    by police officers, and you were arrested.  The motive
10   for this crime moreover was very trivial in relation to
11   the offense.  It was more money.  And I will come back to
12   address your understanding of this crime in one moment.
13   You have, sir, no prior record, and you admitted and have
14   been very frank with this panel as to some alcohol abuse
15   during a period coincident with the commitment offense
16   that you -- or saying that you were not under the
17   influence at the time of the commitment offense.  You
18   have nothing in your record to determine the convictions.
19   You substantiated you had an alcohol problem.  Now, you
20   have said to this panel today that you had a DUI.  We
21   don't have a regard of the DUI, and we have no DUI
22   conviction records on file.  So as far as we know, first
23   the  (inaudible) and implication investigation bureau
24   have found, we have no history of -- of criminality in
25   **JERRY SULLIVAN  C-66878   DECISION   PAGE 3   7/30/07**

66

1     your record, which is to your benefit, sir.  As to your

2     institutional behavior, you have had commendable

3     programming.  Reading level has been stated on record as

4     being 12.9.  You have a history in PIA sewing machine

5     operation, PIA furniture finishing, and you have

6     certificates for efficiency in both.  We believe you have

7     a vocational certification of completion in upholstery in

8     1992.  A report certified fork lift operator, a number of

9     laudatory chronos were read into the file.  You've been

10    continuously participating in AA, and this, despite not

11    having a history of chronic addiction, but you

12    articulated to this panel what you've been getting from

13    the program.  In fact, you did a good job with that.  We

14    also noted that you had participated since the last year

15    in nonviolence communication, a 16-week class.  You've

16    continued your participation in AA.  And you've also been

17    participating in 2006 and 2007 in the impact program, and

18    you're currently in session six of that impact program

19    that you have completed all five previous sections of

20    that program.  So you have programmed extensively in

21    self-help, and I should say that previous board reports

22    show that you have programmed very well in the past along

23    with your participation in programs from 1992 to the

24    present time has been put into the July 2006 board report

25    JERRY SULLIVAN  C-66878   DECISION   PAGE 4   7/30/07

67

```
 1    and shows that you have participated in all of these

 2    programs, and your discussion here today shows that you

 3    are gaining information and direction from those

 4    programs.  So we feel they are valuable to you, and you

 5    have over 37 certificates of completion.  As to your

 6    misconduct in prison, you have an outstanding record.

 7    You have zero 115s.  You have one minor 128(a), but you -

 8    - you -- your record is to be commended because it's

 9    outstanding.  We rarely see inmates here who have zero

10    115s.  As to the psychological report dated March 23$^{rd}$ of

11    2007 by Dr. Richard Sterrit, Dr. Richard Sterrit assesses

12    you as having a low psychopathy and a low risk for future

13    violence and gives you a finding of assessment function

14    of 80.  He basically supports your parole.  As to the

15    parole plans, you do appear to have viable residential

16    plans with your mother, with Doretha Sullivan James --

17    Sullivan James -- excuse me, Sims.   Let me state her

18    name again.  My apologies.  Doretha Sullivan Sims, and

19    you do appear to have -- and to be employible through all

20    of your PIA work, even though you did not present a

21    chrono, but that's not required by law, so you do appear

22    to have eminently marketable skills.  As to Penal Code

23    3042 responses, responses indicate our position in

24    finding your parole suitable specifically by the District

25    JERRY SULLIVAN  C-66878   DECISION   PAGE 5   7/30/07
```

68

1    Attorney of Contra Costa County, Walnut Creek Police
2    Department, and the victim in this case, Mr. Reily.  Mrs.
3    Reily has since died.  So what it came down to for this
4    panel was the question that remains in this panel's mind,
5    and our concern is it's going to remain in future panels
6    now, so we have seriously addressed it.  If you in fact
7    continue to minimize your intent and your roll in this
8    commitment offense, and that calls into question if you
9    truly understand the nature and magnitude of this
10   commitment offense.  You've -- you exercised your right
11   not to discuss the crime today.  It is your right;
12   however, that leaves us with what we have put on record,
13   and what we are left with is you are saying that you
14   never planned the victims would be killed, and reportedly
15   it says everything was happening so fast, it all seemed
16   to be a blur, and that you remember Mr. Reily grabbing
17   the gun, but you say you never pulled the trigger because
18   you knew the gun would not work.  And if -- that is --
19   that is the stopping point for this panel, sir.  We --
20   you said it was not my gun, it was inoperable, and I did
21   not intend to shoot.  First of all, you were 29 years
22   old.  Sir, it stretches credulity to think you would take
23   the gun to such a crime as this and think the gun
24   wouldn't work, that you would, in fact -- that you would,
25   JERRY SULLIVAN  C-66878   DECISION   PAGE 6   7/30/07

69

1    in fact, take any gun and think it would work, there's no

2    evidence that says that that gun was inoperable when you

3    took it to the -- to the crime, and you didn't apparently

4    know it was inoperable.  We don't see any evidence that

5    you even know it was.  And it misfired when you extracted

6    the victim from the vehicle.  It's also not credible,

7    sir, that this victim made up that you attempted to fire

8    that weapon.  The click of a gun -- of a gun trigger

9    being pulled such that the hammer was back and then moves

10   forward is an unmistakable sounds when it happens right

11   near your own stomach.  It's not credible that that

12   person would lie about that.  That he -- he -- he must

13   have thought he heard it, but sir, the indications are

14   that you probably did.  The gun was stuck in his ribs or

15   his stomach, wherever it was, and it was right there, and

16   it was his life, and it would seem credible if that he

17   said he heard it that, in fact, he did.  So then we have

18   to look at was the gun in fact operable, and we'll --

19   probably no one will ever know if it was, in fact,

20   operable at the time, but the fact that the pin fell out

21   of your pants, sir, indicates that somehow that gun went

22   through a lot in the course of being in your pants.  Real

23   guns -- the revolver are fairly simple weapons, and

24   frankly it's -- it's not credible to this panel that you

25   **JERRY SULLIVAN  C-66878   DECISION   PAGE 7   7/30/07**

1    would have used that gun the way someone would who was

2    intending to kill someone if -- if you say well, it

3    wouldn't be a working gun.  So why would you jam it in

4    his -- in the gentleman's ribs and follow him out of the

5    car and tell him you were going to shoot him?  It just

6    doesn't make sense, sir.  But we have another issue, and

7    we feel that maybe this will help clear it up because we

8    don't want to continue to tell you that we need to have

9    some prove that you understand the nature and magnitude

10   of this crime if, in fact, you are doing the best you can

11   and that somehow you don't understand how to proceed with

12   this, so if I may, I'll turn to my colleague to ask her

13   to elaborate on this subject a bit further.

14   Commissioner.

15           **DEPUTY COMMISSIONER SHIELDS**:  Okay .  I agree with

16   everything the Commissioner said, and what we're trying

17   to do is to move beyond this giving you one-year denials

18   year after year.  We got stuck -- because, I mean, you

19   have a great record before this crime, and you have a

20   great record after, and usually it's the crime that's

21   inexplicable, but our problem is that you're inexplicable

22   now.  And, you know, we don't understand why your story

23   is what it is, and, I mean, we just ended up guessing.  I

24   mean, is it what you're attorney's calling a -- a speech

25   **JERRY SULLIVAN  C-66878   DECISION   PAGE 8  7/30/07**

71

1    problem?  Is it because your anxious, you know, when

2    people look at you?  Is it something else we don't know,

3    or another thing that comes to my mind is because you

4    mention somewhere that you didn't want to be a snitch.

5    You know, are you trying to protect somebody, and what we

6    want to suggest is that you meet with an attorney and sit

7    down and -- and this is only a suggestion.  I mean, this

8    isn't mandatory, but that you sit down and see if you can

9    write down what the facts are of this crime.  And then

10   you could consult with an attorney about whether or not

11   in the future you want to -- to actually let people know,

12   but it's -- it's as much your inability to let us in on

13   what went wrong as it is what went problem.  That's the

14   problem now.  Does -- does that make any sense?

15            **INMATE SULLIVAN**:  Yes.

16            **DEPUTY COMMISSIONER SHIELDS**:  Okay.  So, you know,

17   and we even -- because in the beginning, Ms. Fox, when

18   you were talking about an ADA issue, I kind of felt

19   what's this lady talking about?  But I think we have the

20   same feeling that maybe there's an ADA issue here that

21   we're not picking up that's some kind of block on

22   processing this information.  But, you know, again we

23   don't want to jeopardize himself, so I think the safest

24   thing is for him to sit down and talk to an attorney and

25   **JERRY SULLIVAN  C-66878   DECISION   PAGE 9   7/30/07**

72

1    get legal advice and what to do and then decide where to

2    take it from there.  We're trying to do a similar thing

3    by asking for a -- a new psychological that really

4    doesn't address the traditional issue.  What -- we didn't

5    check all the boxes.  What we want is also for the

6    psychologist to take a look and go is there some

7    communication problem here that is putting you in a -- a

8    bad light, you know, unfairly.  So hopefully within the

9    next year you'll have a chance to talk to two people,

10   one, an attorney, and two, a psychologist to try to sort

11   out this one issue that is, you know, the stumbling block

12   for us.

13            **INMATE SULLIVAN**:  All right.

14            **DEPUTY COMMISSIONER SHIELDS**:  Does that make

15   Sense?

16            **INMATE SULLIVAN**:  Yes, sir, that makes sense.

17            **DEPUTY COMMISSIONER SHIELDS**:  Okay.  Thank you.

18            **PRESIDING COMMISSIONER BRYSON**:  And in fact we are

19   ordering a new psychological evaluation with some very

20   specific requests noted, and so please cooperate with the

21   psychologist, and it may -- you should have a longer

22   interview than normal just so have -- to go over some of

23   these issues and in a relaxed setting and discuss them in

24   an open way, and also we believe you'll have time with

25   **JERRY SULLIVAN  C-66878   DECISION   PAGE 10   7/30/07**

73

1  your attorney as well, and we're -- we're recommending

2  that you continue on your discipline-free path.  We know,

3  sir, that's not easy.  We -- we are very well aware of

4  that.  Both of us work inside the walls, so we know.

5  And that you continue with your excellent programming,

6  and well look for you in a year.

7          INMATE SULLIVAN:  All right.

8          PRESIDING COMMISSIONER BRYSON:  All right, sir.

9  (inaudible)

10          INMATE SULLIVAN:  Thank you.

11          ATTORNEY FOX:  One last thing.  Have  -- the new

12  forms say that we need to request a copy of the decision,

13  and --

14          PRESIDING COMMISSIONER BRYSON:  Oh.

15          DEPUTY COMMISSIONER SHIELDS:  Oh.  (inaudible) you

16  know -- know what.  Usually -- I didn't want to distract

17  from what was going on.

18          ATTORNEY FOX:  And also a copy of the transcript

19  of the hearing should be sent to --

20          DEPUTY COMMISSIONER SHIELDS:  That is -- it should

21  be standard.

22          INMATE SULLIVAN:  Yes.

23          DEPUTY COMMISSIONER SHIELDS:  It has not been

24  happening?

25  JERRY SULLIVAN  C-66878   DECISION   PAGE 11   7/30/07

74

1          **ATTORNEY FOX:**  In the past it's been happening

2     within -- within 30 days.  Now they're saying it's more

3     like 90 or when the decision becomes effective, and I

4     know they're complaining if (inaudible) so we are

5     requesting a copy of the transcript, and thank you for

6     the decision.

7          **DEPUTY COMMISSIONER SHIELDS:**  And, you know, I

8     would add for the record that I think in this case it's

9     particularly important that your client have this

10    transcript as soon as possible because we were pretty

11    directive in the information we're trying to give him,

12    and again, if he's having a little trouble communicating,

13    he may need to see it in writing.

14         **PRESIDING COMMISSIONER BRYSON:**  I could fax you a

15    copy to the psychologist, perhaps --

16         **ATTORNEY FOX:**  Right.

17         **PRESIDING COMMISSIONER BRYSON:**  -- to review the

18    transcript also.

19         **ATTORNEY FOX:**  We feel that --

20         **DEPUTY COMMISSIONER SHIELDS:**  What we --

21         **ATTORNEY FOX:**  -- someone you might want to take

22    that with you.

23         **DEPUTY COMMISSIONER SHIELDS:**  Said is the

24    transcript is important, and you might want, if you don't

25    **JERRY SULLIVAN  C-66878  DECISION  PAGE 12   7/30/07**

75

1    have it within 30 days, to just start doing the 602 or

2    something or do whatever -- or have your attorney do

3    whatever it takes.

4            **ATTORNEY FOX:**  Yes.  Yes.

5            **DEPUTY COMMISSIONER SHIELDS:**  Do you agree.

6            **ATTORNEY FOX:**  Yes.

7            **PRESIDING COMMISSIONER BRYSON:**  Okay, sir.

8            **INMATE SULLIVAN:**  Thank you.

9            **DEPUTY COMMISSIONER SHIELDS:**  Okay --

10           **INMATE SULLIVAN:**  Thank you.

11           **DEPUTY COMMISSIONER SHIELDS:**  -- good luck to you,

12    sir.

13           **INMATE SULLIVAN:**  Thank you.

14           **DEPUTY COMMISSIONER SHIELDS:**  Today is July 31st,

15    and the Commissioner and I are going on the record.  We

16    want to record that the ending time for the last hearing,

17    Sullivan, C-66878, was 16:09, and that concludes anything

18    that we have on this track, and we will go on to the next

19    track and the next hearing.

20               **A D J O U R N M E N T**

21    **PAROLE DENIED ONE YEAR**

22    **THIS DECISION WILL BE FINAL ON:**___**NOV 2 7 2007**_____

23    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

24    **DATE, THE DECISION IS MODIFIED.**

25    **JERRY SULLIVAN  C-66878   DECISION  PAGE 13   7/30/07**

76

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, ROBERT WEISZ, a duly designated transcriber,
FOOTHILL TRANSCRIPTION COMPANY, INC., do hereby declare
and certify under penalty of perjury that I have
transcribed the audio recording which covers a total of
pages numbered 1- 75, and which recording was duly
recorded at SAN QUENTIN STAE PRISON, SAN QUENTIN,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of JERRY LEE SULLIVAN, CDC No. C-
66878, on JULY 30, 2007, and that the foregoing pages
constitute a true, complete, and accurate transcription
of the aforementioned audio recording to the best of my
ability.

I hereby certify that I am a disinterested party in
the above-captioned matter and have no interest in the
outcome of the hearing.

Dated SEPTEMBER 14, 2007 at Sacramento County,
California.


Robert Weisz, Transcriber
**Foothill Transcription Company, Inc.**

EXHIBIT "B"

1

2                SUPERIOR COURT OF THE STATE OF CALIFORNIA

3                  IN AND FOR THE COUNTY OF CONTRA COSTA

4

5    THE PEOPLE OF THE STATE OF CALIFORNIA)
                                          )
6                              Plaintiff, )
                                          )
7                      vs.                )      Department No. _____ 2 _____
                                          )
8    JERRY LEE SULLIVAN (29)              )      Docket No. _____ 26837 _____
                                          )
9    DOB: 3/19/53 _____ Defendant   )

10          PROBATION OFFICER'S REPORT AND RECOMMENDATION

11

12   CHARGED WITH:    Counts 1 and 2:   209(b) PC(Kidnapping to Commit
                                        Robbery) with use of a firearm
13                                      within the meaning of Penal Code
                                        Section 12022.5;
14
                      Counts 3 and 4:   211 PC(Robbery) with use of a
15                                      firearm within the meaning of
                                        Penal Code Section 12022.5;
16                    Count     5:      187-664 PC(Attempted Murder);

17                    Count     6:      245(a) PC(Aggravated Assault) with
                                        use of a firearm within the
18                                      meaning of Penal Code Section
                                        12022.5;
19
     GUILTY OF:                         No Conviction - referred pursuant
20                                      to 131.3 CCP (pre-plea report)

21   DATE OF OFFENSE:                   July 2, 1982 (All Counts)
     DATE OF ARREST:                    July 2, 1982
22   CUSTODIAL STATUS:                  Jail(In custody 153 days to Court
                                        date)
23   DATE REFERRED TO
     PROBATION OFFICER:                 November 2, 1982
24
     PROBATION REPORT DUE:              December 2, 1982
25   ATTORNEY FOR DEFENDANT:            Marcus Peppard, 3615 Bissell Ave.,
                                        Richmond, California
26   RECOMMENDATION:

     It is respectfully recommended that, should guilt be established
     in this matter, probation be denied.

JERRY LEE SULLIVAN          -2-

1    PRIOR RECORD:

2    CII NUMBER:      06746959

3    FBI NUMBER:      41794W3

4    Sources of Information:

5    Alameda County CIB
     Walnut Creek Police Department
6    California Department of Motor Vehicles
     Livermore Police Department
7    Shreveport(Louisiana)Police Department
     Fremont Police Department
8

9    Adult Record:

10       No current CII criminal history has been received on this

11   defendant.  According to the Alameda County CIB, where the defendant

12   has resided for the past eleven years, it indicates the following

13   conviction:

14   12/19/81   CHP            23102a VC(Drunk        1/19/82: Pled guilty;
                                driving)              $355 fine plus penalty
15                                                    assessment, 12 months
                                                      Court probation.
16
         The defendant claims that he still owes money on this
17
     particular fine.  It is noted that the defendant has failed to
18
     pay his fine and his probation is in the revoked status.
19
         Contacts were made with the police departments in the various
20
     cities in which the defendant has resided.  According to all
21
     information available, this is the defendant's only conviction.
22

23   Juvenile Record:

24       No prior juvenile criminal history is reported.

25   Driving Record:

26       Driver's license number:  N4558039.

JERRY LEE SULLIVAN      -3-

| | | | |
|---|---|---|---|
| 12/11/79 | Oakland | 4454 VC(Failure to carry registra-tion card in vehicle) | 3/21/80: Forfeit bail $85. |
| 8/8/80 | Oakland | 4454 VC | 8/20/80: Forfeit bail $10. |
| 3/12/82 | Oakland | 22350 VC (Speed) | 4/1/82: Forfeit bail $76. |

No revocations or suspensions are reported. The defendant's driver's license expires in 1986.

INVESTIGATION:

According to reports from the Walnut Creek Police Department, the following appear to be the circumstances of this offense:

The victims, Mr. and Mrs. Reiley, are partners in Reiley Realty, with a business address at the time of the incident of 6900 Village Parkway in Dublin.

On July 1, 1982 Mr. Reiley made an appointment with the defendant and codefendant, William Buford, to meet at 34779 South Brichetto Court in Tracy which was listed for sale by the Reiley Realtor. The agreement was to meet at 10:00 a.m. on July 2nd. At approximately 9:00 a.m. on July 2nd Mrs. Reiley received a phone call from one of the defendants indicating that he had a dental appointment he had forgotten and he needed to cancel the 10:00 a.m. appointment. He would call back later to make another appointment. At approximately ten minutes to one Mrs. Reiley received another phone call from one of the defendants asking to talk to Mr. Reiley. After a brief conversation, Mr. Reiley told Mrs. Reiley that the appointment was now rescheduled for 2:00 p.m. that day. Mr. and

JERRY LEE SULLIVAN          -4-

1   Mrs. Reiley then drove to the residence on Brichetto Court in

2   Tracy.  They arrived at approximately 2:05 p.m.  They waited in

3   the residence until approximately 2:30, at which time Mrs. Reiley

4   looked out the window and saw an older model white Lincoln pull

5   into the driveway of the residence.  She noted that the vehicle was

6   occupied by two persons.  They came into the residence and one

7   person identified himself as "Dennis Turner".  The Reileys showed

8   the residence, and after ten to fifteen minutes the two left.  The

9   Reileys then locked up the residence and left via the rear door.

10  Upon exiting, Mrs. Reiley observed the two standing in a back

11  field area.  They walked toward the Reileys  and the codefendant

12  walked with Mrs. Reiley to her vehicle.  The defendant stayed

13  behind with Mr. Reiley.  Mrs. Reiley became suspicious that something

14  was wrong, and her husband told her to "stay there".  She got into

15  her vehicle and attempted to roll up the window and lock the

16  door when the codefendant stopped her from closing the door.  He

17  then ordered her out of the car.

18      Mr. Reiley then told his wife to do what they said as they had

19  a gun.  They were requested to get into their vehicle, and Mrs.

20  Reiley got into the right rear seat position with the codefendant.

21  Mr. Reiley got into the right front seat with the defendant.

22  The codefendant then went back to the white Continental and brought

23  a large cassette player into the victims' vehicle.  At that time,

24  Mrs. Reiley realized that a third person was in the driver's

25  position of the white Continental.  She then heard the engine of

26  that vehicle start up, and she did not see the white Lincoln again.

Case 3:08-cv-01837-VRW    Document 1-2    Filed 04/07/2008    Page 18 of 76

JERRY LEE SULLIVAN          -5-

1  The defendant and codefendant took Mrs. Reiley's driver's

2  license, apparently to get her home address.  They got directions

3  from the victims on how to get to their (the victims') home.

4  While en route to Walnut Creek, they first stopped at a gas

5  station in Livermore.  They indicated they wished to use the

6  pay telephone, but someone else was using the phone at that

7  time.  They seemed to be noticeably upset because they could not

8  use the phone.  They then got off the freeway again in Dublin.

9  They drove a short distance, and asked where a telephone could be

10  located and what time it was.  They finally got back onto the

11  freeway.

12  They arrived at the victims' residence, located at 40 Sara

13  Lane in Walnut Creek.  The defendant entered the residence with Mr.

14  Reiley.  Mrs. Reiley and the codefendant then entered.  One of the

15  two brought the tape player into the residence.  They were made

16  to listen to the tape recording.  They indicated the voice sounded

17  as if it was modified.  Basically, the voice made the following

18  statements:

19      "Listen closely.  Because, this will not be repeated

20      and your life depends on your full cooperation, as

21      well as your wife's life.  Our organization has had

22      you under close surveillance for the past two years.

23      We know who and what you are, who you bank with, and

24      we know when you went to the bathroom last.  So, to

25      eliminate any time being wasted, we will not tolerate

26      any excuses or alibis at all.

JERRY LEE SULLIVAN          -6-

1    "We want two things today, Mr. Reiley.  We want

2    $150,000 in cash delivered here to your home

3    quick, or our man has orders to first - rape your

4    wife, then kill her, and then kill you.  If you

5    cooperate quickly no one will be harmed.  If you

6    do not cooperate, you both die quickly.  The

7    choice is entirely up to you."

8    The tape went on to indicate that the victims were allowed one

9  phone call to a qualified person who had access to the cash and who

10  could bring it to their home immediately.  The tape suggested

11  several ways which would allow them to obtain the cash and have

12  it delivered.  The tape also cautioned that "their" men were

13  intelligent and would be listening to every word that was spoken,

14  and their lives depended on their full cooperation. The tape

15  indicated that if they were to comply no one would be hurt; the

16  third party bringing the money and Mr. Reiley and his wife would

17  simply be tied up loosely and the men would leave.  It went on to

18  state that they were collecting a total of ten million dollars and

19  that Valley Realty of California had given $300,000 the day before.

20  No one was harmed.  Once again, caution was advised and refusal

21  to cooperate would mean death.

22      The victims attempted to explain that they were in no way

23  able to obtain that amount of money under any circumstances.  The

24  defendants indicated they did not believe the victims despite the

25  fact that the victims continued to explain they could not get that

26  amount of money.  The defendant stayed with the victims, continually

JERRY LEE SULLIVAN        -7-

1  displaying a handgun, while the codefendant went to another portion

2  of the house and appeared to be talking on the telephone.  Various

3  telephone conversations followed, in which it appeared that the

4  defendants were taking orders or decisions were being made by

5  another person.  The defendant and codefendant repeated the threats

6  that were made on the tape with regard to raping Mrs. Reiley,

7  killing her and then killing Mr. Reiley.  They indicated they were

8  following orders and that they had to do what they had to do.

9      Eventually, the Reileys were able to convince the two that

10  they were unable to get $150,000 cash, but they would try to get

11  whatever money they could at their bank.  Then all four got into

12  the victims' vehicle and drove to the Crocker Bank, Broadway Plaza,

13  Walnut Creek.  The defendant drove the vehicle.  The vehicle was

14  parked in the front parking lot to Capwell's, which was next to

15  the Crocker Bank.  Mrs. Reiley was instructed to go into the bank

16  and withdraw all the money that she could.  She would then be

17  picked up when she came out of the bank.  She walked into the

18  bank, leaving her husband sitting with the two defendants.

19      Inside the bank. Mrs. Reiley asked to cash three paychecks

20  that she had received from the Murray School District totalling

21  $4,000.  She asked to withdraw all the money that she had in

22  savings, which was $354.65.  She also wrote a check for $10,000,

23  which she requested to cash, to be covered by what she called a

24  "prime line account"; an account which allowed her to withdraw

25  that amount of money on demand.  She also wrote a brief note which

26  said, "Please give me the money without hassle, my husband is

1   being held by a gunman; Help me!  Call police".  She handed the

2   note to the teller who, in turn, called police.

3       Officer Soberanes was the first to arrive, and he contacted

4   the bank manager who gave him the handwritten note.  Within a short

5   period of time Officer Perry arrived.  They carefully concealed

6   themselves so any other persons in the area would be unable to

7   tell that they were in the bank.  The bank manager pointed out the

8   victim, and one officer motioned for her to walk over to them.

9   She indicated she did not want to leave the teller's window.  The

10  bank manager contacted her and confirmed what had been stated in

11  the note.  He also received a description of the vehicle, which

12  Officer Soberanes broadcast.  The victim was then moved down to

13  a teller's window which was out of view of the outside windows.

14  Mrs. Reiley again told police that her husband was being held at

15  gunpoint by the defendants who had demanded that they give them

16  $150,000 cash.

17      Meanwhile, the two defendants observed police coming to

18  the area.  They began driving away, and a police unit attempted to

19  stop them.  A pursuit began, during which the two asked Mr.

20  Reiley for directions to the freeway.  During the pursuit, the

21  codefendant asked Mr. Reiley if he was going out the door, and the

22  defendant said "I'll shoot him".  The defendant became very hostile

23  toward Mr. Reiley indicating that he had "blown it" and he was

24  going to shoot him.  The defendant then lost control of the

25  vehicle, and collided with a raised wood framed sidewalk at

26  1335 Treat Boulevard.  The vehicle then slid into a wood fence,

JERRY LEE SULLIVAN          -9-

1   finally coming to rest against a tree.  The impact caused the

2   defendant to be thrown on top of Mr. Reiley.  Mr. Reiley reached

3   for the gun but missed it.  The defendant then pushed the gun into

4   Mr. Reiley's ribs and Mr.Reiley heard the distinct sound of the

5   hammer of the gun falling down as if the trigger had been pulled.

6   However, the gun did not discharge.  Mr. Reiley opened his door,

7   and he and the defendant tumbled out on the ground beside the

8   vehicle.  The defendant then grabbed Mr. Reiley around the neck

9   and put the gun beside his ear.  He dragged Mr. Reiley approximately

10  40 to 50 feet away from the vehicle through the bushes.  They

11  slipped and fell to the ground, and were immediately surrounded

12  by several police officers who were shouting commands at the

13  defendant.  The defendant continued to hold the gun to Mr. Reiley's

14  head and did not comply with the orders to drop it.  However, he

15  eventually dropped the gun, which Mr. Reiley grabbed and threw

16  away from them.  The defendant was then taken into custody.

17      Mr. Reiley sustained a possible broken nose, moderate abrasions

18  on both elbows and pain in the ankles.  He had sustained these

19  injuries during the time that he was being dragged by the

20  defendant into through the bushes.

21      As Mr. Reiley was making his statement to police, he indicated

22  that, when the defendant pulled the revolver from his waistband,

23  the cylinder opened.  The defendant inserted one cartridge into

24  the cylinder before closing it.

25      Police noted that neither of the defendants appeared to be

26  under the influence of alcohol or drugs.  The victims indicated that

1  both defendants appeared fully aware of their actions throughout

2  the entire incident.  Blood samples were taken from the two which

3  indicated no intoxicants.

4     When the defendant was being handcuffed he stated, "The gun

5  didn't work".  Once again, while being driven to the police

6  station he voluntarily stated that the gun didn't work.  While the

7  defendant was being taken into custody, one officer obtained the

8  chrome plated .32 caliber Smith and Wesson which had been

9  discarded.  He noted that it appeared to be completely intact but

10 there were no cartridges in it.  Later, two .32 caliber Smith and

11 Wesson bullets were found in the general area where the defendant

12 was taken into custody and the gun discarded.

13    At the police station, the defendants were strip-searched, and

14 a small piece of metal, resembling a bent piece of coat hanger,

15 fell from the underwear of the defendant.  This metal was later

16 determined to be the cylinder pin to the revolver.  The defendant's

17 wallet was searched, and a small handwritten note with two phone

18 numbers on it was obtained.  The note read "Call me at 4:30".  In

19 a search of the codefendant, a second note was found in which the

20 victims' name, two phone numbers and the address in Tracy was

21 written.  On the reverse of that note another phone number was

22 written.

23    Police ran a DMV check on the two.  They found that the

24 defendant had a Lincoln Contintental registered to him.  It was

25 registered to the same address which was on his driver's license.

26 The defendant's brother was later contacted at that address and

JERRY LEE SULLIVAN            -11-

1   indicated that he had taken the defendant to Tracy, but had no

2   knowledge of what was to happen.

3        The defendant's girlfriend, Ms. Jessie Daniels, was contacted.

4   She was cooperative and indicated that the defendant had called

5   her from jail the previous evening asking her to get his car from

6   his brother, store it at her place and not let anyone else use it.

7   However, before she could comply with these directions, the

8   defendant's brother was arrested by Oakland Police Department.

9   She indicated that the defendant and codefendant had been seeing a

10  white guy in the past three or four weeks.  They had been very

11  secretive about meeting with him and what they were doing.

12       In later investigation, police found that four phone calls

13  had been made from the victims' residence during the time that the

14  defendants were at that residence.  One phone number was listed to

15  a pay phone near the Orchard Supply in Dublin, and a second phone

16  number was listed to a pay phone near Jim's Texaco in Dublin.

17       A search warrant was prepared on the defendant's home.  Within

18  the residence, a 3" x 5" notebook with a spiral ring binding

19  having papers similar in appearance to the note paper found in

20  the two defendants' possession was found.  The defendant's

21  vehicle was impounded and searched.  Police located a combination

22  address and calendar book.  Inside that book two pieces of paper

23  were torn out of a newspaper.  One of those pieces of paper had a

24  phone number and Mr. Reiley's name written across it in blue ink.

25  Then there was a message indicating to call at 0900 about

26  0830 have a dentist, make a twelve noon.  The other piece of

newspaper had an address and street directions to number 14927
Corcoran Avenue.  Police also found a brown bag containing four
new appearing rubber gloves in the vehicle.  In the trunk of the
vehicle they located two packages of rubber gloves which still had
the price tags on them.

On July 4, 1982 the defendant was interviewed.  He was asked
why he had picked the Reileys as opposed to any other persons.
He was evasive and indicated that he did not wish to answer the
question.  He admitted that his car was used to go to the house
in Tracy.  He admitted that his brother had gone with them, but
that he had not told his brother anything about what they were
going to do.  He and the codefendant went into the house while his
brother stayed in the car.  When they came out of the house he asked
his brother to drive his car home for him.  He was asked if he
intended to have his brother follow him and the defendant indicated
that he did, but after they got too far ahead of his brother they
did not see him.  He indicated he had no reason for stopping off
at the motel in Livermore and wanting to use the telephone.  When
asked if he intended to talk to another person on the phone, he
indicated that it was only a "front" in an attempt to make the
victims believe that there were other people involved.  He was
asked if he actually talked to anybody on the telephone, and he
stated they did not.  They made several phone calls to make it
appear that they were taking orders from someone else.  Police
indicated that the phone rang and it appeared that those calls were
being answered.  The defendant indicated he did not know who was

JERRY LEE SULLIVAN          -13-

1  on the phone those times because the codefendant was handling the

2  calls.  The defendant claimed that he made the cassette recording.

3  He was asked how he disguised his voice, and he became evasive,

4  indicating that he would rather not say.  He was asked who had the

5  idea for committing the crime, and he indicated that it was both

6  their ideas.  He stated there was no one else involved.  He did not

7  wish to say how he got the gun.  He was asked if the gun had been

8  loaded.  Without hesitation he indicated it had been and had five

9  bullets in it.  He indicated he had lost some of the bullets.  He

10 went on to explain that when he pulled the gun out from his

11 waistband the cylinder opened up, and he thought he dropped two

12 bullets on the ground.  He further explained he had lost the

13 cylinder pin, and that was why it had opened.  He indicated the

14 cylinder pin found in his underwear was the one belonging in the

15 gun.  He went on to state that he believed he dropped two more

16 bullets out of the gun while at the Reileys' home.  He was asked

17 if he thought the gun had some bullets in it when he had it at

18 the arrest.  He indicated he thought it had bullets in it.  When

19 asked if he intended to use the gun, the defendant replied that he

20 would not use the gun no matter what happened and had not intended

21 to hurt anybody.  He denied having put the gun against the victim's

22 side and pulling the trigger after they had crashed.  He felt the

23 victim was mistaken in his belief that the trigger had been

24 pulled. When asked if the two had actually been watching the

25 Reileys as the tape had indicated, the defendant stated they had not.

26 It was explained to the defendant that his brother and a neighbor

JERRY LEE SULLIVAN        -14-

1   had seen a white male in a black Continental come to his home

2   earlier that day and bring a tape recorder.  The defendant indicated

3   he did not know what the officer was talking about.

4       Laboratory work was done on the gun.  It was found that the

5   cylinder pin was missing, the side plate screw was missing, the

6   cylinder advance hand and spring was  not in the gun and the stud

7   that the hammer pivots on was broken off but still in its

8   location.  The gun was found to be inoperable.

9       The defendant and codefendant were held to answer out of

10  Walnut Creek-Danville Judicial District on August 5, 1982.  On

11  November 2, 1982 the defendant was referred to the Probation

12  Department for a pre-plea report to be submitted December 2, 1982.

13  On November 23, 1982 the codefendant was referred to the Probation

14  Department.  It has been learned that a third person, Mr. Robert

15  Davison, was held to answer on November 4, 1982.  Court files note

16  that the defendant and codefendant's trial is set for December 6,

17  1982.

18  DEFENDANT'S STATEMENT:

19      The defendant declined to submit a written statement indicating

20  that he would rather discuss the elements of this case personally.

21  He indicates that he did not understand what he was doing.  He

22  knows he will be punished and he reiterates what he indicated

23  to police, in that he did not intend to hurt anyone.  He realizes

24  that he had the gun, and during the course of the chase it wasn't

25  his intention to shoot.  The victim grabbed the gun and it scared

26  him.  He grabbed the victim and began dragging him.  He was not

JERRY LEE SULLIVAN          -15-

going to shoot him but he figured that he would have been killed
(by police) if the victim was not close to him.  The defendant did
not wish to discuss his initial involvement, and expressed a fear
for his life should he discuss many elements of this offense.  He
indicates that he cannot change his part in the crime and that that
part was wrong.  If he tells anymore he feels he would get a
snitch jacket and he does not wish to live with that in prison.  He
indicates that he and the codefendant, William Buford, were friends
on the street in Oakland.  They used to play ball together.  With
regard to the gun, he claims that the pin came out before they
left the house. He knew that the pin was not in the gun because the
bullets fell out.  He states that he had never heard the tape
before.  He didn't know what was wanted until after he himself
heard the tape.  He reports that the incident was planned, but he
was not the one that planned it.  The gun wasn't his, and he
didn't find it as he told police.  He simply had it.  He states
that many things that he told police were not true.  He was confused
at the time and didn't want to tell on anyone.  He reiterated
several times that he was the one that got himself involved, and will
have to do the time.  He can't change what he's done.  He knows
he will be punished, and then hopes to put his life back together.
He reiterates that he is not a violent person, and really didn't
try to kill or hurt anyone.  He reports that he was having
financial problems, and many things in his life were going wrong
at the time.  His baby's mother was hassling him about seeing his
child, and he had to fight to see the child, even though he was

1  paying child support for her. He speculates that the incident

2  was planned from three days to a week to his knowledge. He

3  indicates his only qualms about the police report was that he is

4  unsure about the gun having been thrown just prior to his arrest.

5  He felt that he was the one that threw the gun.

6  VICTIMS' STATEMENT:

7      Mr. Reiley was initially contacted by phone. He indicated that

8  he wished to make his statement to the Court. He reports that he

9  received a letter from the defendant on Saturday (November 20th)

10  asking forgiveness. It is Mr. Reiley's feeling that, while the two

11  were with them, it was the defendant who was the ringleader.

12  Initially, he was frightened but when he regained his composure,

13  he seemed willing to go ahead with what he had to do.

14      Mr. and Mrs. Reiley submitted a letter which is quoted here

15  verbatim:

16      "On July 2, 1982, my wife and I were subjected to the criminal

17  activities of William Buford and Jerry Lee Sullivan.

18      "The individuals kidnapped us at gunpoint, held us prisoners

19  in our own home while they robbed us and made ransom demands under

20  threat of immediate death. Their eventual capture came only after

21  a multi-car police chase at very high speeds through downtown

22  Walnut Creek, CA., which terminated when they wrecked our car and

23  tried to shoot me. Their actual surrender came as they had a gun

24  to my head.

25      "Fortunately our physical injuries are apparently minor, however,

26  the emotional trauma associated with these terrorists acts will and

JERRY LEE SULLIVAN          -17-

1  has had a continuing and far reaching effect on us.

2      "As citizens we want to insure that the responsible individuals

3  are punished to the fullest extent of the law.

4      "As victims we demand that they be imprisoned for as long as

5  possible without any possibility of their being released to resume

6  their terrorism." Signed/William S. Reiley and Patricia C. Reiley.

7  SOCIAL DATA:

8      This defendant currently resides in the Contra Costa County

9  Jail at Martinez.  He lists his residence address as 9418 Birch

10 Street in Oakland where he would live with his mother.

11     He was born on March 19, 1953 to George Collins and Dorthea

12 Sullivan Sims at Shreveport, Louisiana.  He does not know if his

13 parents were married.  He saw his father one time, and they did not

14 get along at that meeting.

15     His mother is employed as a hotel housekeeper.  She married Mr.

16 Cornell Sims when the defendant was quite young.  However, the

17 defendant was reared principally by his maternal grandmother, Jeanie

18 Limas.  He travelled back and forth between her home in  Shreveport,

19 Louisiana and his mother's home in Oakland, California.  The

20 defendant is the second of seven children.  He has an older brother

21 whose whereabouts are unknown.  His younger brother resides in

22 Berkeley.  Most of his other siblings reside with his mother or

23 in the Oakland area.  He reports that his older brother had some

24 police contact because of fighting.

25     As was reported earlier, the defendant travelled back and

26 forth between Shreveport, Louisiana and Oakland, California.  He

JERRY LEE SULLIVAN        -18-

reports that he finally settled in the Oakland area in 1971.  He
states that he graduated from Norfolk High School in 1971.
Verification of the defendant's schooling has been received.  It is
noted that his grade point average fell generally below the average
range.  The defendant claims that he has had no further education,
and is not interested in future educational endeavors.

Generally, the defendant claims that his health is fine.  He
cut his eye while playing football at a very young age, and cannot
see out of that eye.

He enjoys drawing, shooting pool, running, fishing and bowling
in his leisure time.

The defendant claims that in 1971 he began having a heavy
drinking problem in which he drank as much beer as he could get.
When he was arrested for his drunk driving incident in late 1981 he
quit drinking.  He denies the use of all other illegal intoxicants.

MARITAL STATUS:

This defendant has never been married.  He has a three year old
child by Ms. Muriel Ferguson, who he was helping support.

MILITARY RECORD:

The defendant has never been involved with the military.

EMPLOYMENT RECORD:

The defendant worked for Davey Tree from 1979 to his arrest
as a foreman clearing trees for power lines.  That company verifies
the defendant's employment with them from February of 1980 through
June of 1982.  He was terminated because he did not call for
over three consecutive days.  He was considered a suitable

1   employee who they would not now consider for rehire.

2       The defendant worked for Ruppert's Auto Park, parking cars

3   from 1975 through 1979.  Prior experience was as selling cars.

4   FINANCIAL STATUS:

5       This defendant has no current source of income.  Prior to

6   his arrest he was netting approximately $900 per month.  He owns a

7   1972 Lincoln Mark IV.  He claims that he sold his 1965 Chrysler,

8   but the papers are in the jail, and he is unsure if the title has

9   changed.  His routine monthly expenses were close to $1,000 per

10  month.

11  RESTITUTION:

12      Restitution is not a factor in the disposition of this case.

13  COLLATERAL CONTACTS:

14      The defendant submitted the names of five personal references.

15  However, at least two persons' addresses were incorrect, and have

16  not yet responded to requests for telephone contact.

17      However, Mr. Samuel Tarver responded to inquiries, indicating

18  that he has known the defendant for the past ten years as a good

19  family friend.  He describes the defendant as a quiet young man

20  who was never known to be involved in anything illegal.  He seemed

21  very family-oriented and would work and keep a job.  After he got

22  his own apartment, the defendant would come and take his mother to

23  work in the morning and shopping on Saturdays.  Mr. Tarver was

24  shocked by this arrest and the charges.  He has never known the

25  defendant to have any problems or run with any gang or group of

26  people.  He feels that if he was released it would help because he

1  could go back to work and repay his debts.

2      Mr. James Harris responded by phone. He indicates he has known

3  the defendant for the past seven years in business contacts. He

4  describes the defendant as a respectable, dependable person. The

5  defendant worked for him for a long time in his garage, parking

6  cars. They experienced no problems with him. He feels that the

7  defendant is not the type to get involved in any wrongdoing. He

8  stayed away from trouble when he was working for him. He was

9  surprised about these charges as they do not fit his character.

10      Mr. Jerry George has known the defendant for the past two and

11  a half years as his landlord. He indicates that the defendant should

12  receive one of the highest ratings possible. If the defendant

13  anticipated he would be late with his rent he would contact Mr.

14  George well in advance, showing a high responsibility level. He

15  got along well with the other tenants. He feels that the

16  defendant's biggest problem is that he is in jail. He feels that

17  if released, and after finding housing and a job, the defendant

18  could manage things well.

19      Ms. Thelma Lee has known the defendant since he was in grade

20  school with her sons. He is a responsible young man who is kind

21  and tries to help in any way he can. She has never known him to

22  be in any type of trouble before. Further, she has never heard

23  of anybody saying he took anything from anyone. She indicates that

24  it would be helpful if he could get medical help.

25      Mr. Marcus Peppard, the defendant's attorney, wrote a note to

26  this deputy indicating that the defendant had written an

1  autobiography which he hoped this deputy would get at the

2  interview.  This deputy was unaware of such a document at the time

3  of the interview, and the defendant made no offers of such

4  biographical material.

5  EVALUATION:

6      This defendant is statutorily ineligible for probation by virtue

7  of the charges.  He initially impressed this deputy as being very

8  slow, possibly even retarded.  However, as the interview progressed

9  and the defendant became more relaxed, it became apparent that that

10  initial impression was simply the result of his fear and reticence.

11  This defendant is deeply concerned about his future in prison

12  and the possibility of being killed, should he say too much.  This

13  defendant also impresses this deputy as a person who got himself

14  into a predicament that was far beyond his sophistication.  It is

15  doubtful that Mr. Sullivan had any conception of how far this

16  situation would go when he initially became involved.  Since the

17  defendant is reticent to discuss his initial motivations, little

18  comment can be made as to how he became involved.  The only thing

19  this deputy can base her opinions on are impressions and innuendos,

20  rather than any type of facts.  On the other hand, this defendant

21  was the one that held the gun, and whether out of fear or

22  deliberation, apparently attempted to kill the victim at one point.

23  While he is relatively unsophisticated and less than generally

24  criminally oriented, he commenced his criminal behavior with one

25  of the most serious of crimes.

26      In this deputy's opinion, the criteria affecting concurrent and

JERRY LEE SULLIVAN          -22-

1 consecutive sentencing with regard to these charges appears to be:

2   With regard to the two counts of 209(b) PC, those charges

3 were independent of each other.  It is felt that there was no

4 necessity for both victims to have been involved in this situation.

5 With regard to the two counts of 211 PC, once again it appears

6 that the crime on the two different victims were independent of

7 each other, and the similar argument is used. On the other hand,

8 it is felt that the charge of 209(b) PC includes the charge of

9 211 PC.  With regard  to Counts Five and Six, it appears to this

10 deputy that, if the attempted murder centers around the incident

11 in which the gun did not discharge, but does not include the

12 subsequent action just prior to the defendant's arrest, it is,

13 indeed, separate from the aggravated assault.  On the other hand,

14 if the attempted murder applies to both incidents it appears to

15 include the aggravated assault.  On the other hand, if the

16 aggravated assault refers to the defendant's act of dragging the

17 victim through the bushes at gunpoint, it again is a separate act.

18   In this deputy's opinion, the circumstances in aggravation

19 and mitigation appear to be:

20   Circumstances in Mitigation(Rule 423):

21   A.  Facts relating to the crime:

22      There is a possibility that the

23      defendant had no apparent predisposition

24      to commit this crime and was induced by

25      others.

26 ///

B.  Facts relating to the defendant:

    The defendant has an insignificant prior record.  The defendant voluntarily acknowledged wrongdoing at an early stage in the criminal process.

## Circumstances in Aggravation(Rule 421):

A.  Facts relating to the crime:

    The crime involved the threat of great bodily harm.  The crime involved multiple victims.  The crime indicates premeditation. The crime involved the attempted taking of great monetary value.

B.  Facts relating to the defendant:

    There do not appear to be any factors in aggravation with regard to the defendant.

Respectfully submitted,

GERALD S. BUCK, COUNTY PROBATION OFFICER

BY: _____

KAY HLAVKA, DEPUTY PROBATION OFFICER
ADULT DIVISION, MARTINEZ


APPROVED: _____

RICHARD A. CALICURA, UNIT SUPERVISOR
ADULT DIVISION, MARTINEZ

KH:al
Dictated:11/24/82
Typed:11/30/82

READ AND CONSIDERED: _____
                        JUDGE

EXHIBIT "C"

# FILED

AUG 2 0 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE YELLEN,

        Petitioner,           No. CIV S-01-2398 MCE GGH P

    vs.

DIANE BUTLER, et al.,        ORDER AND

        Respondents.       FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges the 1999 decision of the Board of Prison Terms (BPT) finding him unsuitable for parole. Petitioner raises 12 claims. After carefully considering the record, the court recommends that the petition be granted on grounds that there was not sufficient evidence to support the 1999 decision. The court recommends that the petition be denied in all other respects.

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

        The AEDPA applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus,"

1 28

1  establishing more deferential standards of review to be used by a federal habeas court in

2  assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

3  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

4          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

5  Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion

6  for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy

7  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

8  "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies

9  to two situations: (1) where the state court legal conclusion is opposite that of the Supreme

10 Court on a point of law, or (2) if the state court case is materially indistinguishable from a

11 Supreme Court case, i.e., on point factually, yet the legal result is opposite.

12          "Unreasonable application" of established law, on the other hand, applies to

13 mixed questions of law and fact, that is, the application of law to fact where there are no factually

14 on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

15 Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the

16 AEDPA standard of review which directs deference to be paid to state court decisions. While the

17 deference is not blindly automatic, "the most important point is that an *unreasonable* application

18 of federal law is different from an incorrect application of law....[A] federal habeas court may not

19 issue the writ simply because that court concludes in its independent judgment that the relevant

20 state-court decision applied clearly established federal law erroneously or incorrectly. Rather,

21 that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

22 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the

23 objectively unreasonable nature of the state court decision in light of controlling Supreme Court

24 authority. Woodford v. Viscotti, __U.S.__, 123 S. Ct. 357 (2002).

25          The state courts need not have cited to federal authority, or even have indicated

26 awareness of federal authority in arriving at their decision. Early v. Packer, __U.S.__, 123 S.

2

1   Ct.362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is

2   contrary to, or an unreasonable application of, established Supreme Court authority. Id. An

3   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

4   occurred. Lockyer v. Andrade, __ U.S. __, 123 S. Ct. 1166, 1175 (2003). Moreover, the

5   established Supreme Court authority reviewed must be a pronouncement on constitutional

6   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

7   binding only on federal courts. Early v. Packer, 123 S. Ct. at 366.

8           However, where the state courts have not addressed the constitutional issue in

9   dispute in any reasoned opinion, the federal court will independently review the record in

10  adjudication of that issue. "Independent review of the record is not de novo review of the

11  constitutional issue, but rather, the only method by which we can determine whether a silent state

12  court decision is objectively unreasonable." Himes v. Thompson, __F.3d__, 2003 WL 21544120

13  (9th Cir. 2003).

14  III. Background

15          The opinion of the California Court of Appeal regarding the initial conviction

16  contains a factual summary of petitioner's offenses. The reporter's transcript has not been

17  submitted. However, because the factual background is not disputed, the court will adopt the

18  summary contained in the opinion of the state appellate court:

19          Appellants Michael Yellen [petitioner], Eugene Reams, and Harold Taylor
            [footnote omitted] were convicted of various crimes occurring during a November
20          1983 [footnote 2] crime spree, including conspiracy to rob Neiman Marcus,

21          [Footnote 2: All dates refer to 1983 unless otherwise specified.]

22          grand theft auto, kidnapping to commit robbery, robbery, assault with firearms,
            and burglary, with various findings of personally using and being armed with
23          firearms.

24          *****

25  \\\\\

26  \\\\\

3

## FACTS

At about 6 p.m. on November 5, 1983, Reams answered an advertisement placed by Michael Terzibachian to sell his Porsche. Terzibachian took Reams for a test drive. At a parking lot, Reams got into the driver side, locked Terzibachian out of the car, and drove away.

Sometime that same evening, Yellen showed Terzibachian's Porsche to Thomas Burtrum. Burtrum contacted Terzibachian at about 4 a.m. and told him where his car was. When Terzibachian recovered his car, one small item was broken and it had a dead battery.

At about 3 p.m. on November 18, 1983, Reams and Yellen went to a Porsche dealership, took a yellow Porsche with a black top for a test drive, with the salesman, Alan Silverman. At a freeway exit Yellen got into the driver's seat, locked Silverman out of the car, and drove away.

At about 2 a.m., November 19, 1983, Calvin Nixon, and Chairds, security guards for ADT Security, [Footnote 4] investigated a reported break-in at the Kelco

[Footnote 4: Reams, Taylor and Yellen were formerly employed by ADT.]

building. At about 3:30 a.m., Chairds was in the back of the building and Nixon was in the front, waiting for a back-up security guard, Harry Fournier. A yellow Porsche parked near Nixon's car, Reams got out of the car with a handgun and told Nixon to freeze, and Taylor got out with a shotgun, put a shell in the chamber, and told Nixon to turn around. They handcuffed Nixon, pushed him face down to the ground and took his flashlight and gun. Nixon heard the defendants open the trunk of his car, and tamper with a box containing two to three hundred keys to buildings for which ADT provided security. Nixon was placed face down in the back of his car, wedging his face between the back and front seats. Reams and Taylor got in his car and drove away, followed by the yellow Porsche. Fournier saw the two cars leaving.

Nixon was driven around recklessly for about 25 minutes. His car was driven fast, taking a lot of corners, causing Nixon to be bounced around. The car stopped in the parking lot of the Industrial Indemnity Building, about five to seven miles from the Kelco Building. [Footnote 5] The yellow Porsche was already there.

[Footnote 5: An investigator measured the route to take about 7 ½ to 11 minutes to drive.]

Nixon was handcuffed to a gas meter pipe. Nixon heard the men return to his car and remove the key box.

Nixon's keybag with credit cards and keys to the units belonging to ADT, which had been on the front seat, and the box of keys which had been in the trunk, were missing from Nixon's car. They keys in the keybox were to deactivate the alarm systems of ADT's clients. Although ADT had a contract with Neiman-Marcus, the keys to Neiman-Marcus were not included.

2003). "In the parole context, the requirements of due process are met if 'some evidence' supports the decision." Id. The evidence underlying the board's decision must have some indicia of reliability. Id.

In Biggs, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation. Biggs was serving a sentence of 25 years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner. 334 F.3d at 913. While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three: 1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy. 334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.

The Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." 334 F.3d at 917.

The court now considers whether there was some evidence to support the finding of the 1999 panel that petitioner was not eligible for parole. The relevant regulations provide as follows.



1    Cal. Code Regs. tit. 15 § 2402 sets forth the criteria for determining whether an

2   inmate is suitable for release on parole. Circumstances tending to show unsuitability include, in

3   relevant part,

4           (1) Commitment Offense. The prisoner committed the offense in an especially
            heinous, atrocious or cruel manner. The factors to be considered include:
5
            *****
6           (A) Multiple victims were attacked, injured, or killed in the same or separate
            incidents.
7
            (E) The motive for the crime is inexplicable or very trivial in relation to the
8           offense.

9   Cal. Code Regs. tit. 15 § 2402 (c)(1)(E).

10          Circumstances tending to indicate suitability for parole include:

11          (1) No Juvenile Record: The prisoner does not have a record of assaulting others
            as a juvenile or committing crimes with a potential of personal harm to the
12          victims.

13          (2) Stable Social History. The prisoner has experienced reasonably stable
            relationships with others.
14
            (3) Signs of Remorse. The prisoner performed acts which tend to indicate the
15          presence of remorse, such as attempting to repair the damage, seeking help for or
            relieving suffering of the victim, or indicating that he understands the nature and
16          magnitude of the offense.

17          (4) Motivation for the Crime. The prisoner committed his crime as the result of
            significant stress in his life, especially if the stress has built over a long period of
18          time.

19          (5) Battered Woman Syndrome...

20          (6) Lack of Criminal History. The prisoner lacks any significant history of violent
            crime.
21
            (7) Age. The prisoner's present age reduces the probability of recidivism.
22
            (8) Understanding and Plans for Future. The prisoner has made realistic plans for
23          release or has developed marketable skills that can be put to use upon release.

24          (9) Institutional Behavior. Institutional activities indicate an enhanced ability to
            function within the law upon release.
25

26  Cal. Code Regs. tit. 15 § 2402(d).

1    In finding petitioner unsuitable for parole, the panel found as follows:

2    Mr. Yellen, the Panel has reviewed all the information received from the public
     and relied on the following circumstances in concluding that you are not yet
3    suitable for parole and would pose an unreasonable risk of danger to society and a
     threat to public safety if released from prison. First of all is the commitment
4    offense. It was carried out in an especially cruel and callous manner. Multiple
     victims were attacked in separate incidents, and the offense was carried out in a
5    dispassionate and calculated manner. And the motive for the crime was
     inexplicable or very trivial in relation to the offense. These conclusions are drawn
6    from the Statement of Facts wherein the prisoner and his crime partners really
     went on a robbery spree. There were some auto thefts and robberies and a couple,
7    in fact one security officer was kidnapped, and quite a few victims attacked in the
     crime spree. The prisoner had programmed very well while incarcerated. His
8    institutional behavior, I think, has been laudatory. He did have one 115 for
     participating in the work strike while at DVI that was reduced. The Hearing Panel
9    notes that responses to PC 3042 notices that were sent out indicated opposition of
     a finding of parole suitability by the District Attorney of the County of San Diego.
10   The Panel makes the following findings, that the prisoner needs therapy in order
     to face, discuss, understand and cope with stress in a nondestructive manner. And
11   until progress is made, the prisoner continues to be unpredictable and a threat to
     others. Therapy in a controlled setting is needed but motivation and amenability
12   are questionable. Nevertheless, the prisoner should be commended for his
     vocations, all your certificates, working hard, for your volunteer work in helping
13   other inmates get their GED, I think that's exemplary, for your laudatory chronos
     and your work habits. However, these positive aspects of his behavior do not yet
14   outweigh the factors of unsuitability. We're going to deny your parole for one
     year, twelve months, we're going to reduce you down to twelve months. In that
15   period of time, you need to stay disciplinary-free, as you know.

16   Petitioner: Yes, sir.

17   Presiding Commissioner Bordonaro: Get in any type of, I know that you're
     volunteering which is helping out, but it might help to get into some self-help and
18   therapy programming as you can to try to gain a little bit more insight, I think, as
     to what caused you to go on this crime. Like I said, I see two different people.
19   One is like a Dr. Jekyll and Mr. Hyde and you need to be able to kind of convey
     that to the Panel. And strengthen your parole plans in San Diego County. I know
20   it's not easy, you're doing the right thing. The Panel thinks that you're coming around
     the corner but you've got a little bit more time to do. You're doing all the right
21   things. Continue on that path and stay clean and I do wish you the best of luck...

22   Respondent's Answer, Exhibit C, pp. 38-40.

23          In finding petitioner unsuitable for parole the BPT relied on the circumstances of

24   the commitment offense. In particular, the BPT emphasized that the motive for the crime was

25   inexplicable or very trivial in relation to the offense and that the crimes involved multiple

26   victims.

10

1     All other factors weighed in favor of finding petitioner suitable for parole.

2 Petitioner had no juvenile record and lacked any criminal history other than some vehicle code

3 violations. <u>Id.</u>, p. 13. Petitioner had a classification score of zero. <u>Id.</u>, p. 18. Petitioner was

4 virtually disciplinary free. <u>Id.</u>, p. 18. Petitioner also had obtained substantial vocational training

5 since being imprisoned and completed his GED as well as participated in college programs. <u>Id.</u>,

6 pp. 19-20. Petitioner participated in the Straight Life Program and the Parole Recidivism

7 Program, volunteered as a tutor in the Literacy Program, and completed the Anger Management

8 Program. <u>Id.</u>, p. 20. Petitioner had psychological reports stating that his violence potential upon

9 release was average or lower than average. <u>Id.</u>, p. 23. At the hearing, petitioner expressed

10 remorse for his crimes. <u>Id.</u> at 36. A psychological report stated,

11      There is no evidence of psychopathology or mental or emotional problems of any
        kind that would preclude routine release planning in this case. There is no
12      evidence of emotional problems that would require further diagnosis or
        participation in psychotherapy. The prognosis of successful adjustment in this
13      case is very good.

14 <u>Id.</u>, pp. 24-25.

15     In evaluating the instant claim, it is important to observe that petitioner was

16 required to serve his determinate term of 7 years and 8 months before commencing his life

17 sentence. Petitioner's life sentence began on August 24, 1988. Respondent's June 30, 2003,

18 further briefing, Exhibit A, p. 2. Therefore, at the time of the 1999 hearing at issue, petitioner

19 had served approximately 11 years of two concurrent terms of 7 years to life. The at-issue

20 hearing was his third parole suitability hearing. He has apparently had three additional hearings

21 since that time, at which he was again found unsuitable. <u>See</u> Petitioner's June 30, 2003, further

22 briefing. The court has no information regarding these other hearings.

23     While petitioner has not served as much of his life sentence as the <u>Biggs</u>

24 petitioner, they have been imprisoned for the same length of time. Petitioner is serving two

25 concurrent sentences of 7 years to life for a variety of serious offenses, which do not include

26 homicide. The <u>Biggs</u> petitioner is serving a sentence of 25 years to life for first degree murder.

1  Petitioner is challenging the results of his *third* parole suitability hearing. The <u>Biggs</u> petitioner

2  challenged the results of his first parole suitability hearing. <u>See</u> CIV S-00-1686 WBS GGH P,

3  findings and recommendations filed March 13, 2002, p. 1. In both cases, the BPT relied on

4  unchanging factors, i.e. the circumstances of the offenses, to find the petitioners unsuitable for

5  parole.

6         In <u>Biggs</u>, the Ninth Circuit stated that the BPT was "*initially* justified" in finding

7  Mr. Biggs unsuitable based on the circumstances of the offense and his conduct prior to

8  imprisonment. 334 F.3d at 916 (emphasis added). However, the Ninth Circuit was not specific

9  as to when reliance on the circumstances of the offense and conduct prior to imprisonment would

10  "run contrary to the rehabilitative goals espoused by the prison system" and result in a due

11  process violation. 334 F.3d at 917.

12         More important to the undersigned in assessing any due process violation is the

13  fact that continuous reliance on unchanging circumstances transforms an offense for which

14  California law provides eligibility for parole into a de facto life imprisonment without the

15  possibility of parole. The court asks rhetorically—what is it about the circumstances of

16  petitioner's crime or motivation which are going to change? The answer is nothing. The

17  circumstances of the crimes will always be what they were, and petitioner's motive for

18  committing them will always be trivial. Petitioner has no hope for ever obtaining parole except

19  perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious

20  or the motive was more than trivial. Given that *no one* seriously contends lack of seriousness or

21  lack of triviality at the present time, the potential for parole in this case is remote to the point of

22  non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote

23  possibility.[1]

24  _____

25  [1]To a point, it is true, the circumstances of the crime and motivation for it may indicate a
   petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after
   fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to
26  say the least, and after repeated demonstrations that despite the recognized hardships of prison,

1    In the instant case, the BPT has apparently relied on these unchanging factors at

2  least three times, and probably more assuming petitioner's exemplary record has remained

3  unchanged, in finding petitioner unsuitable for parole. Petitioner has "continue[d] to

4  "demonstrate exemplary behavior and evidence of rehabilitation." 334 F.3d at 916. Under these

5  circumstances, the continued reliance on these factors at the 1999 hearing violated due process.

6    Finally, the one other reason given by the BPT for parole denial– the need for

7  more therapy such that petitioner can gain greater insight into his crimes, and until such time he

8  is a risk to society if released, is devoid of *any* medical or other evidence in support. The

9  conclusion appears to be simply one repeated often in order to add another factor to the non-

10  suitability conclusion. It is especially out of place here given that one Commissioner read into

11  the hearing record the medical evidence directly contradicting the finding:

12    Let's go to the psychiatric report. This is the one prepared by Dr.
        Macomber and it's dated January 16th of 1999 and it's a number of
13      pages long. I want to begin by looking at page 2 where they give a
        historical summary of the previous psychiatric diagnoses and then
14      you can build a pattern. On April 29th of '92, you were seen at DVI
        by Janice Thomas, Ph.D. a Psychologist. The diagnostic
15      impression was, no mental disorder. You denied any involvement
        with drugs or alcohol abuse. On 11/7/94, you were at DVI and
16      were evaluated by Dr. Cotila....Your positive adjustment in the
        institution was noted. You had a certificate in Welding, Drafting
17      and a Machinist. Diagnostic impression was no mental disorder.
        On October 16th of '96, you were seen at DVI by E.
18      Nelson....Diagnostic impression was no mental disorder. Your
        positive prison adjustment was noted, violence potential was seen
19      as average or lower than average if released to parole. The doctor
        under this particular evaluation, under his diagnostic impressions
20      in the current medical status have it as, no mental disorder, with a
        Global Assessment of Functioning of 95, which is quite high,
21      which would indicate that you have an ability to relate to other
        people in an acceptable manner. Under this assessment of
22      dangerousness, the doctor, this particular doctor, uses a format
        where he begins to look at some historical tendencies to either be a
23      risk factor and he concludes after evaluating you that, this is about
        the second line down under assessment of dangerousness: The only

24

25  this petitioner does not possess those attributes, the predictive ability of the circumstances of the
    crime is near zero. Indeed, as seen infra, the medical evidence demonstrates as well as anything
26  can, that no such attributes describe petitioner at the time of his 1999 parole eligibility hearing.

13

1    risk factors that I can identify in this case are that Mr. Yellen had a
     father with alcohol abuse problems and there was a parental
2    separation before the age of 16." Then he talks about risk factors
     that indicate a lower risk potential are that you had no juvenile
3    history of crime, no history of probation failure, no history of
     mental disorder that would contribute to an antisocial personality
4    behavior.

5    "He has completed extensive vocational training and has good
     adjustment while in the institution. All these factors would
6    indicate that he does not present a risk for re-offense in the future.
     Assessment of dangerousness within the controlled setting is seen
7    as below average in comparison to other inmates. There are no
     significant risk factors in this case. He does not have a history of
8    drug or alcohol abuse."

9    According to his doctor. Under observations, the statement is:

10   "There is no evidence of psychopathology or mental or emotional
     problems of *any* kind *that would preclude routine release planning
11   in this case.* There is no evidence of emotional problems *that
     would require further diagnosis or participation in psychotherapy.*
12   The prognosis of successful adjustment in this case is very good."

13   Answer, Exhibit C at 69-72 (emphasis added).

14   Clearly, a conclusion by lay BPT commissioners that petitioner has not yet achieved required

15   therapy for insight or other reasons is not reasonably sustainable, and a state court's conclusion to

16   the contrary is patently unreasonable.

17           Accordingly, the court finds that the denial of this claim by the California

18   Supreme Court was an unreasonable application of clearly established Supreme Court authority.

19   The court recommends that the petition be granted on this ground.

20           B.  Remaining Claims

21           In claim 2, petitioner argues that he has a constitutional right to a non-biased BPT

22   hearing panel. Due process requires the state decision makers to be unbiased. See Edward v.

23   Balisok, 520 U.S. 641, 647, 117 S. Ct. 1584, 1588 (1997).

24           Petitioner argues that the panel members are inherently biased because they are

25   afraid that if they grant parole to any inmate they will lose their appointed positions on the BPT.

26   \\\\

14

1   Other than conclusory speculation, this claim is unsupported. Moreover, while petitioner has a

2   due process right to an unbiased panel, this does not equate to a right to a non-politically

3   appointed panel to determine his suitability. A panel composed of members who are elected

4   rather than appointed may have the same job security interests as appointed members.

5          Petitioner cites the following statement by Presiding Commissioner Bordonaro as

6   an example of bias: "You know, one of the things that you should remember is that the Judge, the

7   last thing the Judge said when he sentenced you was, life. And I see a lot of inmates that are

8   going to do life but I think you are not one of those. I think you've got a light at the end of the

9   tunnel, you're doing the right job, just keep it up, okay?" Answer, Exhibit C, p. 40. This

10  statement does not demonstrate that the panel was biased against petitioner. Rather, this was a

11  favorable statement regarding petitioner and indicated that the panel believed that petitioner

12  would be found suitable one day. For the reasons discussed above, the court finds that

13  petitioner's claim that the panel was biased against him is without merit.

14         In claim 4, petitioner argues that the BPT has converted his sentence to life

15  without the possibility of parole by failing to find him suitable for parole. In related claim 5, he

16  argues that the BPT violated Cal. Penal Code §§ 12 and 13. Cal. Penal Code § 12 provides,

17         The several sections of this Code which declare certain crimes to be punishable as
           therein mentioned, devolve a duty upon the Court authorized to pass sentence, to
18         determine and impose the punishment imposed.

19         Cal. Penal Code § 13 provides,

20         "Whenever in this Code the punishment for a crime is left undetermined between
           certain limits, the punishment to be inflicted in a particular case must be
21         determined by the Court authorized to pass sentence, within such limits as may be
           prescribed by this Code.
22

23         Petitioner argues that because the BPT has failed to grant him a parole date, his

24  sentence is undetermined. Therefore, petitioner argues, jurisdiction to determine his sentence is

25  returned to the court. Although the court would agree with petitioner from a due process

26  standpoint that his sentence has de facto been transformed into one without the possibility of

15

1    parole, a violation of due process is not what is at issue here.  Rather, the question is whether

2    there was a de jure resentencing.

3            Petitioner's arguments regarding claims 4 and 5 are based on a misunderstanding

4    of state law, as found by the Superior Court:

5        This claim is premised on old case law that arose under the Indeterminate
         Sentencing Law (ISL), that of In re Rodriguez (1975) 14 Cal.3d 639, 651-653, and
6        People v. Wingo (1975) 14 Cal.3d 169, 183.

7        Under the old ISL, most crimes carried indeterminate terms with life maximums.
         It was up to the correctional authorities, rather than the courts, to determine the
8        appropriate punishment for each individual.  Thus, it became necessary for the
         courts to step in and determine if the maximum punishment that the correctional
9        authorities had determined an individual prisoner should face was so excessive as
         to be cruel and/or unusual punishment.  In Rodriguez and Wingo, the California
10       Supreme Court made such a determination.  In so doing, the Court noted that if
         the correctional authorities failed to fix a primary term of punishment, that that
11       term would be deemed to be the maximum punishment available under the law
         (which was life for most sentences), and that the courts should then decide
12       whether that maximum is cruel and/or unusual.  (In re Rodriguez (1975) 14 Cal.3d
         639, 651-653, and People v. Wingo (1975) 14 Cal.3d 169, 183).

13
         Although California has adopted the Determinate Sentencing Law (DSL), since
14       the time of Rodriguez and Wingo, many offenses carry what has since been
         referred to as an "indeterminate life sentence" (see People v. Yates (1983) 34
15       Cal.3d 664, 646-647).  At first, after the adoption of DSL, this was limited to a
         very few crimes, including noncapital murder.  The Legislature, however, has
16       since widened the number of crimes carrying such a term, including for recidivist
         behavior even when the current crime is not a serious crime (see e.g., Penal Code
17       §§ 667(b)-(i), 1170.12 [the "Three Strikes" law]).

18       Thus, "indeterminate life sentences" are now "back in vogue," with a great
         number of prisoners whose current offenses cross a wide range of offenses, from
19       petty theft with a prior (when a "Three Striker") to noncapital murder.  In each
         instance, however, the sentence remains subject to attack as being cruel and/or
20       unusual, under the federal and state Constitutions, and indeed in many appellate
         cases in recent years, most particularly "Three Strikes" sentences, the courts have
21       been determining whether individual sentences are cruel and/or unusual.

22       Thus, the basic gist of Rodriguez and Wingo appear to remain good law, despite
         the change to a determine sentencing system.  It appears, then, that petitioner is
23       partially correct, that they apply.  However, this Court can do nothing more than
         to (1) deem his maximum punishment as being that of the maximum of his
24       sentence, life imprisonment, since the Board of Prison Terms has not fixed a
         maximum punishment at this time, and (2) find that for his crime, kidnap for
25       robbery, that life is not cruel and/or unusual punishment.

26   \\\\

1    Petitioner misses the mark in his argument. He is under the mistaken impression
     that by failing to set a parole date, the BPT, at least insofar as this point in time,
2    has essentially set the "maximum" of his term at the <u>minimum</u> of his
     indeterminate life sentence. Not so. The "maximum" of his term is <u>life</u>. Thus, he
3    is <u>not</u> entitled to be released on parole, under the theory he is espousing. Rather,
     if the BPT is to be deemed to have essentially set his "maximum" at life, by not
4    yet setting a parole release date for him, this court need only undertake a
     determination of whether setting life as the maximum is cruel and/or unusual in
5    his case.

6   Answer, Exhibit E, pp. 1-3.

7          Based on the reasoning of the Superior Court, this court finds that petitioner's

8   claims that the BPT converted his sentence to a sentence of life without the possibility of parole

9   by failing to set a parole date and violated Cal. Penal Code §12 and § 13 are based on a

10  misunderstanding of state law. The Superior Court correctly found that no state law violation

11  occurred. Accordingly, these claims are without merit.  <u>Middleton v. Cupp</u>, 768 F.2d 1083,

12  1085 (9th Cir. 1985); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983) (a writ of habeas

13  corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal

14  law binding on the state courts). As indicated by the Superior Court, petitioner's "real" claim is

15  whether a life sentence for kidnapping for robbery violates the Eighth Amendment. Claim 12 of

16  the instant petition raises this claim. Accordingly, the court will now consider that claim.

17          Petitioner was sentenced to two concurrent life terms for his convictions for

18  kidnap for robbery. "The Eighth Amendment, which prohibits cruel and unusual punishments,

19  contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" <u>Ewing v.</u>

20  <u>California,</u> __ U.S. __, 123 S. Ct. 1179, 1183 (2003). The court considers four principles of

21  proportionality review when evaluating an Eighth Amendment claim: the primacy of the

22  legislature, the variety of legitimate penological schemes, the nature of our federal system, and

23  the requirement that proportionality review be guided by objective factors that inform the final

24  one: "The Eighth Amendment does not require strict proportionality between crime and

25  sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the

26  \\\\\

17

At about 9 p.m. on November 19, Reams and Taylor went to an auto dealership and took a blue van for a test drive, with the salesman, Mario Castenada, driving. Taylor took the wheel. Castenada, suspicious of the men, brought a pager to contact the dealership if there was trouble. When Taylor began driving, Reams took the pager. Castenada told Taylor to go back to the dealership because the van was low on gasoline. Taylor turned in the opposite direction. Reams pointed a gun at Castenada and ordered him to lie on the floor. Castenada saw a light colored Porsche with a black top following them. Reams, at gunpoint, got $20 from Castenada for gas. Later Reams asked Castenada for more money, and Castenada gave him the rest of his $180 to $190 and his diamond ring.

Castenada was left out on the center divider of Interstate 5, 6.1. miles from the dealership, after being with the men for a total of 20 to 30 minutes. [Footnote 6]

[Footnote 6: An investigator estimated the route from the dealership to the drop-off point to take about 12 minutes and 45 seconds.]

He saw the Porsche pull in front of the van and saw both vehicles leave.

In the early morning hours of November 20, the police spotted and unsuccessfully pursued the yellow Porsche in a high-speed chase.

At about noon on November 20, Yellen and Taylor, driving the yellow Porsche with the black roof, went to Terzibachian's residence to see the Porsche he was again advertising for sale. They asked Terzibachian how the alarm system worked on the car. They were unable to test drive the car because the battery was dead.

At about 6 p.m. the same day, Yellen, Taylor and Reams returned to Terzibachian's residence, which was an apartment complex protected by a locked security gate. Yellen had called Terzibachian and told him he was back to see the car with his father, who would be paying for it. Rebecca Terzibachian, Michael Terzibachian's wife, went downstairs to the lobby area and heard them enter the complex. She followed them down the hallway until they saw her. She was suspicious, and told a neighbor, Joseph Deuer, to call the police. Deuer followed her out of the laundry room. By this time, Michael was also downstairs. He recognized Reams as the man who had stolen his car on November 5, and told the men he would not show them the car. As the men turned to leave, Michael said: "Wait a minute, I want to talk to you." The three men immediately pulled out guns and pointed them at Michael. Deuer, who was behind Michael, saw the guns pointed in his direction and stood still. Rebecca did not yet see the guns. Rebecca had her hands on the security gate. Yellen was beside her, and as he opened the gate she slipped and fell. Yellen pointed the gun at her head. Reams and Taylor were running sideways toward the security gate, looking back at Michael and Deuer, holding their guns out. Reams and Taylor never pointed their guns directly at Rebecca. All three men passed her, exiting through the doorway-size security gate. The men drove away in a yellow Porsche and an older American car.

At about 7:30 p.m. on the same day, the yellow Porsche was located on the second level parking lot in Fashion Valley shopping center. There were no keys in the ignition and the car was towed to the police station.

At about 7 a.m. on November 21, 1983, Taylor and Reams entered and robbed Neiman-Marcus and its employees at gunpoint. Taylor pointed a gun at Kelly Haliburton, assistant security manager at Neiman-Marcus.

The 13 employees present or arriving during the course of the robbery were brought in to the security office in the store, their eyes and mouths taped, their hands tied behind their backs, and made to kneel, sit, or lie down. One employee attempted to take the tape off her face, and was told by one of the appellants that he would shoot her if she did not "cool it." Personal property was taken from six employees.

The evening of the Neiman-Narcus heist, appellants rented a room in the Best Western Motel in San Ysidro, in Taylor's name. That evening, at the motel, Yellen, Reams, Taylor, and Taylor's girlfriend saw a television news broadcast, and heard the police were linking a K-Mart robbery and the Neiman-Marcus robbery together, which prompted Yellen to say they "had gotten away with it." Earlier, Yellen, who had been employed as a security guard at Neiman-Marcus but had not shown up for a few days, called a coworker, Albert Arena. Yellen told Arena he had heard about the robbery on the news. He told Arena he was at a motel, but would not say where. Arena told Yellen he might be in trouble and he should get an attorney.

Between 8:30 and 9 p.m. that same evening, two of the appellants parked the blue van in the parking lot of an apartment building about one-half mile from the Best Western Motel. The apartment manager told them to move the van, but they said they were visiting someone and would move it shortly. They did not enter the apartment complex, but walked toward the street. The next morning the van was still at the apartment building and the police impounded it. They found fingerprints belonging to Reams and Yellen.

The police found Castenada's page; Nixon's keys, gun, flashlight and credit cards; two Porsche keys; the van registration papers; guns, bullets and speed loaders; Neiman-Marcus' keys, large bag, power packs, fur jackets, handcuffs, walkie talkies, and $2,100 in the hotel room. At the police station, Castenada's diamond ring was found on Taylor.

Verdicts:

All three appellants were convicted as follows. Count 1: conspiring to rob Neiman-Marcus (Pen. Code, [footnote 7] § 182, subd. 1). The overt acts alleged

> [Footnote 7: All statutory references are to the Penal Code unless otherwise specified.]

in the conspiracy were stealing Silverman's Porsche, breaking in at Kelco Industries to lure ADT security personnel, kidnapping and robbing Nixon, stealing Castenada's van, posing as interested buyers of and attempting to steal Terzibachian's Porsche. Counts 4 and 7: kidnappings to rob Nixon and Castenada (§ 209). Counts 5 and 8: robbing Nixon and Castenada (§ 211). Counts 6 and 9: unlawfully taking Nixon's and Castenada's vehicles (Veh. Code, § 10851). Count 10: attempted grand theft auto (Terzibachian's car, § 487, subd. 3 and 664).

Counts 11, 12, and 13: assault with firearms on Michael and Rebecca Terzibachian and Joseph Deuer (§ 245, subd. (a)(2)). Counts 20 through 26: assaulting Neiman-Marcus employees ( 245, subd. (a)(2).) Count 27: burglarizing Neiman-Marcus (§ 450).

...Reams and Yellen were convicted in count 3 of grand theft of Silverman's Porsche (§ 487, subd. 3);...

Appellants were found to have personally used (§ 12022.5) and/or been armed with (§ 12022, subd. (a)) firearms during many of the crimes.

Sentence:

Appellants were sentenced to prison for concurrent life terms with the possibility of parole on counts 4 and 7, the kidnaping to commit robbery. [A]nd Yellen was given a one-year consecutive enhancement for being armed with a firearm on the life term. The life term and enhancement were ordered to run consecutive to the following determinate terms: All three were given three years plus a two-year enhancement for personally using a firearm on count 11, the principal term (the assault with firearms on Michael Terzibachian). All three were given one year on count 1 (conspiracy to rob Neiman-Marcus). Yellen and Reams were given 8 months on count 3 (grand theft of Silverman's auto). Yellen was given 1 year for count 20 (assault on employee Tarin)....The total determinate terms for Yellen and Taylor were 7 years and 8 months...For the remaining counts, concurrent terms or stayed sentences were imposed pursuant to section 654.

Respondent's Answer, Exhibit L, pp. 1-10.

IV. Discussion

    A. Claims 1, 3, 6 and 9

In claim 1, petitioner argues that pursuant to the regulations set forth in Cal. Code Regs. Title 15, he met the criteria for release on parole. In claim 3, petitioner argues that he has a constitutional right to have the BPT consider all of the facts at his parole suitability hearing. In this claim, petitioner argues that he should have been found eligible for parole because he is no longer a threat to society. In claim 6 petitioner argues that he has a protected liberty interest in parole as he has met all of the criteria for being granted parole. In claim 9, petitioner argues that the BPT had an unconstitutional basis for finding him unsuitable for parole.

In claims 1, 3, 6 and 9 petitioner is, in essence, arguing that there was not sufficient evidence to find him unsuitable for parole. California's parole scheme gives rise to a cognizable liberty interest in release on parole. Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir.

1    crime." 123 S. Ct. at 1187, quoting <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1001, 111 S. Ct. 2680

2    (1991) (Kennedy, J., concurring in part and concurring in judgment).

3        Applying these principles, the Supreme Court in <u>Ewing</u> upheld the sentence of a

4    defendant sentenced under the California Three Strikes Law.  The petitioner was convicted of

5    felony grand theft with four prior burglary convictions and a robbery conviction.  <u>Id.</u>, at 1184.

6    He was sentenced to 25 years to life.  <u>Id.</u> at 1185.

7        The Supreme Court noted that the felony grand theft offense was a serious

8    offense.  <u>Id.</u>, at 1189.  In weighing the gravity of this offense, the Court considered Ewing's long

9    history of felony recidivism.  <u>Id.</u>, at 1190.  Ewing's sentence was justified by California's public-

10   safety interest in incapacitating and deterring recidivist felons, and supported by his own long,

11   serious criminal record.  <u>Id.</u>, at 1190.

12           Ewing had been convicted of numerous misdemeanor and felony
             offenses, serving nine separate terms of incarceration, and
13           committed most of his crimes while on probation or parole.  His
             prior "strikes" were serious felonies including robbery and three
14           residential burglaries.  To be sure, Ewing's sentence is a long one.
             But it reflects a rational legislative judgment, entitled to deference,
15           that offenders who have committed serious or violent felonies and
             who continue to commit felonies must be incapacitated.  The State
16           of California "was entitled to place upon [Ewing] the onus of one
             who is simply unable to bring his conduct within the social norms
17           prescribed by the criminal law of the State.  <u>Rummel, supra,</u> at 284,
             100 S. Ct. 1133.  Ewing's is not "the rare case in which a threshold
18           comparison of the crime committed and the sentence imposed
             leads to an inference of gross disproportionality."

19

20   <u>Id.</u>, at 1190.

21       In the instant case, petitioner is serving two concurrent terms of 7 years to life

22   after being convicted of two counts of kidnap for robbery.[2]  The reiterated, emphasized point

23   after <u>Andrade, supra,</u> (sentence of 50 years to life for a Three Strikes sentence upheld where

24   underlying crime was petty theft) is that the result of the state court decision must be even more

25

     [2] Petitioner must serve his determinate term of 7 years 8 months before commencing the
26   life sentence.

18



1   incorrect than "clear error," in order to be subject to a granting of the writ of habeas corpus.  As

2   the result in <u>Andrade</u> was not an unreasonable application of Supreme Court authority given the

3   facts there, petitioner cannot possibly prevail here.  <u>See also</u> <u>Eckert v. Tansy</u>, 936 F.2d 444, 457-

4   450 (9th Cir. 1991) (two consecutive life sentences for kidnap for robbery convictions did not

5   violate Eighth Amendment).  Accordingly, this claim is without merit.

6              In claim 7, petitioner argues that he has a liberty interest in not having his parole

7   hearing predetermined.  Petitioner states that his 1999 hearing lasted approximately 40 minutes.

8   Petitioner contends that there is no way that the panel could have actually considered all relevant

9   facts, documents and reports within that time.  Therefore, petitioner contends, the panel made

10  their decision prior to petitioner' parole hearing.

11             In denying this claim the Superior Court stated,

12             Petitioner, however, fails to recognize that the BPT panel members may have
              simply prepared for their hearings by reviewing the materials before the hearing
13             itself.  This does not mean that the panel members had "predetermined" the case
              in an unconstitutional manner.  Indeed, even courts prepare for hearings by
14             reviewing the materials before a hearing, and may even have reached a tentative
              conclusion.  This, however, does not deny a prisoner due process.  The final
15             decision has not been made until the hearing.  Furthermore, the opposite would be
              more arguable than petitioner's argument, that the failure to come prepared to a
16             hearing such as a parole hearing might, in some case, deny due process.

17  Respondent's Answer, Exhibit E, p. 9.

18             Due process requires a review of all of the records pertinent to the parole

19  considerations to be relied upon by the Board.  <u>Greenholtz v. Inmates of Nebraska</u>, 442 U.S. 1,

20  14-16, 99 S. Ct. 2100, 2108-07 (1979).  After reviewing the record, the court does not find that

21  the BPT failed to review the pertinent records.  The court agrees with the reasoning of the

22  Superior Court that the panel most likely reviewed the record prior to the hearing.  The transcript

23  from the hearing indicates that the panel was familiar with petitioner's case.  Petitioner's claim

24  that the panel's decision was predetermined as a result of their failure to consider the record is

25  without merit.

26  \\\\\

1          In claim 8, petitioner argues that the failure to find him suitable for parole violated

2  the Equal Protection Clause. Petitioner argues that other prisoners convicted of kidnaping and

3  more serious offenses who received life sentences have been released on parole. On June 2,

4  2003, the court granted petitioner's request to expand the record to include a list of prisoners who

5  were granted parole during several periods of time. Supplemental Exhibit A, February 12, 2003,

6  motion for discovery and to expand the record.

7          According to this document, in 2001 the BPT found 59 inmates suitable for parole

8  including 10 prisoners convicted of first degree murder, 28 prisoners convicted of second degree

9  murder and 13 prisoners convicted of kidnaping. In 2000, the BPT found 26 inmates suitable for

10  parole including 16 prisoners convicted of second degree murder and 9 prisoners convicted of

11  kidnaping. In 1999, the BPT found 13 inmates suitable for parole including 9 convicted of

12  second degree murder and 2 convicted of kidnaping.

13          On June 12, 2003, petitioner filed another motion to expand the record and for

14  reconsideration of the June 2, 2003, order. Petitioner moves to expand the record to include an

15  exhibit which the court previously found to be not authenticated. Petitioner's current Exhibit A

16  is his proposed authenticated version of his previous Exhibit A attached to his February 3, 2003

17  motion (docket #19), which the court found was not properly authenticated.[3] Petitioner has now

18  submitted the exhibit with a declaration of Barbara Fargo, Deputy Public Defender, who declares

19  that a Mr. Sessa, the Public Information Officer and Legislative Representative for the Board of

20  Prison Terms, provided her with the lists by e-mail, which copies are attached to her declaration.

21  Because there is no declaration by the person in the position to state that the data is what the

22  proponent claims, Mr. Sessa, petitioner's request is denied as to this exhibit. Fed. R. Evid. 901.

23  \\\\\

24

25      [3] On June 2, 2003, the court granted petitioner's request to expand the record to include
his *supplemental* exhibit A attached to the request, but denied his request to expand the record to
26  include exhibit A.

1    Petitioner's Exhibit B attached to the instant motion is an updated version of his

2  previous Exhibit A, which was attached to his supplemental motion, filed February 12, 2003

3  (docket #20). That exhibit was found to be relevant by order of June 2, 2003, but only

4  marginally so. The current exhibit, by including inmates' names and parole suitability decisions

5  for the additional period from April 30, 2002 to September 30, 2002, does not render the exhibit

6  relevant. No value judgment can be made based on an inmate's conviction and a parole

7  determination in a particular case. Many factors go into the parole determination. The basis for

8  the conviction is only one of many considerations. Petitioner's request is denied as to this

9  exhibit.

10    Petitioner finally requests that the court reconsider its previous decision denying

11  discovery. Petitioner has submitted a copy of Governor Davis' executive report on parole review

12  decisions which contains case-by-case analyses of parole review decisions in individual cases.

13  Exhibit C. He has also included an indeterminate sentence parole release review in one case.

14  Exhibit D. Petitioner's equal protection claim cannot be proved by comparison to other prisoners

15  in this manner. For the same reasons given in response to petitioner's previous request for

16  discovery, his current request is denied.

17    Accordingly, the court now considers the merits of petitioner's Equal Protection

18  claim. "The Constitution permits qualitative differences in meting out punishments and there is

19  no requirement that two persons convicted of the same offense receive identical sentences."

20  Williams v. Illinois, 399 U.S. 235, 243, 90 S. Ct. 2018, 2023 (1970). Parole considerations

21  require only a rational relationship to legitimate state interests. McGinnis v. Royster, 410 U.S.

22  263, 270, 93 S. Ct. 1055, 1059-60 (1973).

23    In order to prevail on this claim, petitioner must demonstrate that similarly

24  situated prisoners have been released on parole sooner than him. See McQueary v. Blodgett, 924

25  F.2d 829, 835 (9th Cir. 1991). In other words, petitioner must demonstrate that prisoners

26  convicted of two counts of kidnaping for robbery based on similar circumstances have been

21

1    released on parole. Petitioner has not done this. As stated in the June 2, 2003, order denying

2    petitioner's request for discovery regarding this claim, given the variety of parole suitability

3    criteria to be utilized for someone who is serving a non-murder life term, every decision

4    concerning parole suitability is necessarily performed on a case-by-case basis.[4] No two prisoners

5    will have the same factors considered; indeed, in most cases some factors will be non-existent

6    and in others those same factors might be dispositively present. While the evidence submitted by

7    petitioner indicates that prisoners convicted of kidnaping and murder have been released on

8    parole, petitioner has not demonstrated that other prisoners with records substantially similar to

9    his own have been granted parole.

10            An equal protection argument based on petitioner's race, ethnicity, sex, religion,

11    etc. may well be sustainable if a decision had been made on one of those prohibited criteria.

12    However, a decision on the merits of parole eligibility should be reviewed, if at all, under the due

13    process rubric, and not on a comparison of crimes and criminals. No meaningful standards can

14    be developed, i.e., kidnaping is "better" than murder, petitioner's kidnaping was "worse" than

15    another, petitioner is "more rehabilitated" than another. Rather, relief must be based on the facts

16    of petitioner's own case—was there "some evidence" to support the denial of parole? The

17    undersigned has determined that there was not. Nothing is gained by attempting impossibly

18    standardless comparisons in addition to that finding. Accordingly, this claim is without merit.

19    \\\\\

20

---

21    [4] Criteria include the severity of the offense and risk to society if the prisoner is released. Factors in this equation would include review of a prisoner's psychological condition, or a "failure to demonstrate evidence of substantial change for the better." Cal. Code Regs. tit. 15, §

22    2316. In fixing a parole date, one would consider the extent of the victim's injury, psychological harm caused, sophistication of the crime, etc. Cal. Code Regs. tit. 15, § 2317. If murder lifers

23    are added to the discussion, the potential divergence in parole considerations is even more striking. In general, one is never found suitable for parole if his release would be deemed to pose

24    an unreasonable risk to society. In determining suitability, the parole commissioners review "all relevant, reliable information which includes social history, past and present mental state, past

25    criminal history, the base and other commitment offenses, past and present attitude towards the crime, conditions of treatment and control if released, and any other information which bears on

26    the prisoner's suitability for release. Cal. Code Regs. tit. 15, § 2402.

1    In claim 11, petitioner argues that he has a constitutional right to a non-biased fact

2  finder on appeal. Petitioner claims that the two BPT commissioners who responded to his

3  administrative appeal of the findings of the 1999 panel also participated in parole consideration

4  hearings and are under instructions not to give parole dates to prisoners.

5    In denying this claim the Superior Court stated,

6    In any event, even if other commissioners, who did not decide his initial denial
     but do sit on initial panels at parole hearing, decided his appeal, petitioner fails to
7    show that this is improper in any way. In sitting on an appeal, a commissioner is
     sitting in a different capacity than the commissioner does at an initial parole
8    hearing, just as a superior court judge who sits on an appellate panel in the
     appellate department of the superior court may also hear cases at the superior
9    court level without involving any impropriety. Similarly, superior court judges
     may be specially assigned to sit on a case in the Court of Appeal, and still
10   continue to hear other cases in the capacity as a superior court judge. It is only
     when the person sits on both the initial decision and the appeal in the same case
11   that any issue of impropriety is raised.

12  Answer, Exhibit E, p. 11.

13    For the reasons stated by the Superior Court, this court finds this claim to be

14  without merit. Simply because the commissioners who denied petitioner's appeal also sit on

15  initial panels at parole hearings does not make them biased in considering petitioner's appeal.

16  Petitioner's claim that these commissioners are under instructions not to give parole dates is

17  speculative and unsupported. This claim is without merit.

18    In claim 10, petitioner argues that he did not receive a new parole hearing within

19  12 months, as ordered by the May 1999 panel. On June 20, 2003, the court ordered the parties to

20  inform the court whether petitioner had received a parole suitability hearing following the 1999

21  hearing. On June 30, 2003, petitioner and respondent filed responses to this order. According to

22  both parties, petitioner had another suitability hearing in November 2000.

23    The April 1999 decision finding petitioner unsuitable for parole became final on

24  May 12, 1999. Respondent's Answer, Exhibit C, p. 89. Therefore, the November 2000

25  suitability hearing occurred approximately six months late. However, petitioner has not

26  demonstrated that he suffered any prejudice as a result of this delay. Cf. Vargas v. U.S. Parole

1  Com'n, 865 F.2d 191, 194 (9th Cir. 1988) (due process violation occurs when delay in parole

2  revocation hearing is unreasonable and prejudicial). Accordingly, this claim is without merit.

3         For the reasons discussed above, the court finds that the denial of the claims

4  discussed in this section by the California Supreme Court was not an unreasonable application of

5  clearly established Supreme Court authority. Accordingly, these claims should be denied.

6         Accordingly, IT IS HEREBY ORDERED that petitioner's June 12, 2003, motion

7  for expansion of the record and reconsideration of the court's June 2, 2003, order is denied;

8         IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

9  habeas corpus be granted as to petitioner's due process claim that there was not sufficient

10  evidence to support the 1999 decision finding him unsuitable for parole; petitioner be given a

11  parole date within thirty days of adoption of these findings and recommendations, assuming his

12  record remains substantially unchanged from the time of the 1999 hearing; the petition be denied

13  in all other respects.

14         These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

16  days after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties. Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

19  shall be served and filed within ten days after service of the objections. The parties are advised

20  that failure to file objections within the specified time may waive the right to appeal the District

21  Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED:  August 20, 2003.

23

24

25                                                     GREGORY G. HOLLOWS
                                                       UNITED STATES MAGISTRATE JUDGE

26  yellen.157

24

# FILED

OCT - 1 2003

CLERK, U.S. DISTRICT COURT
STERN DISTRICT OF CALIFORNIA

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE YELLEN,

            Petitioner,                    No. CIV S-01-2398 MCE GGH P

      vs.

DIANE BUTLER, et al.,

            Respondents.                    ORDER

_____/

Petitioner, a state prisoner proceeding pro se, has filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

On August 20, 2003, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days. Respondent Diane Butler has filed objections to the findings and recommendations.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this court has conducted a de novo review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

2 3

1         Accordingly, IT IS HEREBY ORDERED that:

2         1. The findings and recommendations filed August 20, 2003, are adopted in full;

3    and

4         2. Petitioner's application for a writ of habeas corpus is granted as to petitioner's

5    due process claim that there was not sufficient evidence to support the 1999 decision finding him

6    unsuitable for parole; within thirty days of the date of this order, petitioner shall be given a parole

7    date, assuming his record remains substantially unchanged from the time of the 1999 hearing; the

8    petition is denied in all other respects.

9    DATED:    **SEP 3 0 2003** .

10

11

12                           MORRISON C. ENGLAND JR.

                             UNITED STATES DISTRICT JUDGE

13

14    /yel12398.806

15

16

17

18

19

20

21

22

23

24

25

26

2

FILED

MAR 3 1 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFOR. '
BY ___  _  _ .. _____

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE YELLEN,

     Petitioner,          No. CIV S-01-2398 MCE GGH P

     vs.

DIANE BUTLER, et al.,

     Respondents.         ORDER

_____/

     Petitioner, a state prisoner proceeding pro se, has filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

     On February 23, 2004, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within ten days. Both parties have filed objections to the findings and recommendations, and petitioner has filed a reply.

     In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this court has conducted a de novo review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

1 ⌒55

Accordingly, IT IS HEREBY ORDERED that:

1. The findings and recommendations filed February 23, 2004, are adopted in full; and

2. The judgment in this case is not stayed, and the stay entered February 4, 2004 is dissolved.

DATED:     MAR 3 1 2004       .

MORRISON C. ENGLAND JR.
UNITED STATES DISTRICT JUDGE

/yell2398.805

2

EXHIBIT "D"

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF CONTRA COSTA

PEOPLE OF THE STATE OF CALIFORNIA          CASE NO. 05-071903-9

Vs.



JERRY SULLIVAN,
      **Defendant.**

---

### CERTIFICATE OF MAILING OF
### [ DECISION ON PRO PER PETITION FOR WRIT OF HABEAS CORPUS ]

    I, the undersigned, certify under penalty of perjury that I am a citizen of the United States, over 18 years of age, employed in Contra Costa County, Martinez, California; that I served the attached Notice, Order or Paper by causing to be placed a true copy thereof in an envelope addressed to the parties or attorneys for the parties, as shown below; which envelope was then sealed and postage fully prepaid thereon, and thereafter was deposited in the United States Mail at Martinez, California, on the date shown below; that there is delivery service by the United States Mail between the place of mailing and the place so addressed.

Jerry Sullivan (C-66878)
San Quentin State Prison 1-N-08
San Quentin, CA 94974

I declare under penalty of perjury that the foregoing is true and correct.
    Executed at Martinez, California on January 9, 2008.

                         CLERK OF THE SUPERIOR COURT

                    By:              Deputy

                    A. Jang

Petitioner's second contention stands or falls along with first contention. If the Board's decision was supported by the evidence, then the Board 's determination of unsuitability was not arbitrary and capricious.

The petition is accompanied by three exhibits. A: The reporter's transcript of the parole hearing (Hereinafter RT). B: The pre-plea report by the probation department. C: An order in an unrelated habeas corpus case in federal district court dealing with legal issues similar to those raised by petitioner.

### The Commitment Offense

At the hearing petitioner exercised his right not to discuss the facts of the commitment of fense. (RT 13.) The parole board relied on the facts set out in the pre-plea probation report.1 On July 1, 1982, petitioner and his codefendant, Mr. Buford made an appointment with Mr. and Mrs. Riley, a husband and wife team of real estate agents, to see a listed property. At the property petitioner took a hand gun out of his pants and threatened Mr. Riley. Petitioner and his codefendant took Mrs. Riley's drivers license in order to obtain her home address. Petitioner drove Mr. and Mrs. Riley' s automobile to the Riley home with his codefendant and the two victims as passengers.

At the victim's home the petitioner and his codefendant played a tape recorded message commanding the victims to obtain $150,000. According to the tape the kidnapping was the work of a criminal organization. If Mr. and Mrs. Riley did not obtain the money, Mrs. Riley would be raped and she and her husband would both be killed.

Mr. and Mrs. Riley convinced their abductors that they could not obtain that much money. Petitioner and his codefendant agreed to allow the victims to go to a local bank and withdraw a sum of cash.

Petitioner and his codefendant took Mr. and Mrs. Riley to the bank, with petitioner at the wheel of the car. Mrs. Riley went into the bank alone to withdraw the money while her husband stayed behind in the car with the two kidnappers. Inside the bank Mrs. Riley gave a note to a teller saying she had been kidnapped and asking the teller to call the police.

---

1 The pre-plea report is attached to the petition as exhibit B. The factual narrative is contained in pp.3-10 of the report.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF CONTRA COSTA

FILED

JAN -9 2008

K. TORRE CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By_____
Deputy Clerk

In re Jerry Sullivan
On Habeas Corpus

No. 071903-9

Decision on Pro Per.
Petition for Writ of
Habeas Corpus.

Underlying Case
No. 26837

### Nature of the Case

Petitioner pled to the following offenses: 1. Penal Code section 209(b) (Kidnapping to commit robbery). 2. Penal Code section 664/187 (Attempt murder). 3. Penal Code section 211 (Robbery), with an enhancement for Penal Code section 12022.5 (Use of a weapon). 4. Penal Code section 245(a) (1) (Assault with a deadly weapon or force likely to produce great bodily injury). On April 20, 1983, petitioner was sentenced to life plus seven years.

At the eleventh subsequent parole hearing, the Board of Parole Hearings (Hereinafter the Board) found petitioner unsuitable for parole for one year. The finding of unsuitability was based upon the nature of the underlying commitment offense. The parole board recognized that numerous other relevant factors weighed in favor of parole suitability. The habeas corpus petition before the court challenges that finding of unsuitability.

### Contentions of the Petition

Petitioner advances two arguments 1. In light of other factors relevant to parole suitability, the finding of the Board that petitioner was unsuitable for parole because of the nature of the commitment offense was not supported by the evidence. 2. In finding petitioner unsuitable for parole the Board applied the regulations contained in California Administrative Code Title 15 in and arbitrary and capricious way.

Petitioner's second contention stands or falls along with first contention. If the Board's decision was supported by the evidence, then the Board 's determination of unsuitability was not arbitrary and capricious.

The police arrived and petitioner drove off with Mr. Riley in the car. A chase ensued. Petitioner lost control of the car and crashed. Mr. Riley tried to get the gun from petitioner. A struggle followed during which petitioner pointed the gun at Mr. Riley' s side and pulled the trigger. The gun didn't fire.

Petitioner and Mr. Riley tumbled out of the car onto the ground. Petitioner grabbed Mr. Riley around the neck, pointed the gun to his ear and dragged him forty or fifty feet. The police surrounded petitioner and he surrendered.

When Petitioner was searched by the police the firing pin to the gun was found inside his underpants. The gun was inoperable.

### The Standard of Judicial Review

In a writ proceeding after a finding of unsuitability for parole by the Board, the court exercises very limited powers of review. A court may only determine whether there is "some evidence" to support the Board's decision based upon the factors set out in the regulations. A writ of habeas corpus seeking to overturn the Board's finding of unsuitability should be granted only where the Board's finding is devoid of a factual basis. (*In re Rosenkranz* (2004) 29 Cal. 4th 616, 658.)

### The Legal Standard for Parole Suitability

The Board will set a release date for life prisoners unless it determines that the gravity of the commitment offense is such that consideration of public safety requires a lengthier period of incarceration. (Penal Code section 3041 subdivision (b).) The regulations implementing Penal Code section 3041 are set out in California Administrative Code, Tit le 15, Section 2402. [All further references to administrative regulations are to Title 15 unless otherwise indicated.] A prisoner who would pose an unreasonable risk of danger to society shall be found unsuitable for parole regardless of the length of time served. (Section 2402 subdivision (a).) Title 15 delineates specific criteria for determining dangerousness and hence parole suitability. The criteria, however, are general guidelines and the importance to be attached to any circumstance or combination of circumstances is left to the judgment of each parole hearing panel. (Section 2402 subdivision (c).) A specific factor tending to show unsuitability is that the commitment offense was especially cruel, heinous or atrocious. (Section 2402 subdivision (c) (1).)

In determining whether a prisoner would pose an unreasonable risk of danger, the Board may rely solely on the nature of the commitment offense as especially vicious or violent to find a prisoner unsuitable for reasons of public

safety. To support such a determination there should be some evidence that the violence or viciousness of the commitment offense exceeded the minimal elements necessary for conviction of the underlying crime. (*In re Dannenberg* (2005) 34 Cal. 4th 1061, 1094-1095.)   However, the nature of the commitment offense is an immutable factor. Reliance on the commitment offense alone to deny parole can be sustained only where all other relevant factors are considered and only if the circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. (*In re Scott* (2005) 133 Cal. App. 4th 573, 595.) Thus, in addition to some evidence in the record for the various findings of the Board regarding the egregious nature of the offense, there must be some evidence that a prisoner's release would endanger public safety. ( *In re Lee* (2006) 143 Cal. App. 4th 1400, 1408.)

For the reasons stated below, the court concludes that there is some evidence to support the Board's determination that the commitment offense was especially cruel. Furthermore, the court finds some evidence supports the Board's assessment that the nature of the commitment offense rationally indicated petitioner would present an unreasonable public safety risk if released from prison.

### The Board's Decision

The Board determined that petitioner would pose an unreasonable risk of danger to society if released from prison. (RT p.63.)

The Board reached this conclusion despite finding that a number of factors spelled out in the regulations would favor a finding of parole suitability. Petitioner had no prior criminal record. He had participated in Alcoholics Anonymous to deal with a chronic alcohol problem. He had an excellent record of institutional conduct and while in prison he had acquired skills in fork lift operating, sewing machine operating, upholstery and furniture finishing. Petitioner also had a reasonable parole plan to reside with his mother upon release. (RT pp.65-67.)

The Board founded its determination of unsuitability upon the character of the commitment offense, as unusually cruel.  The Board framed its finding that the crime was unusually cruel in terms of the regulations in Title 15. The crime was unusually cruel because the victims were vulnerable. There were multiple victims as both Mr. and Mrs. Riley were kidnapped. (Section 2402 subdivision (c) (1) (A).) The plan was carried out dispassionately.  A recorded message was used, and when the victims could not supply the money they were driven to a bank to make a withdrawal. (Section 2402 subdivision (c) (1) (B).) The crime was carried out with a callous disregard for human suffering. The victims were threatened with

death. (Section 2402 subdivision (c) (1) (D).) The motive for the crime, money, was trivial in relation to the offense. (Section 2402 subdivision (c) (1) (E).) (RT pp.63-64.)

The Board also concluded that petitioner had attempted to minimize his degree of culpability and that this showed he did not realize the gravity of his offense. Although petitioner did not answer detailed questions about the offense, he claimed that at the time of the offense he believed the gun he attempted to fire at Mr. Riley was inoperable. (RT pp.13, 68-69.) The Board thought it important that petitioner develop a clearer understanding of his conduct. (RT p.70)

### Court's Analysis

As outlined above, the board matched specific facts to specific criteria mapped out in the regulations. The court recognizes that the Board's reasoning process was not completely flawless. While petitioner's conduct was unjustifiable, it is not entirely logical to conclude that the money constitutes a trivial motive for a crime when the crime is kidnapping for robbery. Nonetheless, whether the court focuses one by one on specific factors in the regulations, or uses the regulations as general guidelines to evaluate the offense, there is some evidence that the crime was especially cruel.

In addition to the necessary elements of a kidnapping this case involved threats of rape and murder as well as an attempted murder of one of the victims. Moreover, this was s not a situation in which movement of the victim, unintended at the outset, transformed an act which beg an as a robbery and no more into a kidnapping for robbery. Here the victims were moved by automobile to two different locations in a planned scheme to extract money.

Given the calculated plan to kidnap two victims and the attempt murder of one of the victims, along with petitioner's failure to acknowledge his full culpability, the court concludes that the nature of the commitment offense provides some evidence to reliably indicate that the petitioner would pose a risk of danger to society if released.

As noted above, because the decision of the Board was supported by evidence, the decision was not arbitrary and capricious.

**Disposition**

Accordingly the petition is denied

Dated _____ , 2008

Theresa Canepa
Judge of the Superior Court

Cc: Petitioner
No. 071903-9

TM/Sullivan/1/08

6

EXHIBIT    "E"

Court of Appeal, First Appellate District, Div. 4 - No. A120375
**S160498**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JERRY L. SULLIVAN on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

MAR 2 6 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re JERRY L. SULLIVAN,<br><br>on Habeas Corpus. | A120375<br><br>(Contra Costa County<br>Super. Ct. No. 071903-9) |

FILED
Court of Appeal First Appellate District

JAN 24 2008

Diana Herbert, Clerk

By_____Deputy Clerk

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Ruvolo, P.J., Reardon, J., and Sepulveda, J., joined in the decision.)

Date: _____JAN 24 2008_____    _____RUVOLO, P.J._____ P.J.